UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| DUDLEY THOMPSON,<br><br>       Plaintiff,<br><br>v.<br><br>THE COCA-COLA COMPANY,<br><br>       Defendant. | Civil Action No. 3:05CV30168 |

**DEFENDANT THE COCA-COLA COMPANY'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

  The plaintiff, Dudley Thompson, a Black man of Jamaican descent, claims The Coca-Cola Company ("Coca-Cola" or the "Company") discriminated against him when a neutral Separation Review Committee terminated him after he took an unauthorized three-week vacation on eight-hours' notice during the height of annual production at the plant where he worked.

  Thompson grounds his discrimination claims on three isolated comments, spread over his nearly four years of employment, allegedly disparaging of his Jamaican heritage. Thompson attributes two of these comments to his former Manager, Jerry Goodsell, and one to a Quality Assurance Supervisor, Donna Harris. It is undisputed that neither Goodsell nor Harris made the decision to terminate Thompson. Rather, he was terminated by a Separation Review Committee comprised of the Plant Manager, Jim Lane, HR Manager, Celine Lasonde and incoming Production Manager, Dennis Williams, in consultation with members of Coca-Cola's corporate HR and Legal departments in Atlanta. Accordingly, Thompson cannot establish any nexus between these isolated comments and his termination.

  Moreover, the Separation Review Committee concluded that Thompson violated the Plant protocol for obtaining approved vacation time because, among other violations, he had waited until just hours before his flight to notify his manager. The committee decided that

termination was appropriate because Thompson had a long history of poor performance, including missing a shift and missing an important management meeting without a valid excuse only months earlier. Accordingly, Coca-Cola had valid non-discriminatory reasons for terminating Thompson.

Coca-Cola, therefore, is entitled to summary judgment on all counts as a matter of law.

## RELEVANT UNDISPUTED FACTS

### Coca-Cola Is A Leader In Workplace Diversity.

For over 100 years, Coca-Cola has been a world leader in the production of beverages. Coca-Cola now operates in more than 200 countries, and it considers the diversity of its workforce to be one of its core assets. *See* Defendants' Local Rule 56.1 Statement In Support Of Its Motion For Summary Judgment, ("Statement"), ¶ 1. Coca-Cola has won numerous awards and accolades for its workplace diversity programs and results. *See* Statement ¶ 2. In particular, Coca-Cola has been recognized as an employer of choice for African- Americans. Coca-Cola was recently named One of the 40 Best Companies for Diversity by *Black Enterprise* magazine; One of the Top Ideal Employers for African-Americans by *Savoy Professional* magazine; One of the Top 50 Companies for Minorities by *Fortune* magazine and the recipient of the 2006 ROBIE Achievement in Industry Award from the Jackie Robinson Foundation for efforts to promote minority recruitment and advancement, just to name a few. *See* Statement ¶ 2.

In furtherance of these core values, Coca-Cola has had a comprehensive anti-discrimination and workplace dispute resolution system for all relevant periods herein. *See* Statement ¶ 3. Coca-Cola's anti-discrimination policy strictly prohibits all forms of harassment and discrimination. *See* Statement ¶ 3. The Company's dispute resolution system incorporates local management, local HR representatives and multiple alternatives. *See* Statement ¶ 6.

Employees who believe that they have been discriminated against may pursue several avenues of relief:

- **Solutions** -- A formal multi-step approach to resolving workplace issues.
- **Ombuds** -- A confidential dialog with an independent neutral resource.
- **Employee Reporting System/ERS** -- An easy-to-use, toll-free phone number to report issues of concern. *See* Statement ¶ 6.

In 2002, Coca-Cola initiated a number of **mandatory** classes to further improve its workplace environment, including Civil Treatment for Managers, Civil Treatment for Employees, Leveraging the Power of People & Ideas, Maximizing Performance and Coaching & Feedback. *See* Statement ¶ 8.

### Thompson Is Hired To Coca-Cola's Northampton Noncarbonated Beverage Facility As A Production Supervisor.

The Northampton Plant was opened in 1995. It produces various types of noncarbonated beverages ("NCB"), including juices and the POWERade® sports drink. *See* Statement ¶ 9. As a production facility, the Plant has large heavy manufacturing equipment with a number of employees on an assembly line who make sure that the product is produced and bottled consistent with the Company's specifications. *See* Statement ¶ 10. During the course of Thompson's employment, the Plant operated three production lines -- two producing drinks in bottles, and the other producing juice drinks in "pouch" containers. *See* Statement ¶ 11.

