UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | |
|---|---|
| DUDLEY THOMPSON,<br><br>        Plaintiff,<br><br>v.<br><br>THE COCA-COLA COMPANY,<br><br>        Defendant. | Civil Action No. 3:05CV30168 |

**DEFENDANT'S THE COCA-COLA COMPANY'S STATEMENT OF
UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, defendant The Coca-Cola Company ("Coca-Cola" or the "Company") respectfully submits this statement of *material* facts to which Coca-Cola contends there is no genuine issue in support of its Motion For Summary Judgment.

**Coca-Cola Is A Leader In Workplace Diversity.**

1. For over 100 years, Coca-Cola has been a world leader in the production of non-alcoholic beverages. Affidavit of James Lane ("Lane Aff.") ¶ 2. Coca-Cola now operates in more than 200 countries and it considers the diversity of its workforce to be one of its core assets. *See* Lane Aff., ¶ 3.

2. Coca-Cola has won numerous awards and accolades for its workplace diversity programs and results. In particular, Coca-Cola has been recognized as an employer of choice for African-Americans. Coca-Cola was recently named: One of the 40 Best Companies for Diversity by *Black Enterprise* magazine; One of the Top Ideal Employers for African-Americans by *Savoy Professional* magazine; One of the Top 50 Companies for Minorities by *Fortune* magazine and the recipient of the 2006 ROBIE Achievement in Industry Award from the Jackie Robinson Foundation for efforts to promote minority recruitment and advancement, just to name

a few. A complete list of Coca-Cola's diversity awards and accolades is attached to Lasonde Aff. ("Lasonde Aff.) as Exhibit 1.

3. In furtherance of these core values, Coca-Cola has a comprehensive antidiscrimination and workplace dispute resolution system. See Exh. 2, attached to Lasonde Aff. Coca-Cola's policy strictly prohibits all forms of harassment and discrimination. See Exh. 2, attached to Lasonde Aff.

4. According to the policy, "if an employee has concerns or feels he/she or a co-worker has been subjected to harassment or discrimination the employee should contact the appropriate Human Resources representative immediately." Further, the Human Resources representative must take immediate action by conducting an investigation." See Exh. 2, attached to Lasonde Aff.

5. The policy also requires managers to "take responsibility to prevent acts of discrimination and harassment." Moreover, all employees are responsible for "maintaining an environment that prohibits discrimination and harassment." See Exh. 2, attached to Lasonde Aff.

6. In addition to local management and local HR representatives, an employee who has a dispute or who feels that they have been discriminated against has several avenues of reporting and resolving these concerns:

- **Solutions**--A formal multi-step approach to resolving workplace issues;

- **Ombuds**--A confidential dialog with an independent neutral resource.

- **Employee Reporting System/ERS**—An easy-to-use, toll-free phone number to report issues of concern. See Exhs. 3, 4, and 5, attached to Lasonde Aff.

7. Coca-Cola uses a variety of means to inform its employees about these policies and reporting avenues including emails, intranet postings, bulletin board postings and brochure mailings. See Lasonde Aff., ¶ 7.

8.  In 2002, Coca-Cola initiated a number of **mandatory** classes to further improve its workplace environment including:

- Civil Treatment for Managers
- Civil Treatment for Employees
- Leveraging the Power of People & Ideas
- Maximizing Performance
- Coaching & Feedback

See Lasonde Aff., ¶ 8.

### Thompson Is Hired To Coca-Cola's Northampton Noncarbonated Beverage Facility As A Production Supervisor.

9.  The Northampton Plant was opened in 1995 and it produces various types of noncarbonated beverages ("NCB") including juices, and Coca-Cola's POWERade® sports drink. See Lane Aff., ¶ 4.

10.  As a production facility, the Plant has large heavy manufacturing equipment with a number of employees on an assembly line who make sure that the product is produced and bottled consistent with the Company's specifications for each type of product. See Lane Aff., ¶ 5.