In or about June 2000, Thompson was hired as one of the Plant's four Production Supervisors. *See* Statement ¶ 12. Notably, it was Jerry Goodsell who interviewed Thompson and recommend that he be hired. *See* Statement ¶ 12. As a Production Supervisor, Thompson was responsible during his shift for the production of both lines, including the management of up to 30 line employees. *See* Statement ¶ 13. Production Supervisor is a critical job in the Plant because the production lines cannot run without their effective oversight. *See* Statement ¶ 13.

The Production Supervisors are required to arrive at least 30 minutes before their shift begins to meet with the Production Supervisor for the preceding shift. *See* Statement ¶ 14. This meeting is a critical transition period for the Plant because the outgoing Production Supervisor shares critical operations information regarding the equipment, personnel, etc. *See* Statement ¶ 14. For instance, if equipment needed adjustment, this meeting would provide an opportunity for the Production Supervisors to discuss what needed to be done. *See* Statement ¶ 14.

During Thompson's employment, the Northampton Plant had a diverse group of Production Supervisors, including Martin Duval, a Caucasian male; Diego Garcia, a Latino male; and Sean Rutherford, another African-American male. *See* Statement ¶ 15. All of the Production Supervisors reported either to the Production Manager or directly to the Plant Manager. *See* Statement ¶ 16.

**Thompson's Poor Performance Is Documented By Various Managers.**

Nearly from the outset of Thompson's tenure at Coca-Cola, he had continuous and ongoing performance problems. *See* Statement ¶¶ 21-31. Thompson received numerous verbal and written warnings regarding his performance failures from different members of management. Production Managers also provided Thompson with frequent informal "coaching sessions" aimed at helping him improve his performance. *See* Statement ¶ 22.

One recurring theme was Thompson's "chronic" tardiness. *See* Statement ¶ 23. Specifically, he was often late for the transition meetings at the beginning of the shift. *See* Statement ¶ 23. Thompson admits that he had been late on numerous occasions over the course of his employment.[1] *See* Statement ¶¶ 23-25. Thompson was also given warnings for poor leadership, failing to properly document safety incidents in a timely fashion, failing to follow plant policy regarding dumping products which resulted "in a loss of 4000 gallons of product and

---
[1] Thompson attributes his repeated tardiness on bridge construction along one of the many routes to work. *See* Statement ¶¶ 23-24. Irrespective of bridge work or alternate routes, Thompson conceded that it was not unreasonable for Coca-Cola to expect him to be on time for these transition meetings. *See* Statement ¶ 25.

created a potential environmental issue," and failing to process his subordinates' timecards to meet the payroll schedule. *See* Statement ¶ 27.

Rather than firing Thompson for these performance problems, the Company offered him successive Performance Improvement Plans (PIP) to help his performance and to track his progress in relation to the stated goals of the plan.[2] *See* Statement ¶¶ 26-32.

**Thompson's Peers Were Treated Similarly With Respect To Performance Inadequacies.**

Coca-Cola's various Production Managers were consistent in the application of Plant rules and production standards with respect to its racially diverse group of Production Supervisors. *See* Statement ¶¶ 33-43. As a result, each of the Production Supervisors were given warnings and placed on PIPs for inadequate performance for similar issues of punctuality, poor leadership and inadequate documentation. *See* Statement ¶¶ 33-43. Across the board, a failure in these important management areas was routinely documented regardless of whom the Production Manager was at the time or which Production Supervisor was found to be lacking. *See* Statement ¶¶ 33-43.

**Coca-Cola Takes Corrective And Preventative Action In Response To Complaints Of An Offensive Comment By Donna Harris.**

Donna Harris, a Caucasian female, was a Quality Assurance Supervisor in another department at the Plant.[3] *See* Statement ¶ 46. In or about April 2002, Harris said words to the effect that she was not one of Thompson's "Jamaican bimbos." *See* Statement ¶ 51. Thompson

---

[2] *See, e.g.*, (1) May 24, 2001 – Corrective Action Memo from Walter Klenzing to Dudley Thompson; (2) October 4, 2001 – Written Warning Memo from Walter Klenzing to Dudley Thompson; (3) November 11, 2001 – Monthly Performance Summary Memo from Walter Klenzing to Dudley Thompson re: performance improvement plan; (4) December 12, 2001 – Written Warning Memo from Walter Klenzing to Dudley Thompson; (5) May 30, 2003 – Performance counseling memo from Darren Plawinski to Dudley Thompson; (6) August 11, 2003 – Written Warning Memo from Darren Plawinski to Dudley Thompson. *See* Statement ¶¶ 26-32.