11.  During the course of Thompson's employment, the Plant operated three production lines — two producing bottled drinks such as POWERade® and the other producing juice drinks in "pouch" containers mainly marketed to kids. See Lane Aff., ¶ 6.

12.  In or about June 2000, Jerry Goodsell interviewed Thompson and recommended that he be hired. As a result, Thompson was hired as one of the Plant's four Production Supervisors. See Lane Aff., ¶ 7; Lasonde Aff., ¶ 11. Deposition of Dudley Thompson ("Thompson dep.") at 105-106.[1]

---

[1] Relevant excerpts of the Thompson Dep. are attached to Affidavit of Damon P. Hart, Esq. ("Hart Aff.") as Exhibit 1.

13. In this position, Thompson was responsible for the production of all lines during his shift including the management of up to 30 line employees reporting to him during the shift. Production Supervisor is a critical job in the Plant because the production lines cannot run without the effective oversight of the Production Supervisors. Thompson Dep. at 106-108.

14. The Production Supervisors are required to arrive at least 30 minutes before the beginning of the shift to meet with the Production Supervisor for the preceding shift. See Thompson Dep. at 108. This meeting is a critical transition period for the Plant because the outgoing Production Supervisor shares critical production information regarding the equipment, personnel, etc. See Thompson Dep. at 53-54; Lane Aff., ¶ 8. For instance, if adjustments needed to be made to the equipment, this meeting would provide an opportunity for the Production Supervisors to discuss what needed to be done. See Thompson Dep. at 53-54; Lane Aff., ¶ 8.

15. While Thompson was employed, the other three Production Supervisors were as follows: Martin Duval, a White male, Diego Garcia, a Latino male, and Sean Rutherford, an African-American male. See Deposition of Martin Duval ("Duval Dep. ") at 11-12[2], Affidavit of Diego Garcia ("Garcia Aff.") ¶ 5; Affidavit of Sean Rutherford, ("Rutherford Aff.") ¶ 5.

16. All of the Production Supervisors reported either to the Production Manager or directly to the Plant Manager. See Lane Aff., ¶ 9.

17. From late 2000 until mid 2003, Thompson and the other Production Supervisors reported to Klenzing. Thompson Dep. at 112.

18. From mid 2003 until late August 2003, Thompson and the other Production Supervisors reported to Plawinski. In late August 2003, Plawinsky resigned and moved to

---

[2] Relevant excerpts of the Duval Dep. are attached to Hart Aff. as Exhibit 2.

Florida abruptly with little notice. Thompson Dep. at 112-114; Deposition of Jerry Goodsell ("Goodsell Dep.") at 15-16.[3]

19. From late August 2003 until early January 2004, Thompson and the other Production Supervisors reported to Goodsell, who was filling in as the Production Manager on an interim basis. Goodsell Dep. at 18; Thompson Dep. at 113.

20. Dennis Williams transferred to Northampton from another Coca-Cola facility in New Jersey effective as of January 1, 2004. Deposition of Dennis Williams ("Williams Dep.") at 42-44.[4] In December 2003, Williams visited the Northampton Plant to familiarize himself with the Plant's equipment, personnel and procedures, but he had no management responsibilities. Williams Dep. at 53; Goodsell Dep. at 19-20.

**Thompson's Poor Performance Is Documented By Various Managers.**

21. Nearly from the outset of Thompson's tenure at Coca-Cola, he had continuous and ongoing performance problems in his position as Production Supervisor. See Thompson Dep. at 56-64 and Exhs. 37, 10; Exhs. 6-11 attached to Lasonde Aff.

22. Thompson received numerous verbal and written warnings regarding his performance failures from at least three different members of management over the course of three years including Klenzing, Plawinski, and Goodsell. He also received frequent informal "coaching sessions" aimed at helping him improve his performance. See Thompson Dep. at 56-64 and Exhs. 37, 10; Exhs. 6-11 attached to Lasonde Aff.