[3] The Quality Assurance department (QA) was responsible for testing the product as it came off the production line to ensure that the product meets Coca-Cola's quality specifications. If the product does not meet such specifications, the QA Supervisor is required to shut down the line and recalibrate or adjust the production machinery. Harris reported to the QA Manager. Harris was not Thompson's peer nor, did she have any supervisory authority over him. *See* Statement ¶ 44.

was in another part of the Plant at the time and did not hear Harris' comment. *See* Statement ¶ 51. Another employee heard and reported the comment to management. *See* Statement ¶ 51.

Coca-Cola's HR Department and management investigated the comment. *See* Statement ¶ 52. Harris was given a verbal warning and was ordered to attend a civil treatment training seminar. *See* Statement ¶ 52. Harris was also required to apologize to Thompson and the employee who heard the comment. *See* Complaint ¶ 6; Statement ¶ 53.

### On August 29, 2003, Plant Manager James Lane Reiterates Plant Protocol Regarding Vacation Time.

In response to coverage problems caused by shift swapping, Plant Manager James Lane sent an email to the four Production Supervisors reiterating the Plant protocol regarding personal vacation time. *See* Statement ¶¶ 61-64. Lane's August 29, 2003, email recounted that the following steps must be taken to obtain approved time off:

- Obtain coverage with one of the three other Production Supervisors;
- Request personal vacation time from your direct manager in writing;
- Notify the other Production Supervisors; and
- Enter the requested vacation time into a comprehensive computerized spreadsheet maintained on the Plant's computer system. *See* Statement ¶ 62.

Thompson admits that he received this email. *See* Statement ¶ 63. Also, all of the other Production Supervisors agree that Lane's email accurately reflected their own understanding of the protocol. *See* Statement ¶ 64.

### In September 2003, Thompson Is A "No Show" For A Shift And Misses An Important Management Meeting Without Excuse.

Only weeks after receiving this message from the Plant Manager, Thompson failed to show up for a shift that he agreed to work as a part of a shift swap with Martin Duval. *See* Statement ¶¶ 65-66. Thompson claimed that he and Duval had a "miscommunication" regarding

his obligation to cover the shift. *See* Statement ¶ 65. Later that month, on September 22, 2003, Thompson missed a supervisors' meeting without a valid excuse. *See* Statement ¶¶ 66-67.

**On December 19, 2003 Thompson Takes Unapproved Vacation Time During Plant's Busiest Production Period On Less Than One Day's Notice.**

The following undisputed facts show that Thompson violated the Plant protocol for obtaining approved vacation time by failing to communicate with his acting manager until just hours before his departure, failing to assure coverage for his shifts, and failing to get approval or assuring coverage for his one week extension. *See* Statement 74-77, 81-83.[4] Thompson claims that he wanted to take vacation leave to have dental work done after determining that it would be cheaper to have the work done in Jamaica rather than having the work done in the United States under Coca-Cola's dental insurance plan. *See* Statement ¶ 68. However, in violation of the protocol requiring that he request vacation from his direct manager in writing, Thompson admits that he did not seek approval from Plant Manager Jim Lane or Acting Production Manager Jerry Goodsell. *See* Statement ¶¶ 67-71. Instead, he approached Dennis Williams, a new production manager who was transitioning to the Plant, in early December 2003 regarding his proposed vacation. *See* Statement ¶ 70. Thompson asked Williams orally if he could have time off from December 20th to January 2nd to have dental work done. *See* Statement ¶ 70. There was no written request. *See* Statement ¶ 68-83. Thompson testified that Williams approved his request on the condition that Thompson "pass it by Jerry [Goodsell]," Thompson's Acting Manager at the time.[5] *See* Statement ¶ 70. It is undisputed that Williams was not Thompson's manager for purposes of approving vacation requests at the time this discussion occurred in early December 2003. *See* Statement ¶ 72. Nevertheless, even if Williams could have approved his request, that

---

[4] The facts of the notice given for Thompson's vacation are immaterial to this Motion For Summary Judgment, which should be granted in favor of Coca-Cola because the Separation Review Committee was neutral, i.e., did not include individuals whom Thompson claims to be biased against him and it reasonably concluded that Thompson should be terminated given his troubled work history.

[5] Thompson admitted that no one told him that he was to report to Williams and that Williams was assuming Goodsell's position as of the time of this conversation. He stated that, "I took liberty at that point to assume he was taking over for Jerry and then I could discuss my vacation plans with him." *See* Statement ¶ 71.

approval was expressly conditioned on Thompson getting Goodsell's approval, which he did not attempt to do until hours before his trip. *See* Statement ¶ 70.