23. One recurring theme in Thompson's performance problems was his "chronic" tardiness. Specifically, he was often late for the transition meetings at the beginning of the shift.

---

[3] Relevant excerpts of the Goodsell Dep. are attached to Hart Aff. as Exhibit 4.
[4] Relevant excerpts of the Williams Dep. are attached to Hart Aff. as Exhibit 6.

Thompson admits that he was late on a number of occasions throughout his employment. See Thompson Dep. at 53-54; 57; 62-63.

24. Thompson attributes his repeated tardiness on construction on a bridge along his route to work:

> A. I was late, and the explanation was that I lived in Amherst. At that point in time, the bridge that connected Northampton and Hadley was being extended and the traffic pattern was unpredictable. Even when I made an effort to get there, I would be hindered, and this was brought to the attention of my bosses.

Thompson Dep. at 53.

25. Thompson conceded that it was not unreasonable for Coca-Cola to expect him to be on time for these transition meetings. See Thompson Dep. at 53-54.

26. The Company offered Thompson Performance Improvement Plans (PIP) on a number of occasions to help his performance and to track his progress in relation to stated goals of the plan. See Thompson Dep. at 83-84; Exhs. 10, 37; Exhs. 6-11 attached to Lasonde Aff.

27. For instance, Thompson was placed on a PIP as reflected in the May 24, 2001 Corrective Action Memo from Walter Klenzing documenting Thompson's failure to adequately supervise his staff, failure to follow Company Policies regarding dumping product which "resulted in a loss of 4,000 gallons, and created a potential environmental issue," and demonstrating inadequate judgment. The memo also noted that Thompson had received "frequent one on one counseling to help build and improve [his] supervisory skills," prior to receiving this memo. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 6.

28. Thompson was placed on a PIP as reflected in the October 4, 2001 Written Warning Memo from Walter Klenzing for a host of performance issues including being chronically late for meetings at the beginning of his shift, poor leadership of his shift, and failure to properly document safety and quality incidents in a timely fashion among other issues. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 7.

29. On or about November 14, 2001, Thompson was given a memo from Walter Klenzing measuring his progress against the goals set forth in the October 4, 2001, memo and in an October 20, 2001 meeting. Thompson had shown no improvement with respect to the punctuality issues and had shown improvement in only one of the nine performance issues noted in the previous memo. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 8.

30. On or about December 12, 2001, Thompson received a Written Warning from Walter Klenzing, which again evaluated Thompson's performance based upon the goals set forth in the October 4, 2001, memo. Thompson was found to be lacking in 3 of the 5 documented minimum expectations for Production Supervisors. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 9.

31. On May 30, 2003, Thompson received a Performance Counseling Memo from Darren Plawinski regarding Thompson's failure to provide required documents regarding safety and quality incidents. Plawinski noted that Thompson's chronic tardiness continued and that he consistently failed to process his subordinate's timecards in a timely fashion to meet the payroll schedule. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 10.

32.	On August 11, 2003, Thompson received a Written Warning Memo from Darren Plawinski recapping the previous memos and verbal counseling sessions noting that Thompson had failed to bring his performance to a "successfully meets" expectations level. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 11.

**Thompson's Peer's Were Treated Similarly With Respect to Performance Inadequacies.**

33.	Each of the Production Supervisors were given warnings and placed on PIPs for inadequate performance by Coca-Cola. Thompson Dep. at 83-84.

**Martin Duval.**

34.	For instance, Martin Duval, a white male, was placed on a PIP on June 4, 2003 as documented in a Performance Counseling Memo from Darrin Plawinski. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 15. The memo also addressed unsatisfactory quality incident, downtime and payroll documentation. See *id.*

35.	On July 15, 2003, Duval was given a Performance Counseling Memo from Darrin Plawinski, which measured his progress in relation to the goals set forth in the June 4, 2003, memo. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 17. Plawinski noted that Duval had improved in some areas but still needed to work on others. Plawinski set a follow-up meeting for August 15, 2003 to revisit these issues. See *id.*

36.	Duval also testified about receiving a warning for failing to maintain production standards from Goodsell, in 2005. See Duval Dep. at 12.