Thompson states that he waited at least a week after this discussion before he had a face-to-face conversation with Martin Duval, in which he says Duval agreed to cover his shifts while he was away on the condition that Thompson sent him a confirming email. *See* Statement ¶ 73. Thompson waited until the night of his trip, December 19, 2003,[6] to attempt to fulfill this condition as well. *See* Statement ¶ 74. In his email, which Duval did not receive until Thompson was already gone, Thompson states, "I will be off on December 23, 27, 28, and 29. However there is a possibility that I could be off also on Jan 2, 6, and 7 if my dental work is not completed."[7] *See* Statement ¶ 75.

Furthermore, Thompson says that his first contact with Goodsell, his manager, regarding the vacation was when he called Goodsell at his home at about 7 o'clock in the evening of December 19, 2003. *See* Statement ¶ 77. Upon learning for the first time that Thompson would be gone for at least two weeks, Goodsell testified that his first and primary concern was shift coverage. *See* Statement ¶ 78. Goodsell told Thompson that he did not follow proper protocol for obtaining vacation time. *See* Statement ¶ 78. Further, Thompson left Goodsell in no position to approve Thompson's vacation because Thompson had already purchased a ticket and he told Goodsell that he was, in fact, leaving on a flight in the early morning hours of the next day December 20th. *See* Statement ¶ 79. Thus, Thompson's call was not a request for time off, but rather a notice of his departure. The Company was left with the choice of either firing him on the spot or permitting him to leave while his story could be verified.

---

[6] Thompson testified that he boarded a plane for Jamaica in the early morning hours of December 20, 2003. *See* Statement ¶ 80.
[7] Thompson did not state that he was confirming his vacation plans or reference any other previous conversation in this email. *See* Statement ¶ 76.

- 8 -

Thompson further violated the protocol when he extended his vacation from January 2, 2004. until January 9, 2004. He never made a written request for the extension. Rather, he left a voicemail for Goodsell but never actually spoke to him, which was a requirement for phoned-in requests for time off. *See* Statement ¶¶ 81-82. Nor did he communicate with Duval or the other Production Supervisors to ensure coverage during this additional week off. *See* Statement ¶¶ 81-82. Based solely on his voicemail to Goodsell, Thompson unilaterally extended his vacation until January 9, 2004. *See* Statement ¶¶ 81-82. Accordingly, Thompson did not follow any of the requisite steps of the vacation protocol for this additional week because he had not confirmed coverage in advance; he had not spoken directly with Goodsell, his manager; he had not spoken to the other Production Supervisors, and he had not entered the time into the vacation planner spreadsheet before obtaining approval from his Manager. Management was forced to scramble to assure that the shifts were covered. Goodsell himself had to fill in as a Production Supervisor to prevent gaps in coverage and Duval had to work forty consecutive days without a day off. *See* Statement ¶ 83.

**Coca-Cola Creates A Neutral Separation Review Committee To Review Thompson's Vacation.**

Upon Thompson's return, he was given an opportunity to explain himself in a meeting at the Plant. *See* Statement ¶ 85. Thompson's explanation was unsatisfactory to the Plant's management team. *See* Statement ¶ 85. Thompson never provided any medical documentation to support his story at any time. *See* Statement ¶ 86.

Consistent with Company policy, the Northampton management team formed a Separation Review Committee comprised of Lasonde, Lane, Williams and members of Coca-Cola's Corporate HR and Legal Departments in Atlanta. *See* Statement ¶ 87. This group had several conference calls to review Thompson's situation. *See* Statement ¶ 87. On or about January 22, 2004, Lasonde prepared a memorandum outlining the findings of the investigation

and recommending Thompson's termination. *See* Statement ¶ 88. The Separation Review Committee approved this recommendation determining that Thompson should be terminated for job abandonment. *See* Statement ¶ 89. Neither Goodsell nor Harris participated in any of these calls or had any role in the termination decision. *See* Statement ¶ 90.

Thereafter, Thompson's position was eliminated when the Plant eliminated one of its shifts for production reasons. *See* Statement ¶ 97.

## ARGUMENT

### I. Coca Cola Is Entitled To Summary Judgment.

Summary judgment is appropriate where there are no genuine disputes of material fact so that a party is entitled to prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if it has the potential to alter the outcome of the case under the governing law. *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 428 (1st Cir. 1996). Disputes about other facts are irrelevant and do not prevent the entry of summary judgment. *Rodrigues v. Furtado*, 950 F.2d 805, 809 (1st Cir. 1991).