**Diego Garcia.**

37.	Diego Garcia, a Latino male, was placed on a PIP as reflected in the March 1, 2001, Written Performance Improvement Plan Memo that he received from Dirk Lunsford regarding performance deficiencies in his leadership, punctuality i.e. arriving to the shift at least 30 minutes prior to the shift start time, personal use of company computers on lunch breaks, and

the completion of required documentation. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 12.

38. On or about May 30, 2003, Garcia received a Performance Counseling Memo from Darrin Plawinski, which noted Garcia's failure to provide required documents regarding safety and quality incidents and that he was inconsistent in the processing of his subordinate's timecards in a timely fashion to meet the payroll schedule. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 13.

39. On or about July 15, 2003, Garcia received a Performance Counseling Memo from Darrin Plawinski, which measured his progress against the goals set forth in the May 30, 2003 memo. The memo stated as follows "Diego, you have show [sic] improvements in many of the areas that we have previously discussed." It also pointed out a number of areas in which Garcia needed further improvement. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 18.

40. Garcia testified that he had disagreements with Goodsell and even that Goodsell yelled at him but that Goodsell <u>never</u> made comments about his Hispanic heritage. Garcia further stated he never heard Goodsell make any racial comments. See Deposition of Diego Garcia ("Garcia Dep.") at 26, 29.[5]

41. Garcia stated that he witnessed Goodsell yelling at other white employees in a similar fashion. Garcia Dep. at 26, 29.

**Sean Rutherford.**

42. Sean Rutherford, an African-American male, was placed on a PIP for issues noted in a June 2, 2003 Performance Counseling Memo from Darrin Plawinski. The plan was aimed at addressing Rutherford's failure to provide required documents regarding safety and quality

---

[5] Relevant excerpts of the Garcia Dep. Are attached to Hart. Aff. as Exhibit 3.

incidents and that he was inconsistent in the processing of his subordinate's timecards in a timely fashion to meet the payroll schedule. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 14.

43. On or about July 14, 2003, Rutherford received a Performance Counseling Memo from Darrin Plawinski, which measured his progress against the goals set forth in the June 2, 2003 memo. The memo stated as follows "Sean you have shown improvement in many of the areas that we have previously discussed. You have volunteered for project work & assignments and have been going well towards their completion." It also pointed out a number of areas in which Rutherford needed further improvement. A true and accurate copy of this memorandum is attached to Lasonde Aff. as Exhibit 16.

**Donna Harris Takes FMLA Leave To Attend To Her Sick Daughter.**

44. The Quality Assurance department (QA) is responsible for testing the product as it comes off of the production line to ensure that the product meets Coca-Cola's quality specifications. If the product does not meet such specifications, then the QA Supervisor is required to shut down the line and recalibrate or adjust the production machinery. Thompson Dep. at 38-39.

45. When the QA Supervisor determines that the line needs to be shut down, it had a negative impact on the Production Supervisors production results for that shift. Thompson Dep. at 39.

46. Donna Harris, a white female, was a Quality Assurance Supervisor. Thompson Dep. at 38-39.

47. Thompson claims that Donna Harris, a white female, was given unapproved "vacation" time. Complaint ¶ 14; Thompson Dep. at 88-94.

48.     In 2002, Harris was granted a number of absences pursuant to the FMLA because of significant health problems suffered by her young daughter.  Lasonde Aff. ¶¶ 9-10.

49.     Harris submitted the required medical documentation to justify her absences. Lasonde Aff. ¶¶ 9-10.

50.     Thompson concedes that he does not "know" the circumstances of Harris' absences; he merely assumed that her absences were unapproved.  Thompson Dep. at 88-94.