The moving party need not produce evidence to negate its opponent's claim, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), but may satisfy its burden by demonstrating that the opposing party has insufficient evidence to support its case. *Id.* A failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial and mandates the entry of summary judgment in favor of the moving party. *Id.*

### II. Thompson Fails To Present A *Prima Facie* Case Of Discrimination Under Any Theory.

Although not clearly pled in separate counts, Thompson has alleged three different theories of discrimination in his complaint: (i) hostile work environment; (ii) disparate treatment

and; (iii) discriminatory discharge – all arising out of the same facts.[8] All of Thompson's various discrimination claims are governed by the familiar *McDonnell Douglas* three-step burden-shifting framework under federal or state law.[9] *Douglas v. J.C. Penney Co., Inc.*, 422 F. Supp.2d 260, 272 (D. Mass. 2006) (Ponsor, J.);[10] *McKenzie v. Brigham & Women's Hosp.*, 405 Mass. 432 (1989) (applying *McDonnell Douglas* framework to analysis of M.G.L. c. 151B discrimination claim). This burden shifting analytical framework is aimed at answering "the ultimate question" in a race discrimination case which "is whether the employee has been treated disparately *'because of race'*." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 58 (1st Cir. 1999) (emphasis added). Thompson cannot make the prerequisite showing under any of his theories.

### A. Thompson's Claim For Hostile Work Environment Fails Because There Was No Severe Or Pervasive Harassment.

To state a claim for a hostile work environment, Thompson must demonstrate that he was subjected to severe and pervasive harassment so as to alter the conditions of his employment and create an abusive work environment. *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001). The environment must be sufficiently hostile or abusive in light of all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). Thompson cannot prove that he was subjected to severe or pervasive harassment because Thompson's only evidence of a hostile environment boils down to three comments over

---

[8] In addition to a claim for Retaliation (Count IV), Thompson has alleged three nearly identical Counts (I-III) for discrimination based on his Race/Color (Count I), Ethnicity/Ancestry (Count II) and National Origin (Count III).
[9] First, the employee must establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts to the employer to "present a legitimate, non-discriminatory reason, sufficient to raise a genuine issue of material fact as to whether it discriminated against the employee, for the employment decision." *Quinones v. Buick*, 436 F.3d 284, 289 (1st Cir. 2006). Finally, the employee must show that the employer's non-discriminatory reason was a "mere pretext," and that the "real reason" for the employment decision was discrimination. *Id*.
[10] This case is of particular note because it involves discrimination claims filed by Thompson's attorney on behalf of another individual. This Court found in favor of the defendant/employer on all counts as it should here, because the not clearly pled allegations of vague stray remarks in the complaint were insufficient to overcome the employer's documented legitimate non-discriminatory reasons for the termination.

the course of his nearly four-year tenure with Coca-Cola. *See Williams v. Astra USA, Inc.*, 68 F. Supp.2d. 29, 36 (D. Mass. 1999) (dismissing hostile environment claim because five incidents of racial slurs in a three-year period insufficient).

The first comment occurred in April 2002, almost two years before Thompson's termination. Donna Harris, a Quality Assurance Supervisor, said words to the effect that she was not one of Thompson's "Jamaican bimbos." *See* Statement ¶ 51. It is undisputed that Harris made this comment only once, to another employee, and that Thompson did not hear it. *See* Statement ¶ 51. It is further undisputed that Harris was not in Thompson's department, had no management activity over him, and her comment did not affect his work performance. *See* Statement ¶ 44. Coca-Cola's HR Department and management investigated and addressed this comment. *See* Statement ¶¶ 52-53. Harris was given a verbal warning and was ordered to attend a civil treatment training seminar. *See* Statement ¶ 52. Harris was also required to apologize to Thompson and the employee who heard the comment. *See* Statement ¶ 53. Moreover, the comment is not directed as Jamaicans, nor is it severely derogatory. Thompson even testified that he took the statement to refer to a "pretty, good-for-nothing woman. Like in reference to blondes for instance." *See* Statement ¶ 51. Therefore, there is no factual basis from which the Court could conclude that Harris' comment was severe or pervasive enough to alter the conditions of Thompson's employment.