**Coca-Cola Takes Corrective and Preventative Action In Response To Complaints Of An Offensive Comment By Donna Harris.**

51.     In or about April 2002, Harris said words to the effect that she was not one of Thompson's "Jamaican bimbos."[6]  Thompson was in another part of the Plant at the time and did not hear Harris' comment.  Another employee heard and reported it to management.  Thompson Dep. at 33-34, 37-38.

52.     Coca-Cola's HR Department and management investigated the comment.  As a result, Harris was given a verbal warning and was ordered to attend a civil treatment training seminar.  Deposition of James Lane ("Lane Dep.") at 17-21.[7]

53.     Harris was also required to apologize to Thompson and the employee who heard the comment.  See Complaint ¶ 6; Lane Dep. at 17-21.

**Thompson Claims That Goodsell Made Two Derogatory Comments About Jamaicans.**

54.     At a 2002 Christmas party Thompson alleges that Jerry Goodsell stated, "I hate Jamaican music and Jamaicans."  Thompson Dep. at 6.  Thompson was unable to articulate what he meant by the reference to Jamaican or African-American music.  Thompson Dep. at 78-79.

55.     Thompson never reported this alleged incident.  Thompson Dep. at 11.

---

[6] Thompson testified that he took this statement to refer to a "pretty, good-for-nothing" woman.  Like in reference to blondes for instance."  Thompson Dep. at 34.

[7] Relevant excerpts of the Lane Dep. are attached to Hart Aff. as Exhibit 5.

56.     Sometime in the Fall of 2003, Thompson alleges that Goodsell said "I am going to deal with you, you fucking Jamaican,"[8] during an argument in Thompson's office. Thompson Dep. at 14-15.

57.     Again, Thompson did not report this alleged incident.[9] Thompson Dep. at 14-15.

**Thompson's Diverse Group Of Peers Never Witnessed Any Discriminatory Comments or Actions.**

58.     Duval testified that although Goodsell yelled at him and sometimes used profanity, but that he never heard of Goodsell making any racial comments. Duval Dep. at 14-15, 40.

59.     Garcia testified that he had disagreements with Goodsell and even that Goodsell yelled at him but that Goodsell <u>never</u> made comments about his Hispanic heritage. Garcia Dep. at 26. Garcia further stated he never heard Goodsell make any racial comments. Garcia Dep. at 26.

60.     Rutherford, an African-American states that:

> I am an African-American and I have never been treated differently in the terms and conditions of my employment by Coca-Cola because of my race. Furthermore, to the best of my memory, Mr. Thompson never made any complaints to me that he thought he was being treated differently by Coca-Cola because of his race.
> Moreover, I am not aware of any instance in which Coca-Cola in the Northampton plant employees were treated differently in the terms or conditions of their employment because of their race. Rutherford Aff. ¶¶ 5 and 6.

---

[8] In paragraph 8 of his Complaint Thompson stated this allegation without the "you fucking Jamaican" reference. See Complaint ¶8. Indeed, this allegation is conspicuously absent from his complaint and MCAD charge.
[9] Thompson admits that he bases his claim on a total of three offensive comments. Thompson Dep. at 5-6.

### On August 29, 2003, Plant Manager James Lane Reiterates Plant Protocol Regarding Vacation Time.

61. On August 29, 2003, Plant Manager James Lane sent an email to the four Production Supervisors reiterating the Plant protocol regarding personal vacation time in response to coverage problems caused by shift swapping. See Thompson Dep. at 191-193.

62. Lane's email recounted that the following steps that needed to be taken to obtain approved time off:

- Obtain coverage with one of the three other Production Supervisors,
- Request personal vacation time from my direct manager in writing,
- Notify the other Production Supervisors, and
- Enter the requested vacation time into a comprehensive computerized spreadsheet maintained on the plant's computer system.