Thompson attributes two allegedly derogatory statements to Jerry Goodsell. *See* Statement ¶¶ 54-57. The first occurred at a 2002 Christmas party, in which Thompson alleges that Jerry Goodsell stated, "I hate Jamaican music and Jamaicans." *See* Statement ¶ 54. The other comment allegedly occurred sometime in the Fall of 2003, when Thompson alleges that Goodsell said "I am going to deal with you, you fucking Jamaican."[11] *See* Statement ¶ 56. Both

---

[11] Prior to Thompson's deposition, he stated this allegation without the "you fucking Jamaican" reference. *See* Complaint ¶8. Indeed, this allegation is conspicuously absent from his complaint and MCAD charge.

comments occurred long before Thompson's vacation request or his termination in 2004. Thompson never reported either of the comments through any of the available reporting mechanisms provided by Coca-Cola. *See* Statement ¶¶ 55, 57. Neither comment affected Thompson's work performance. Thus, these two stray comments are neither frequent nor severe enough to establish a hostile work environment. *See, e.g. Douglas*, 422 F. Supp.2d at 52 (dismissing racial harassment claim because a few stray racial remarks and allegedly discriminatory performance reviews were <u>not</u> severe and pervasive even under a "generous" reading of Plaintiff's allegations); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) ("Not every unpleasant workplace is a hostile environment. . . <u>The workplace that is actionable is one that is hellish.</u>") (emphasis added). Accordingly, Thompson's hostile work environment claim fails as a matter of law.[12]

**B.     Thompson's Claim For Discriminatory Discharge Fails Because He Was Not Performing His Job Adequately.**

To establish a *prima facie* case for discriminatory discharge, Thompson must show that he was performing his job at a level that rules out the possibility that he was fired for job performance. *Benoit Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 1999); *Douglas*, 422 F. Supp.2d at 273. Thompson cannot state a *prima facie* case because he was not performing his job adequately.

Throughout Thompson's tenure with Coca-Cola, he was continuously a sub-par performer. Despite being given numerous opportunities to improve, Thompson routinely failed to address many serious performance issues. For example, Thompson admits that he was late for work on numerous occasions. *See* Statement ¶ 23. Thompson's managers expected him at the

---

[12] Even assuming Thompson could state a claim for a hostile environment, which he cannot, Coca-Cola may still avoid liability by showing that (1) it exercised reasonable care to prevent and correct promptly any harassing behavior, and (2) Thompson failed to take advantage of any preventive or corrective opportunities provided by Coca-Cola. *See Burlington Indust., Inc. v. Ellerth*, 324 U.S. 742, 762 (1998); *Faragher*, 524 U.S. at 807. By failing to report two of these three alleged incidents, Thompson has failed to take advantage of Coca-Cola's various corrective procedures, of which he admits to being made aware.

Plant at least 30 minutes prior to the start of the shift. *See* Statement ¶ 14. Thompson agreed that this requirement was not unreasonable, but yet he refused to comply. *See* Statement ¶ 25. Thompson also received warnings for sloppy or missing paperwork, poor communication and missed meetings. *See* Statement ¶¶ 26-32. In addition, Thompson failed to communicate with Duval regarding a shift swap in September 2003, which left the shift uncovered. *See* Statement ¶ 65. Later that month, Thompson missed an important meeting without a valid excuse. *See* Statement ¶¶ 66-67. Any or all of these performance problems could justify termination. Therefore, Thompson cannot establish the adequacy of job performance prong of the *prima facie* case.

C.  **Thompson's Claim For Disparate Treatment Fails Because Coca-Cola Did Not Discriminate Against Thompson In The Terms Or Conditions Of His Employment.**

To state this claim, Thompson must prove that "for the same or similar conduct he was treated differently than similarly situated employees." *See Wyse v. Summers*, 100 F. Supp.2d 69, 76 (D. Mass. 2000) (*citing McDonald Douglas* 411 U.S. at 802). As a threshold matter, Thompson must "be able to provide comparative evidence in order to raise an inference that others similarly situated to him in all relevant respects were treated differently by the employer." *See Wyse*, 100 F. Supp.2d at 76; *Conward v. The Cambridge School Committee*, 171 F.3d 12, 20 (1st Cir. 1999) (finding employee's evidence of three other disciplinary actions taken against other employees not to be comparable, thus, plaintiff failed to present adequate evidence). "It is boilerplate in disparate treatment cases, that the absence of any showing that the plaintiff was treated differently from similarly situated employees requires a finding for the defendant." *Thomas v. Digital Equipment Corp.*, 702 F. Supp. 22, 25 (D. Mass. 1988). Thompson cannot show that similarly situated employees were treated differently in similar circumstances.

Thompson claims that Donna Harris, a white female, was given unapproved "vacation" time. *See* Statement ¶ 47. The undisputed facts demonstrate that Thompson is not comparable to

- 14 -

Harris because she was in a different department, and their positions and work responsibilities were entirely different. *See Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129-130 (1997) ("plaintiff must identify other employees to whom he is similarly situated in terms of performance, qualifications, and conduct, without such differentiating or mitigating circumstances that would distinguish their situations").