See Thompson Dep. at 191-193.

63. Thompson admits that he received this email. Thompson's Dep. at 191-193.

64. Also, all of the other Production Supervisors agree that Lane's email captures their understanding of this protocol. Rutherford Aff. ¶ 7; Garcia Aff. ¶ 7; Duval Aff. ¶ 8.

### In September 2003, Thompson Is A "No Show" For A Shift And Misses An Important Management Meeting Without Excuse.

65. Only weeks after receiving this message from the Plant Manager, Thompson failed to show up for a shift that he agreed to work as a part of a shift swap with Martin Duval. See September 16, 2003, memorandum from Goodsell to Lane attached to the Affidavit of Celine Lasonde as Exhibit 19. Thompson attributes this missed shift to a miscommunication with Martin Duval. Thompson Dep. at 118-122.

66. Thompson also missed a supervisors meeting on September 22, 2003 without excuse. A true and accurate copy of this email is attached to Lasonde Aff. as Exhibit 20.

67. Goodsell sent Thompson an email on September 23, 2003 stating:

> Dudley,
>
> I was very disappointed as were your fellow supervisors, that you did not show up for the supervisor's meeting yesterday. We had a lot of things to cover that needed consensus in order to set up an efficient working process to eliminate important mistakes. As a result, I a [sic] have left the decision process up to them and anything that they submit, you will comply with. You accepted this invitation 12 days ago and forgot. This is unprofessional and unacceptable, and I will no longer tolerate it. I will be discussing this matter further with you after consulting with Jim when he returns.
>
> Jerry

A true and accurate copy of this email is attached to Lasonde Aff. as Exhibit 20.

### On December 19, 2003 Thompson Takes Unapproved Vacation Time During The Busy Holiday Season On Less Than One Day's Notice.

68. Thompson claims that he went to Jamaica to have dental work done after determining that it would be more economically feasible to have the work done in Jamaica rather than having the work done in the U.S. under Coca-Cola's dental insurance plan. See Thompson Dep. at 134-140; 155-157.

69. Thompson says that he came to this conclusion after an analysis that he did sometime in the summer of 2003, although he admits that he never contacted anyone in Coca-Cola's Human Resources Department, management or its insurer to determine the amount of insurance benefit provided for this type of procedure. Thompson Dep. at 154-155.

70. Thompson claims that he spoke to Dennis Williams in early December 2003 regarding his proposed vacation. According to Thompson, he asked Williams if he could have the time off to have dental work done and that Williams said yes, but that Thompson should pass it by Jerry [Goodsell], Thompson's current Supervisor." Thompson Dep. at 160-161.

71. Thompson admitted that no one told him that he was to report to Williams and that Williams was assuming Goodsell's position as of the time of this conversation in December 2003. He stated that, "I took liberty at that point to assume he was taking over for Jerry and then I could discuss my vacation plans with him." See Thompson Dep. at 163.

72. It is undisputed that Williams was not Thompson's manager for purposes of approving time off at the time this discussion occurred in early December 2003. See Williams Dep. at 43-44, 53.

73. After this discussion, sometime during the week of December 15, 2003, Thompson states that he had a face-to-face conversation with Martin Duval in which Thompson says Duval agreed to cover his shifts while he was away. Thompson testified that Duval agreed to cover him but requested a confirming email. Thompson Dep. at 167.

74. According to Thompson's deposition testimony, he waited until the night of his trip, December 19, 2003, to this condition. See Thompson Dep. at 133; 170; 173-175.

75. In this email, which Duval did not receive until he came to work in the afternoon of December 20, 2003, Thompson states "I will be off on December 23, 27, 28, and 29. However there is a possibility that I could be off also on Jan 2, 6, and 7 if my dental work is not completed." Thompson Dep. at 172-175, and Exh. 6.