Furthermore, the circumstances of their requests for leave were different. Thompson concedes that he does not "know" the circumstances of Harris' absences; he merely assumed that her absences were unapproved.[13] *See* Statement ¶ 50. The undisputed facts of Harris' absences, unknown to Thompson, reveal that she received federally mandated leave pursuant to the FMLA because of significant, documented health problems suffered by her young daughter. *See* Statement ¶¶ 48-49. Furthermore, Harris submitted the required medical documentation to justify her absences. *See* Statement ¶ 49. Thompson, by contrast, never requested medical leave for his vacation, and he admits that he <u>never</u> submitted any medical documentation regarding the purported reasons for his trip and three-week absence. *See* Statement ¶ 86. Thompson's unapproved last minute vacation to Jamaica and unauthorized extension, therefore, is not comparable to Harris' approved federally mandated FMLA leave.

As to Thompson's true peers, the other Production Supervisors all received performance counseling memos and all were placed on Performance Improvement Plans at various times to improve performance deficiencies. *See* Statement ¶¶ 33-43. Thompson's peers were documented for similar performance issues, such as inadequate documentation and tardiness. *See* Statement ¶¶ 33-43. This fact, coupled with the fact that the group of Production Supervisors at the Northampton Plant is the picture of diversity, i.e., one Caucasian, one Latino, and two African-American, demonstrates that Coca-Cola treated Thompson no differently

---

[13] It is black letter law that "summary judgment may be appropriate if the non-moving party rests [its case] merely upon conclusory allegations, improbable intents, and <u>unsupported speculation</u>." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (emphasis added).

because of his race than it did others.[14] Accordingly, Thompson's comparisons do not advance his discrimination theories, which fail as a matter of law.

### III. Coca Cola Had Legitimate Business Reasons For Terminating Thompson.

Even if Thompson could establish a *prima facie* case under any of his theories, which he cannot, Coca-Cola has stated legitimate business reasons for terminating him. Under settled discrimination law, Coca-Cola's stated reasons for terminating Thompson need not be good reasons. They must simply be legitimate and not a cover-up for discrimination. "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. . . . [the] focus is to be on the employer's motivation, . . . not its business judgment." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir. 1979); *see Mesnick v. General Electric Co.*, 950 F.2d 816, 825 (1st Cir. 1991) ("courts may not sit as super personnel departments, assessing the merits – or even rationality – of employers' non-discriminatory business decisions") (emphasis added). Moreover, "an employer is entitled to make its own policy and business judgments, and may, for example, fire an adequate employee if his reason is to hire one who is even better, as long as this is not a pretext for discrimination." *Loeb,* 600 F.2d at 1012 n. 6.

Thompson was terminated in January 2004, for taking an unauthorized two-week vacation to Jamaica on eight hours' notice, which he extended to three weeks without authorization. Even taking Thompson's own recitation of the facts, his actions warranted termination because he failed to follow multiple aspects of the Company's vacation protocol. *See Vazquez Gonzalez v. K-Mart Corp.*, 940 F. Supp. 429, 432 (D.P.R. 1996) (upholding summary judgment for employer where employee was terminated for abandoning her position);

---

[14] Moreover, Thompson's peers state that they never observed any discrimination, nor did Thompson ever complain of unfair treatment to them. *See* Statement ¶¶ 58-60.

*Blick v. Pitney Bowes Mgmt. Serv., Inc.*, No. 93-3618-C, 1996 WL 414029, at *3 (Mass. Super. 1996) (termination for reasons stated in employee handbook not pretextual).

### IV.     There was No Pretext Because The Termination Decision Was Made By Neutral Decisionmakers.

Thompson has built his discrimination claims solely upon the vague 2002 "Jamaican Bimbo" comment by Harris and the recently added allegations that Jerry Goodsell criticized Jamaicans on two occasions. *See* Statement ¶ 57. But settled case law clearly holds that "stray remarks" like these, with no other evidence of discrimination, are too vague and insubstantial to establish a pretext to rebut Coca-Cola's legitimate business reasons for terminating Thompson. "[S]tray workplace remarks normally are insufficient, standing alone to establish either pretext or the requisite discriminatory animus." *Gonsalez v. El Dia, Inc.*, 304 F.3d 63, 70 (1st Cir. 2002); *see also Baralt v. Nationwide Mutual Ins. Co.*, 251 F.3d 10, 17 (1st Cir. 2001) (stray remarks "can be suggestive but are often found to be insufficient to prove discrimination in the absence of more meaningful evidence").