76. Thompson did not reference any other previous conversation in this email. Thompson Dep. at 174-175, and Exh. 6.

77. Thompson says that he next called Goodsell at his home on the evening of December 19, 2003 to inform him, for the first time, that he would be away for the next two weeks. Thompson claims that Goodsell never told him that he could not take the vacation during this call. See Thompson Dep. at 66-67; 176-178.

78. Upon learning for the first time that Thompson would be gone for at least two weeks, Goodsell testified that his first and primary concern was shift coverage. Goodsell states that he told Thompson that he did not follow proper protocol for obtaining vacation time. See Goodsell Dep. at 31-33.

79. At the time of the call, Thompson had already purchased a ticket and he told Goodsell that he was, in fact, leaving on a flight in the early morning hours of the next day December 20th. See Goodsell Dep. at 33.

80. Thompson testified that he boarded a plane for Jamaica in the early morning hours of December 20, 2003. See Thompson Dep. at 170, 133.

81. Thompson stated that he extended his vacation from January 2, 2004 until January 9, 2004, by voicemail. Thompson Dep. at 66-67.

82. Thompson never actually spoke to anyone at the Plant to make sure that his message was received. See Thompson Dep. at 66-67; 179. Furthermore, Thompson did not communicate with any of the other production supervisors regarding this extension. Thompson Dep. At 180-181.

83. Management was forced to scramble to assure that the shifts were covered including that Goodsell had to fill in as a Production Supervisor to prevent gaps in coverage. Goodsell Dep. at 69; Duval Aff. ¶ 7.

**An Independent Separation Review Committee is Formed to Review Thompson's Situation**

84. Thompson was suspended via a letter sent to his home on January 7, 2004, for violating the protocol for scheduling vacations and his failure to return to work. Thompson was encouraged to contact the Plant immediately. A true and accurate copy of this letter is attached to Lasonde Aff. as Exhibit 21.

85. Upon Thompson's return, he was given an opportunity to explain himself in a meeting with Lane, Lasonde, Goodsell and Williams on or about January 13, 2004. See Deposition of Celine Lasonde ("Lasonde Dep.") at 36-37.[10] Thompson's explanation was unacceptable to management. Goodsell Dep. at 42-43 Lasonde Dep. at 35-37; Lane Dep. at 44-65.

86. Further Thompson admits that he never provided any medical documentation to support his story. Thompson Dep. at 147-148;

87. Consistent with Company policy, the Northampton management team formed a Separation Review Committee comprised of Lasonde, Lane, Williams and members of Coca-Cola's Legal and Human Resources Departments in Atlanta. This group had several conference calls to review Thompson's situation. Lasonde Dep. at 41.

88. On or about January 22, 2004, Lasonde prepared a memorandum outlining the findings of the investigation and recommending Thompson's termination. Lasonde Dep. at 31-32; 41-44.

89. The Separation Review Committee approved this recommendation determining that Thompson should be terminated for job abandonment. Lasonde Dep. at 43-44.

90. Neither Goodsell nor Harris participated in the Separation Review process and had no role in the termination decision. Lasonde Dep. at 41-42; Goodsell Dep. at 43, 48-50.

91. On January 23, 2004, Thompson was sent a letter terminating his employment "for unauthorized absences from December 20, 2003 through January 9, 2004." A true and accurate copy of this letter is attached to Lasonde Aff. as Exhibit 23.

---

[10] Relevant excerpts of the Lasonde Dep. are attached to Hart Aff. as Exhibit 7.

92. Thompson's position was eliminated when the Plant eliminated one of its shifts for production reasons. See Lasonde Dep. at 85-86.

THE COCA-COLA COMPANY
By its attorneys,

Holland & Knight LLP

/s/ Damon P. Hart
Steven H. Wright (BBO No. 535185)
Damon P. Hart (BBO No. 644586)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: September 1, 2006

- 19 -

## CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 1, 2006.

                              /s/ Damon P. Hart
                              Damon P. Hart

# 3956481_v2