Moreover, "even if the remarks are relevant for the pretext inquiry, their probativeness is circumscribed if they were made in a situation temporarily remote from the date of the employment decision, or if they were not related to the employment decision in question or were made by nondecisionmakers." *McMillan v. Massachusetts Society for Prevention of Cruelty to Animals*, 140 F.3d 288, 300 (1st Cir. 1998). For instance, in *Straughn v. Delta*, 250 F.3d 23, 25 (1st Cir. 2001), the First Circuit Court of Appeals held that a supervisor's use of an offensive mimicking "southern black" accent "without more, is not probative of pretext on the part of Delta, given (i) the absence of any discernible contextual or temporal relationship between the discharge decision and the workplace accent used by [supervisor], (ii) the demonstrably self-sufficient basis for the management recommendation by [another employee] to discharge

[Plaintiff] due to her persistent work-related dishonesty, and (iii) the distinctly subordinate role [supervisor] played in the dismissal decision."

Here, two of the three alleged comments are temporally remote from the termination decision by more than a year, and none of these alleged comments involved the termination process or decision. Moreover, it is undisputed that Harris had no role in Thompson's termination whatsoever, and Goodsell merely reported Thompson's call to him on December 19th and participated in the meeting in January upon Thompson's return. *See* Statement ¶ 90. He did not have any role in the termination discussions, and he testified that he lacked the authority to terminate an employee even if he wanted to[15]. *See Frieze v. Boatmen's Bank of Bolton*, 950 F.2d 538, 541 (1st Cir. 1991) (statements by various employees could not support an instance of discrimination because those employees "did not take part in the decision to discharge").

Finally, any suspicion of pretext is dispelled by Coca-Cola's affirmative efforts to avoid bias. The Company formed a <u>neutral</u> committee whose member's were not involved in any of Thompson's alleged incidents of discrimination. *See* Statement ¶¶ 87-90. This committee reviewed the evidence independently and made the termination decision. *See* Statement ¶¶ 87-90. Thompson, therefore, has set forth no evidence that Coca-Cola's reasons for his termination were a pretext for discrimination.

V.      **Thompson's Retaliation Claim Fails Because It Lacks Essential Elements.**

To establish a *prima facie* case of retaliation, an employee must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse job action. *Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005) (articulating the standard for retaliation under both federal and state law). *See also Douglas,* 422 F. Supp.2d at 278; *Mole v. Univ. of Mass.*, 442 Mass. 583, 595 (2004).

---

[15] *See* Statement ¶ 90.

For a retaliation claim "to survive a motion for summary judgment, the plaintiff must point to evidence in the record that would permit a rational fact finder to conclude that the employment action was retaliatory." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 57 (1st Cir. 2000), *citing King v. Town of Hanover*, 116 F.3d 965, 968 (1st Cir. 1997). It is insufficient to allege simply that one complained and was disciplined. *Id.* The inference of causation arises only "where adverse employment actions follow close on the heels of protected activity." *Mole*, 442 Mass. at 595. Once established, such an inference has a limited lifespan, and "as the elapsed time between those two events becomes greater the inference weakens and eventually collapses." *Id.*

Here, Thompson's only candidate for a protected activity is his unofficial complaint about Harris' comment to another employee. This incident occurred in Spring 2002, and it is undisputed that the Company investigated and appropriately disciplined Harris for her comment. *See* Statement ¶¶ 52-53. Moreover, Harris had no role in Thompson's termination. *See* Statement ¶ 90. Accordingly, there is no causal connection to Thompson's termination nearly two years later.

Furthermore, as noted in *Mole*, a causal inference is broken when an action is taken by a neutral decision-maker. *Id.* at 598-99. Accordingly, the "mere fact that [an allegedly] retaliating supervisor *provides some of the information* upon which a decision is based or initially recommends the adverse action to someone higher up in the organization, does not necessarily mean that the decision-maker lacks sufficient independence from the supervisor to be independent for these purposes." *Id.* at 599 (emphasis added). Thus, even if Thompson could generate some sort of inference that Goodsell held a discriminatory animus toward him, the fact that Goodsell participated in the fact finding meeting upon Thompson's return from Jamaica

does not establish that the Separation Committee acted improperly in deciding, on its own, to discharge Thompson.

## CONCLUSION

For these reasons, Coca-Cola respectfully requests summary judgment in its favor on all counts.

THE COCA-COLA COMPANY

By its attorneys,

Holland & Knight LLP

/s/ Damon P. Hart
Steven H. Wright (BBO No. 535185)
Damon P. Hart (BBO No. 644586)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: September 1, 2006


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 1, 2006.

/s/ Damon P. Hart
Damon P. Hart

# 3952877_v5