UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

DUDLEY THOMPSON,
                    Plaintiff,

v.                                                    C.A. No. 3:05CV30168

THE COCA-COLA COMPANY,
                    Defendant.

## AFFIDAVIT OF DAMON P. HART, ESQ. IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Damon P. Hart, Esq., do hereby depose and say:

1.      I am counsel for defendant The Coca-Cola Company.  I am submitting this

Affidavit in support of Defendant's Motion for Summary Judgment.

2.      Attached hereto as Exhibit 1 is a true and accurate copy of relevant excerpts of the

deposition of Dudley Thompson;

3.      Attached hereto as Exhibit 2 is a true and accurate copy of relevant excerpts of the

deposition of Martin Wayne Duval;

4.      Attached hereto as Exhibit 3 is a true and accurate copy of relevant excerpts of the

deposition of Diego Garcia;

5.      Attached hereto as Exhibit 4 is a true and accurate copy of relevant excerpts of the

deposition of Gerard P. Goodsell;

6.      Attached hereto as Exhibit 5 is a true and accurate copy of relevant excerpts of the

deposition of James G. Lane;

7.    Attached hereto as Exhibit 6 is a true and accurate copy of relevant excerpts of the deposition of Dennis Allen Williams;

8.    Attached hereto as Exhibit 7 is a true and accurate copy of relevant excerpts of the deposition of Celine Lasonde.

Signed under the pains and penalties of perjury on August 31, 2006.

Damon P. Hart, Esq.

# 4018682_v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 1, 2006.

/s/ Damon P. Hart _____
Damon Hart

EXHIBIT 1



Page 1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                  No.:  06-30168-MAP

4

5     * * * * * * * * * * * * * * * * * * * * * * * * * * * *

6     DUDLEY THOMPSON,                    *

7                 Plaintiff              *

8                 vs.                    *

9     THE COCA-COLA COMPANY,             *

10                Defendant              *

11    * * * * * * * * * * * * * * * * * * * * * * * * * * * *

12

13

14          DEPOSITION OF:  DUDLEY THOMPSON

15        CATUOGNO COURT REPORTING SERVICES

16            1414 Main Street, 6th Floor

17            Springfield, Massachusetts

18        April 13, 2006        9:35 a.m.

19

20

21

22

23                Ian F. Galloway

24                Court Reporter

**DUDLEY THOMPSON**
**April 13, 2006**

Page 5

1          A.      No.

2          Q.      Have you ever been deposed before?

3          A.      No.

4          Q.      Have you ever been a witness in a

5    trial?

6          A.      No.

7          Q.      Have you brought any documents

8    here with you today?

9          A.      No.

10         Q.      Please tell me each and every

11   instance in which you believe you were

12   discriminated against by your former employer,

13   the Coca-Cola Company.

14         A.      To begin with, there were two

15   statements by Jerry Goodsell, one by Donna

16   Harris, accusation of not doing my job

17   properly, and filling out my vacation, and my

18   job being replaced by a white male.

19         Q.      Anything else?

20         A.      No.

21         Q.      So what we have are two statements

22   by Jerry Goodsell, one statement by Donna

23   Harris, being accused of not properly applying

24   for vacation, and then being replaced by a

**DUDLEY THOMPSON**
**April 13, 2006**

Page 6

1  white employee.  That's it?

2      A.    Yes.

3      Q.    Let's take that one by one.  What

4  were the two statements that you say were

5  discriminatory that were made by Jerry

6  Goodsell?

7      A.    The annual Christmas party in

8  2002, while sitting at that table that I was,

9  after dancing I went and sat.  Jerry, he was

10  also dancing all over the place being under the

11  influence of alcohol.  I went to my seat, which

12  was not in the isle as such, so he had to go

13  out of his way in order to reach where I was,

14  and he came up, and he said, "I hate Jamaican

15  music and Jamaicans."

16      Q.    Did he say anything else?

17      A.    He walked away.

18      Q.    And what did you say?

19      A.    I was appalled.  I didn't say

20  anything.

21      Q.    You said this was the Christmas

22  party 2002?

23      A.    Yes.

24      Q.    So I assume it occurred sometime

**DUDLEY THOMPSON**
**April 13, 2006**

1    Q.    What kind of music was it?

2    A.    It was DJ, African American DJ and

3    a reggae mix.

4    Q.    So it was reggae music that was

5    playing?

6    A.    Yes.

7    Q.    And that was what you were dancing

8    to?

9    A.    No.

10    Q.    Were you dancing?

11    A.    Not at this point.  I was sitting

12    when he made that --

13    Q.    I'm sorry.  Prior to that, were

14    you dancing?

15    A.    Yes.

16    Q.    Was Mr. Goodsell dancing prior to

17    that?

18    A.    He was dancing all over the place.

19    Q.    Okay.  You mentioned that Mr.

20    Goodsell had been drinking, correct?

21    A.    Yes.

22    Q.    Had you been drinking?

23    A.    Yes.

24    Q.    What time of night was this?  I

**DUDLEY THOMPSON**
**April 13, 2006**

1    Q.    And you didn't say anything to

2    him?

3    A.    I was appalled.  I didn't expect

4    that reaction from a manager.

5    Q.    Did you have any conversation with

6    him prior to him making this statement?

7    A.    No.

8    Q.    Was he already sitting down when

9    you joined the table?

10   A.    He was not at that table.

11   Q.    So he came to your table?

12   A.    Yes.  He went out of his way to

13   pass by where I was.

14   Q.    Did you report this comment?

15   A.    No.

16   Q.    You didn't report it to anyone?

17   A.    No.

18   Q.    You know that you could have

19   reported this comment to the human resources

20   department?

21              MR. SHEA:  Objection.  You can

22        answer.

23              THE WITNESS:  If I wanted to get

24        fired, terminated.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 14

1    appeared, opened the door, and came in the

2    office, and humiliated me by ordering the four

3    employees out of the office.

4              He closed the door and then

5    proceeded to gesticulate, which I felt a bit

6    ~~threatened. Then he took a seat in~~ front of

7    where I was sitting, and during this time, I

8    could smell his breath with alcohol, and I

9    could see that he was flush, signifying that he

10   was under the influence of alcohol, and he

11   started raising his voice at me, and I told him

12   that if he wanted to discuss a particular

13   matter, and what he was disputing at the time

14   is that I was entertaining in the office, I

15   told him no, it was discussion regarding a

16   problem that we had at the labeler that I was

17   discussing with them.

18             As I was giving him my views, he

19   kept raising his voice higher and higher until

20   I thought he was going to explode in there.  He

21   opened the office with one rage, and he said,

22   "I'm going to deal with you, you fucking

23   Jamaican."

24        Q.       **When was this?**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 15

1    A.    This was during the stint that he

2    was serving under when Darrin Plawinski left

3    the job, so he was actually acting operations

4    manager at the time.

5    **Q.    And that would have been what**

6    **year?**

7    A.    2002.

8    MR. SHEA:  2002?

9    THE WITNESS:  2003, sorry.

10   **Q.    (By Mr. Hart)  Do you know what**

11   **month?**

12   A.    It was during the summer going up

13   to the fall, during that time.

14   **Q.    So maybe August, September?**

15   A.    Sometime in that region.

16   **Q.    Did he say anything else?**

17   A.    No.  He just went out of the

18   office in one rage.  I was saying to myself,

19   what did I do for him to react in that manner,

20   because I was just telling him that he should

21   not be speaking to me like that.

22   **Q.    What were his exact words again?**

23   MR. SHEA:  With respect to this

24   particular statement about Jamaicans, is

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 33

1  about this comment by Donna Harris, which you

2  were referring to earlier?

3         A.      She, in speaking to Ron McKeithen

4  who is also of Jamaican heritage, she mentioned

5  that if I think that she is one of my Jamaican

6  bimbo.

7         Q.      How did you hear about this

8  statement?

9         A.      Immediately, Ron was very upset,

10  and he reported the matter to me as the

11  production supervisor on that shift and in

12  relation to me as that statement was directed

13  to me.

14         Q.      Can you give me a little more of

15  the context of her making this statement?

16         A.      There was a argument, some

17  discussion, between Ron and Donna.  I don't

18  know.  I can't recall presently what it was,

19  and she made that remark.

20         Q.      At some time prior to this

21  statement being made to Ron McKeithen, did you

22  have a discussion with Ms. Harris about your

23  taste in women?

24         A.      No.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 34

1    Q.    Did you ever tell her that you
2    preferred Jamaican women?
3    A.    Never.
4    Q.    Did you have a discussion with
5    anyone in the plant about your preference in
6    women?
7    A.    No.
8    Q.    So your testimony today is that
9    this statement by Ms. Harris came totally out
10   of the blue?
11   A.    Yes.
12         MR. SHEA:    Objection.
13   Q.    (By Mr. Hart)   It was not in
14   reaction to anything that you had said?
15   A.    Right.
16   Q.    What did she mean by she's not one
17   of your Jamaican bimbos?  What did you take
18   that to mean?
19   A.    That being married to a Jamaican
20   woman, that a bimbo, meaning that pretty, good-
21   for-nothing woman.  Like reference to blondes,
22   for instance.
23   Q.    So it's the equivalent of calling
24   someone a blonde bimbo?

**DUDLEY THOMPSON**
**April 13, 2006**

Page 37

1          Q.      Let me just take a step back.

2    This comment that she made, the Jamaican bimbo

3    comment, when was that?

4          A.      This was during one of the -- on

5    the shift, the second shift, to Ron McKeithen.

6          Q.      What year was that?

7          A.      That was in -- I'm not 100 percent

8    sure, but it could be 2002.

9          Q.      Do you know what month?

10         A.      I cannot recall at this time.

11         Q.      Do you remember what season it

12   was, was it Spring, Summer, Fall?

13         A.      No.

14         Q.      Some time in 2002 though?

15         A.      Yes.

16         Q.      Now, you weren't present whenever

17   this comment was made; is that correct?

18         A.      Can you rephrase that?

19         Q.      You didn't hear Ms. Harris say

20   these words; is that correct?

21         A.      Yes.

22         Q.      Mr. McKeithen told you about it?

23         A.      Yes.

24         Q.      Were you working on the day the

**DUDLEY THOMPSON**
**April 13, 2006**

Page 38

1    comment was made, do you know?

2        A.    Yes.

3        Q.    You were working, but you were in

4    another part of the plant, correct?

5        A.    Yes.

6        Q.    Do you know where the statement

7    was made?

8        A.    In the vicinity of the labeler to

9    the office of the lab, somewhere in there.

10        Q.    And that's a different area of the

11    plant from the production office where you

12    would have been, correct?

13        A.    Yes.

14        Q.    Can you talk a little bit about

15    how Ms. Harris's function and your function as

16    production supervisor how they interacted with

17    each other or how they worked together?

18        A.    The quality supervisor plays a

19    support role to the production supervisor

20    ensuring that all the critical checks are made

21    to insure that the product that is being

22    produced is sellable.

23        Q.    Let me just unpack that a little

24    bit.  There are guidelines for the consistency

**DUDLEY THOMPSON**
**April 13, 2006**

Page 39

1    of the product, correct?

2         A.    Yes.

3         Q.    And your job is to produce the

4    product within those guidelines?

5         A.    Yes.

6         Q.    And then Ms. Harris's function,

7    her group tests the product to make that it's

8    within those guidelines?

9         A.    Yes.

10         Q.    And if there's problems with the

11    product, then they would notify you and you

12    would make certain adjustments to the

13    equipment, correct?

14         A.    Yes.

15         Q.    And Ms. Harris's group,

16    particularly the supervisor, her, would have

17    the ability to shut the line down if the

18    product is out of spec, correct?

19         A.    Yes.

20         Q.    And when that occurs, that has a

21    negative impact on your production numbers for

22    your shift, correct?

23         A.    Yes.

24         Q.    So on a number of occasions, you

**DUDLEY THOMPSON**
**April 13, 2006**

Page 53

1  your performance, correct?

2       A.    Yes.

3       Q.    Do you dispute that you were late

4  for your shift on a number of occasions?

5       A.    I was late, and the explanation

6  was that I lived in Amherst.  At that point in

7  time, the bridge that connected Northampton and

8  Hadley was being extended and the traffic

9  pattern was unpredictable.  Even when I made

10 effort to get there, I would be hindered, and

11 this was brought to the attention of my bosses.

12      Q.    But you have no dispute that you

13 were late on a number of occasions?

14      A.    I was not late to the point of the

15 starting of the shift.  I was tardy in coming

16 on a few occasions to the preparatory meeting

17 before, so it did not affect the performance of

18 my shift.

19      Q.    But one of the requirements of

20 your job as a production supervisor was to

21 arrive prior to the start of the shift, and the

22 purpose for that earlier arrival was so that

23 you could get information from the previous

24 shift; is that correct?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 54

1          A.      Yes.

2          Q.      And in your mind, is there

3    anything unreasonable about that requirement or

4    request that the company would expect you to be

5    there a half an hour prior?

6          A.      I'd conform, and it was not to the

7    extent as what was said by my boss.

8          Q.      My question is not what you did.

9    My question is:  Is it unreasonable for the

10   employer to -- this expectation, was it somehow

11   unreasonable?

12         A.      No.

13         Q.      Does a production supervisor who

14   arrives shortly before the line starts or

15   before the shift, does that have any impact on

16   the production?

17         A.      Not on my production.

18         Q.      What year was this bridge work

19   taking place?  When I say bridge work, I'm

20   referring to the bridge between your town where

21   you lived and the plant.

22         A.      It went on for maybe years.

23         Q.      Which years?

24         A.      2002 right up to 2003.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 56

1          now are Plaintiff's exhibits that were

2          marked in the previous two depositions?

3                    MR. HART:  Sure.

4                    MR. SHEA:  Okay.

5          Q.      **(By Mr. Hart)  Have you had a**

6     **chance to review Exhibit 10?**

7          A.      Yes.

8          Q.      **Do you recognize this document?**

9          A.      Yes.

10         Q.      **What is it?**

11         A.      It's Walter's perception of my

12    performance, of which I refuted.  I adamantly

13    told them I was not in agreement with what his

14    concerns were.

15         Q.      **And at the time, Walter Klenzing**

16    **was your manager?**

17         A.      Yes.

18         Q.      **What's the date on this document?**

19         A.      October 4, 2001.

20         Q.      **October 4, 2001?**

21         A.      Yes.

22         Q.      **And the title of this document is**

23    **performance improvement tool, written warning;**

24    **is that correct?**

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 57

1      A.      That's the title.

2      Q.      I want to direct your attention to

3   number two.  Number two says, Punctuality:  You

4   have been chronically late to the shift start,

5   a poor example for employees.

6              Did I read that correctly?

7              MR. SHEA:  Meaning is that what it

8        says?

9      Q.      (By Mr. Hart)  Is that what it

10  says?

11     A.      Yes.

12     Q.      Were you chronically late to the

13  shift start?

14     A.      No.

15     Q.      Were you late at all in 2001?

16     A.      Yes.

17     Q.      And was this also related to the

18  bridge?

19     A.      Yes.

20     Q.      How far away from the plant did

21  you live?  That's a confusing question.  Let's

22  just say the bridge was working; there was no

23  work on the bridge.  How long would it take you

24  to get from your house to the plant?

**DUDLEY THOMPSON**
**April 13, 2006**

Page 58

1        A.      Twenty minutes.

2        **Q.      Twenty minutes, and then while the**

3   **bridge work was happening, how long would it**

4   **take?**

5        A.      It varies.

6        Q.      It varies from what to what?

7        A.      It could take 40 minutes, 50

8   minutes, sometimes an hour.

9        **Q.      So the longest it took you was an**

10  **hour?**

11       A.      I can't recall, but I know within

12  that time frame.  It varied.

13       **Q.      Were there any other ways you**

14  **could go to work without going over this**

15  **bridge?**

16       A.      Yes.

17       **Q.      And how long would it take you to**

18  **go those alternate routes?**

19       A.      Three times that time.  I'd have

20  to go all the way up to 91, and then go and

21  head south on 91, and exit at Northampton.

22       **Q.      So how many minutes would you**

23  **estimate it would take you to take this**

24  **alternate route?**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 59

1     A.    About 40 minutes.

2     Q.    **Forty minutes as opposed to twenty**

3  **minutes?**

4     A.    Yes.

5     Q.    **Earlier you spoke about a**

6  Christmas party in which Mr. Goodsell made a

7  **statement that was offensive to you.  Was your**

8  **wife with you at that party?**

9     A.    No.

10    Q.    **So you were there alone?**

11    A.    Yes.

12          MR. SHEA:  Alone meaning not with

13     her, because there were other people at

14     the table, I think he testified.

15          MR. HART:  Yes, you're right.

16    Q.    **(By Mr. Hart)  I think my question**

17  **is:  Did you bring anyone with you to the**

18  **party?**

19    A.    No.

20    Q.    **Could you please take a look at**

21  **Exhibit 37, please, in the exhibits prepared by**

22  **your attorney?**

23    A.    (Witness complying)

24    Q.    **Have you reviewed it?**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 60

1      A.      Yes.

2      Q.      **Do you recognize this document?**

3      A.      Yes.

4      Q.      **What is it?**

5      A.      It's a document prepared by Darrin

6   regarding performance issues, which I, in the

7   presence of Celine, refuted.  I told Darrin

8   that certain things that was brought up, I was

9   hearing it for the first time; nobody ever said

10  anything to me about it.  That was the first

11  time.  How can he, as a manager, not, allowing

12  if I'm going to the wrong way, say something to

13  correct it.  Coming up with certain things at

14  that point, or hearing what I wasn't doing for

15  the first time, I refuted that because some of

16  the things that was said was not true.

17      Q.      **What is the date on this document?**

18      A.      August 11, 2003.

19      Q.      **August, mine says May?**

20              MR. SHEA:  Which exhibit are you

21      on?

22              MR. HART:  I see.  You must be on

23      the wrong one, 37.

24              THE WITNESS:  Okay, sorry.  Give

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 61

1        me a chance.

2                    MR. HART:  Sure.

3        Q.      (By Mr. Hart)  Are you familiar

4    with this document?

5        A.      I saw it.

6        Q.      Do you remember receiving it?

7        A.      Yes.

8        Q.      What is it?

9        A.      It's Darrin's perception of me.

10       Q.      More specifically, your

11   performance, correct?

12       A.      His perception of my performance.

13       Q.      Yes.

14       A.      Yes.

15       Q.      It's not about just you as a

16   person.  It's about your performance --

17       A.      Yes.

18       Q.      -- in the plant, correct?

19       A.      His perception.

20       Q.      What's the date on this document?

21       A.      May 30, 2003.

22       Q.      2003?

23       A.      Yes.

24       Q.      And this is a performance

**DUDLEY THOMPSON**
**April 13, 2006**

Page 62

1    counseling memo.  That's the title of the

2    document?

3         A.    Yes.

4         Q.    Did you agree with his perception

5    of your performance?

6         A.    No.

7         Q.    Let me turn your attention to the

8    second page of this document, Bates labeled

9    216.  Do you see that at the bottom, very

10   bottom of the page in the right corner it says

11   216?

12        A.    Yes.

13        Q.    One of the things that he noted,

14   the last bullet point here, is

15   attendance/tardiness, chronic tardiness

16   continues, zero attendance at required

17   scorecard meetings, you should notify your

18   manager in event of absence or tardiness.  Then

19   this part is underlined:  This should not even

20   need to be stated.  Do you see that?

21        A.    Yes.

22        Q.    Do you disagree that you had

23   tardiness issues in 2003?

24        A.    Not chronic tardiness.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 63

1    Q.    But you were tardy?

2    A.    Yes, as everybody else.

3    Q.    I'm not asking about everybody

4    else.  I'm just asking about you.

5         MR. SHEA:  Well, that's part of

6    his answer, so you've got to let him

7    finish his answer.  Have you completed

8    your answer?

9         THE WITNESS:  No.  As everybody

10   else, the plant, when I'm being relieved,

11   people were being tardy on both first and

12   third shift.  I don't know if this was on

13   their -- if any reprimand was being done

14   to them.

15   Q.    (By Mr. Hart)  Let me ask this

16   question:  Is it a true statement that you were

17   tardy on more than one occasion in the year

18   2003 prior to receiving this memo?  Is that

19   true?

20   A.    More than one, but not chronic.

21   Q.    Okay, more than one, but not

22   chronic.  Who was Darrin Plawinski?

23   A.    The production manager.

24   Q.    So he was in the same position

**DUDLEY THOMPSON**
**April 13, 2006**

Page 64

1    that Walter Klenzing was in?

2         A.    He took over from Walter Klenzing

3    when there was a coming together of the pouch

4    and the two NCB lines.

5         Q.    And he was your direct report,

6    correct?

7         A.    Yes.

8         Q.    You reported to him?

9         A.    Yes.

10        Q.    Was that bridge work that you

11   mentioned earlier, was that still going on in

12   May of 2003 to your memory?

13        A.    From my memory, yes.

14        Q.    When we started out, I asked you

15   about all the instances of discrimination that

16   you allege occurred at Coca-Cola, and we're

17   marching down getting more details on each one

18   of them.  You mentioned something about

19   vacation time.

20        A.    Yes.

21        Q.    Could you tell me what that was

22   about?

23        A.    I was having a dental problem, and

24   I decided to go to Jamaica to have it done.  I

**DUDLEY THOMPSON**
**April 13, 2006**

Page 66

1   I went to Jamaica.  The same Saturday, I had an

2   appointment to see my dentist, which I landed

3   in Montego Bay.  I had to travel to Mandeville.

4   I subsequently called Marty to arrange

5   coverage.  I told him that my dental work

6   wasn't completed and he should be prepared to

7   do some more coverage and I'm sorry about that.

8   I also, two days before, tried to contact Jerry

9   Goodsell.  I didn't get him at this number.  I

10  called the supervisor number, Sean Rutherford;

11  he answered.  I told him to page Jerry

12  Goodsell; he did three times, no response, so I

13  hung up and then I called Jerry Goodsell's

14  number again leaving him a message that,

15  listen, my dental work isn't completed, and I'm

16  asking for extended time to have it completed.

17          I, subsequent to that, after I

18  left that, called home, because I kept in touch

19  with home every day to see if he had responded

20  in any way to say, listen, I could not have

21  gotten that time, and I say to you now, if he

22  had said that to me, I would have forfeited the

23  extended leave and I would be at the job, but

24  nobody said anything.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 67

1          So coverage was prepared in terms

2     of talking to Marty on a one-to-one basis.

3     Messages were left with Jerry Goodsell to say

4     that I am asking for time.  No response was

5     given whether that time was not given, so I

6     accepted it as being silent and that that was

7     granted.

8          On coming back, I receive a letter

9     from Celine that I should get in touch with the

10    plant immediately.  I did, and it was to set up

11    a meeting, which was had on the following

12    Monday, if my date holds right.  We went to the

13    meeting.  I explained exactly that the

14    procedure was as per the plant manager, Jim

15    Lane, was followed and that the dental work

16    took additional time.

17         At no time, I was in breach of not

18    following what was in that memo from Jim Lane.

19    I would go along to say that this was part of

20    Jerry's motion to deal with me.

21              MR. SHEA:  Could we take a quick

22         break?

23              MR. HART:  Sure.

24

**DUDLEY THOMPSON**
**April 13, 2006**

Page 78

1   American music?

2       A.      Rap, DJ, which for some, in my

3   perception, the Jamaican DJ was initiated by

4   Jamaicans and it is deemed as music by African

5   Americans.

6       Q.      Is rock and roll African American

7   music?

8       A.      I don't know.

9       Q.      You don't know.  What about R and

10  B, rhythm and blues, is that African American

11  music in your opinion?

12      A.      I don't know.

13      Q.      Please look at paragraph number

14  eight of your complaint.  Paragraph eight says

15  the Plaintiff reported the discriminatory

16  conduct to management and was harassed and

17  retaliated against.  Could you please tell me

18  every time you reported discriminatory conduct

19  to management?

20          MR. SHEA:  Other than what he's

21          already said?  He talked about reporting

22          Donna Harris's conduct.

23          MR. HART:  Yes, to Mr. Lane, and

24          Mr. Newton, and Mr. Klenzing, and Mr.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 79

1    Goodsell.

2              THE WITNESS:  Yes.

3         Q.    (By Mr. Hart)  Are there any other

4    instances where you reported discriminatory

5    conduct to management?

6         A.    No.

7         Q.    It also says in that paragraph

8    that you were harassed and retaliated against.

9    Please tell me every instance in which you were

10   harassed as a result of your reporting

11   discriminatory conduct to management.

12        A.    The way in which Mr. Goodsell

13   conducted his interaction with me, shouting,

14   making different statements, I deem that as

15   hostile.

16        Q.    Did Mr. Goodsell ever --

17             MR. SHEA:  I'm not sure he's done

18   with his answer.

19             MR. HART:  I'm sorry.  I thought

20   he was done.

21             MR. SHEA:  He wants to know about

22   all the harassing conduct.  Were you

23   done?

24             THE WITNESS:  No.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 83

1    Is there anything other than what you've

2    testified about that you're referring to in

3    that sentence?

4         A.      Just that the nit-picking, making

5    mountains out of a molehill in regards to me,

6    and I didn't know of any of the other

7    supervisors being harassed in this way.

8         Q.      You were here for the testimony of

9    at least two other production supervisors

10   during this week, correct?

11        A.      Yes.

12        Q.      Did you hear both of them testify

13   as to being on performance improvement plans?

14   Did you hear that testimony?

15        A.      Yes.

16        Q.      Did you know, while you were an

17   employee at Coca-Cola, that your fellow

18   production supervisors were also on performance

19   improvement plans at different times during

20   their tenure?

21        A.      Yes.

22             MR. SHEA:  Do you mean from the

23        depositions or prior to the depositions

24        did he know it?

**DUDLEY THOMPSON**
**April 13, 2006**

Page 84

1          MR. HART:  I think that question
2     was while he was employed did he know.
3          MR. SHEA:  Whether they were on
4     performance improvement plans?
5          MR. HART:  Yes.
6          THE WITNESS:  Yes.
7     Q.     (By Mr. Hart)  So is it fair to
8  say that the company had taken issue with all
9  of the production supervisors with their
10  performance at various time; isn't that
11  correct?
12          MR. SHEA:  Objection.  If you
13     know.
14          THE WITNESS:  Yes.
15     Q.     (By Mr. Hart)  And that would be
16  the reason for the performance improvement
17  plan, because the company, they had some issue
18  with their performance and put all of you, all
19  production supervisors, on performance
20  improvement plans at various times.  Isn't that
21  fair to say?
22     A.     Yes, but in terms of being
23  harassed continuously, no.
24     Q.     Paragraph nine of your complaint

**DUDLEY THOMPSON**
**April 13, 2006**

Page 88

1    Q.    (By Mr. Hart)  Mr. Thompson, I'd

2  like to, again, direct you to your complaint,

3  and in particular, paragraph number 14.  Let me

4  know when you've had a chance to review it.

5    A.    Yes.

6    Q.    Can you tell me what you're

7  referring in paragraph 14 in the second

8  paragraph where it says, for example, Donna

9  Harris went on vacation without notifying

10  anyone and was not reprimanded in any way?

11    A.    Yes.  I turned up for work and

12  Donna was supposed to be at work.  Hunter

13  Alexander was the other QA supervisor and she

14  did not know anything about Donna going on

15  vacation.

16    Q.    Do you know anything else about

17  why Ms. Harris was absent on that day?

18    A.    No.  All I know is that it wasn't

19  communicated to Hunter Alexander.

20    Q.    And Ms. Alexander was a peer of

21  Ms. Harris?

22    A.    Yes.

23    Q.    They were on the same level?

24    A.    Yes.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 89

1      Q.      When was this, what year?

2      A.      I think this might have been, not

3   '03, '02.

4      Q.      2002?

5      A.      Yes.

6      Q.      Do you know what month?

7      A.      No.

8      Q.      Do you know what time of year it

9   was?

10      A.      I don't recall.

11      Q.      You said when you came to work you

12   had learned this, right, that Ms. Harris was

13   not there and Ms. -- the other lady, could you

14   refresh me on her name?

15      A.      Hunter Alexander, yes.

16      Q.      Hunter Alexander didn't know that

17   Ms. Harris would be out that day?

18      A.      Yes.

19      Q.      What information do you have that

20   leads you to believe that Ms. Harris was on

21   vacation?

22      A.      Because Robert Camacho said that

23   she was.

24      Q.      So he had known that she was going

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 90

1  to be out?

2      A.    Yes, but I did not know; Hunter

3  Alexander didn't know.

4      **Q.    Was Ms. Harris required to notify**

5  **you when she was not going to be in the plant?**

6      A.    On vacation, yes, and to the

7  person that she would normally cover for her.

8      **Q.    She was obligated to tell you that**

9  **she was not going to be in the plant?**

10      A.    Yes, because in terms of coverage

11  for the QA on my shift, it would be pertinent

12  for her to do.

13      **Q.    So did you have the authority to**

14  **grant her vacation time?**

15      A.    No.

16      **Q.    So how is it that she was supposed**

17  **to notify you?**

18      A.    For continuity and for the

19  business to continue with the proper checks and

20  balances, it would be in the interest of the

21  company to allow me, on my shift, if she would

22  be going on vacation that she will be actually

23  be off.

24      **Q.    Was there a policy that required**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 91

1    her to notify you that she was going to be on

2    vacation?

3         A.    Not that I know of.

4         Q.    When you went out on vacation at

5    any time, did you notify the quality assurance

6    department that you would be on vacation?

7         A.    Yes.

8         Q.    You did?

9         A.    Yes.

10        Q.    And who in the quality assurance

11   department would you notify?

12        A.    I would tell Lance; I would tell

13   even Donna.

14        Q.    And on this day, which I think you

15   said was some time in 2002, correct?

16        A.    Yes, but don't hold me to that

17   time frame.

18        Q.    Do you know if Ms. Harris was out

19   sick that day?

20        A.    It was vacation.  It was said that

21   vacation was taken.

22        Q.    Someone else told you that it was

23   vacation?

24        A.    Yes.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 92

1    Q.    Who was that that told you?

2    A.    Robert Camacho.

3    Q.    And what position was he in?

4    A.    He was a direct report of Donna

5    Harris.

6    Q.    So Mr. Camacho reported to Ms.

7    Harris?

8    A.    Yes.

9    Q.    Do you know if Ms. Harris

10   discussed this vacation or this time off that

11   you're referring to in 2002 with John Newton?

12   A.    No.

13   Q.    You don't know?

14   A.    No.

15   Q.    Do you know if she talked to Mr.

16   Goodsell?

17   A.    No.

18   Q.    Do you know if she talked to Ms.

19   Lasonde?

20   A.    No.

21   Q.    Do you know if she talked to Jim

22   Lane?

23   A.    No.

24   Q.    Are you familiar with the Family

**DUDLEY THOMPSON**
**April 13, 2006**

Page 93

1    Medical Leave Act?

2         A.    Yes.

3         Q.    Do you know whether or not Ms.

4    Harris was not on vacation, but was in fact on

5    family medical leave?

6         A.    Don't know.

7         Q.    Do you know if she submitted

8    medical documentation regarding this leave?

9         A.    No.

10        Q.    Do you know whether or not she had

11   a sick child that she was missing time to

12   attend to?

13        A.    No.

14        Q.    And you do know that the Family

15   Medical Leave Act is federal law that requires

16   a company to grant employees leave once certain

17   criteria are met?

18        A.    Yes.

19        Q.    You understand that it's not a

20   discretionary thing.  It's a mandatory thing;

21   the company had to grant time off once the

22   criteria is met and certain documentation is

23   provided?

24        A.    Yes.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 94

1    Q.    And you don't know one way or the

2  other whether or not Ms. Harris was in fact on

3  vacation?

4    A.    It was told that she was on

5  vacation.

6    Q.    But you don't know whether or not

7  she was on vacation?

8    A.    I was told that she was on

9  vacation.

10    Q.    You were told by Robert, but you

11  don't know for a fact whether or not she was on

12  vacation?

13    A.    Right.

14    Q.    You've never seen Ms. Harris's

15  personnel file, have you?

16    A.    No.

17    Q.    Where do you live currently?

18    A.    Winter Haven, Florida.

19    Q.    Winter Haven, is that in Central

20  Florida?

21    A.    Yes.

22    Q.    Is that near Orlando?

23    A.    Yes.

24    Q.    What's your address?

**DUDLEY THOMPSON**
**April 13, 2006**

Page 105

1  accepted the redundancy.  Prior to that, what

2  happened, my wife of 18 years died, and so I

3  was in the process of contemplating getting

4  away from the island to alleviate the memories

5  with myself and my three boys.

6      **Q.    What is an AS400?**

7      A.    It's a computer system that we use

8  to communicate and to do all the computerized

9  system within the company.

10     **Q.    What city were you in when you**

11 **worked for Red Stripe?**

12     A.    Kingston.

13     **Q.    While you were there, did you**

14 **receive any warnings for performance?**

15     A.    No.  If you see, within every two

16 years, I was on a progressive move in that

17 company.

18     **Q.    What did you do after you left Red**

19 **Stripe?**

20     A.    I came to America.

21     **Q.    Who did you work for?**

22     A.    I did not work.  I was unemployed,

23 and deliberately so, for about four or five

24 months trying to acclimatize in Wilmington,

**DUDLEY THOMPSON**
**April 13, 2006**

Page 106

1   Delaware.  Then I actually put my resume on the

2   internet and I got a call from the Northampton

3   facility.  I can recall Teri Thomas being the

4   HR manager, so I went up for the interview.

5        Q.    **And you got the job, correct?**

6        A.    Yes, I did.

7        Q.    **What year?**

8        A.    2000, June 2000.

9        Q.    **And what position were you hired**

10  **into?**

11       A.    Production supervisor.

12       Q.    **And what were your duties as a**

13  **production supervisor?**

14       A.    To insure the proper operation of

15  the shift I was put on in terms of making sure

16  the production quotas were gotten, make sure

17  safety was adhered to in terms of GMPs, make

18  sure that each operator conformed to the SOPs,

19  foster good industrial relations.  That covers

20  quality, safety, and ultimately efficiency.

21       Q.    **When you were there, what products**

22  **did the Northampton plant produce?**

23       A.    Powerade, different flavors of

24  Powerade and different sizes, along with fruit

**DUDLEY THOMPSON**
**April 13, 2006**

Page 107

1  juices in different bottle sizes, especially 16

2  ounces for the fruit juices.

3      **Q.    Anything else?**

4      A.    No.

5      **Q.    Was there a time when they**

6  **produced juices that go in a pouch?**

7      A.    Sorry, in pouch, sorry.  Pouch

8  also, that came later on.

9      **Q.    Now, is the equipment that's used**

10  **to produce pouch products different from the**

11  **equipment that's used to produce bottled juices**

12  **and beverages?**

13      A.    Yes.

14      **Q.    How is that different?**

15      A.    The filling process is completely

16  different.  In the principle of bringing the

17  product to a certain filling temperature,

18  pasteurization temperature was the same, but in

19  terms of filling, this was a pouch as compared

20  to bottles and filler, cappers, labelers.

21  Those pouches were pre-labeled.  They were

22  sealed immediately after filling and then

23  cooled, so the whole process was different.

24  The packaging was different, but in terms of

**DUDLEY THOMPSON**
**April 13, 2006**

Page 108

1   processing the product, it was similar.

2          Q.      **How many employees reported to**

3   **you?**

4          A.      I think it was 30, 30-plus, when

5   it was combination of the pouch and the two NCB

6   lines, inclusive of the maintenance guys.

7          Q.      **Inclusive of he maintenance guys?**

8          A.      Yes.

9          Q.      **So there were 30 employees that**

10  **you --**

11         A.      Thirty-plus, I said.

12         Q.      **Thirty-plus, around?**

13         A.      Something like that.

14         Q.      **And you would give them direction**

15  **as to what they should do on a daily basis?**

16         A.      Yes.

17         Q.      **Were there other production**

18  **supervisors at Coca-Cola when you began?**

19         A.      Yes.

20         Q.      **Who were they?**

21         A.      Walt Klenzing, Diego Garcia.

22         Q.      **How did you interact with the**

23  **other production supervisors, in terms of how**

24  **did you break up the shifts?**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 112

1        Q.      And then was there a time when

2    your reporting relationship changed?

3        A.      Yes, to Walt Klenzing.

4        Q.      And then did it change again after

5    that?

6        A.      To Darrin Plawinski.

7        Q.      When did it change from Jerry to

8    Walt?

9        A.      When, I think, there was demand

10   for a production manager and Walt actually

11   applied for that position and was given that

12   position.

13       Q.      Do you know what year it was?

14   Keeping in mind you started in June of 2000, do

15   you know what year it was?

16       A.      I think it was maybe 2001,

17   somewhere along that line.

18       Q.      Somewhere in 2001?

19       A.      Yeah.  Don't hold me to that.

20       Q.      Do you know how long Mr. Klenzing

21   was your direct report?

22       A.      Upon the time when Mr. Lane came,

23   then changes were made.

24       Q.      What year would that have been?

**DUDLEY THOMPSON**
**April 13, 2006**

Page 113

1    A.    That was 2002 sometime, I think.

2    **Q.    And then how long was Mr.**

3    **Plawinski your direct manager?**

4    A.    Not very long, and then he decided

5    to go to somewhere.  I don't know where.

6    **Q.    And then who was your direct**

7    **manager after Mr. Plawinski left?**

8    A.    Jerry assumed the position, along

9    with his plant manager portfolio, and in

10    December there came Dennis Williams.

11    **Q.    Were you responsible for**

12    **evaluating the performance of the employees on**

13    **your line, the employees under you?**

14    A.    Yes.  That's part of the

15    supervisor's role.

16    **Q.    What was the policy or how would**

17    **you have handled an employee who had an**

18    **attendance problem?**

19        MR. SHEA:  Objection.  You can

20        answer if you can.

21        THE WITNESS:  To go through the

22        normal policy that is there for the

23        attendance in relation to the associates.

24        That was in the policy book.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 114

1       Q.     (By Mr. Hart)  So there was a

2  written policy on how --

3       A.     To do that, yes.

4       Q.     But let me just ask you how you

5  would handle it if you had an employee who had

6  attendance problems?

7       A.     I would follow the policy, what

8  the policy stipulated.

9       Q.     So what --

10       A.     It's not a matter of what I want

11  to do, but it is what the policy states that

12  would go.

13       Q.     During your time of employment

14  with Coca-Cola, did you ever have to address

15  attendance problems with employees that worked

16  under you?

17       A.     I don't recall.

18       Q.     You could have, but you don't

19  remember?

20       A.     Yes.

21       Q.     Did you ever have an employee that

22  worked under you that missed a schedule

23  meeting?

24       A.     Yes.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 118

1    responded immediately, got my shower, had

2    something to eat, and headed out for work, but

3    as usual, the traffic, the UMass traffic, going

4    over to Northampton played a big role in the

5    time that I got there.  So it was not a

6    deliberate attempt to not conform, but it was,

7    I think, a miscommunication between

8    supervisors, as to the swap that Mr. Lane

9    wanted to do.

10        Q.    Let me just kind of try to unpack

11   that a little bit.  You correct me if I'm wrong

12   or if I'm misstating what you just said, but

13   you and Mr. Duval arranged a swap of shifts.

14        A.    Yes.

15        Q.    He would cover one of your days

16   and you would cover one of his, correct?

17        A.    Yes.

18        Q.    In the meantime, Mr. Lane sent out

19   a message about swapping, correct?

20        A.    Yes.

21        Q.    And you took that to mean that the

22   arrangement that you had with Mr. Duval was

23   off, correct?

24        A.    Yes.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 119

1   Q.    And so who was supposed to cover

2   who first?  Were you supposed to cover him

3   first, or was he supposed to cover you first?

4   A.    He covered me first.

5   Q.    So he covered you.  What day was

6   that?  What date, do you remember?

7   A.    I don't recall.

8   Q.    Was it in August?

9   A.    Could be.  I don't recall.

10   Q.    If I told you that Mr. Lanes

11   message was on August 29th, would you think it

12   was before that?

13        MR. SHEA:  Don't speculate if you

14   don't know.

15        THE WITNESS:  I don't know.

16   Q.    (By Mr. Hart)  Well, anyway, he

17   covered your shift, so you owed him a cover,

18   essentially, correct?

19   A.    Yes.

20   Q.    And then on September 16th or

21   September 15th, you were at home and could have

22   been at work, but you assumed that Mr. Duval

23   would be working his regular shift?

24   A.    Yes, because it was a discussion

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 120

1  among the supervisors that the swap thing is

2  off.

3          Q.      But you did get dressed, come into

4  work, and cover for him eventually on that day,

5  correct?

6          A.      Yes.

7          Q.      And you explained that it was a

8  miscommunication or a mistake and you didn't

9  intentionally not come in, correct?

10         A.      I don't remember what I did.

11         Q.      I think your testimony a little

12  earlier was that it was a miscommunication,

13  correct, and not an intentional thing?

14         A.      Right.

15         Q.      But the end result of this

16  miscommunication was that the shift was ready

17  to start and there was no supervisor there to

18  cover, correct?

19         A.      No.

20         Q.      That wasn't correct?

21         A.      No.

22         Q.      Well, who was there?

23         A.      It is the agreement with

24  supervisors that you're not supposed to leave

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 121

1    until somebody else is there.

2         Q.    Got you.  So who was on that day?

3         A.    I think it was Diego.

4         Q.    Diego was on, his shift ends, and

5    no one come to relieve him; is that correct?

6         A.    Right, right.

7         Q.    And that was because of the

8    miscommunication between you and Mr. Duval?

9         A.    Yes.

10        Q.    And then somebody called you at

11   your house, correct?

12        A.    Diego called.

13        Q.    Diego called you?

14        A.    Yes.

15        Q.    And you came into work?

16        A.    Yes, and also Jerry called.

17        Q.    Jerry called?

18        A.    Yes.

19        Q.    Did you have any discussions with

20   Mr. Goodsell about this whole arrangement after

21   the fact?

22        A.    Yes'.

23        Q.    What happened?

24        A.    I told him exactly what happened

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 122

1    and left it at that.

2         Q.     **And what did you say happened?**

3         A.     Exactly what I told you.

4         Q.     **Okay, and what did he say?**

5         A.     I don't recall.

6         MR. HART:  I'm just going to take

7    a two-second break.

8

9         (A recess was taken)

10

11        MR. HART:  Back on the record.

12        Q.     **(By Mr. Hart)  I'd like to talk to**

13   **you a little bit about this trip to Jamaica in**

14   **December of 2003.  When did you make your**

15   **travel arrangements to go to Jamaica?**

16            MR. SHEA:  Are you referring to

17        the flight and the whole trip?

18            MR. HART:  Yes.

19            THE WITNESS:  If I can recall, a

20        week before.

21        Q.     **(By Mr. Hart)  A week before?**

22        A.     Yes, sometime before.

23        Q.     **When exactly did you leave?**

24        A.     I left on Saturday morning on the

**DUDLEY THOMPSON**
**April 13, 2006**

Page 133

1    itself to and from?

2    Q.    (By Mr. Hart)  Just whatever else,

3    travel, meals, lodging, cars?

4    A.    Yes, meals and for gas.

5    Q.    But other than that, you stayed

6    with your family and you drove the cars of some

7    of your family?

8    A.    Yes.

9    Q.    Okay.  What did you do while you

10   were in Jamaica?

11   A.    Mostly stayed at one of my

12   relatives' and interact.  My trip to Jamaica

13   was not a vacation.  It was a trip to have my

14   dental work procedure completed.

15   Q.    Now, looking at this calendar, you

16   took off on the 20th, I think we've

17   established, and probably got there sometime

18   midday on the 20th; is that correct?

19   A.    Yes.

20   Q.    It's about what, a three or four-

21   hour flight?

22   A.    Yeah, from Boston.  It was close

23   up to 1:00, somewhere in that.

24   Q.    And then someone picked you up?

**DUDLEY THOMPSON**
**April 13, 2006**

Page 134

1      A.      Yes.

2      **Q.      And you drove to Mandeville?**

3      A.      Yes.

4      **Q.      What did you do the rest of that**

5   **day?**

6      A.      I was actually late to get to my

7   dental appointment because I wanted to schedule

8   that appointment very early so the procedure

9   could be completed within the specific time

10  that I outlined to Dennis Williams and Jerry

11  Goodsell and Marty.

12     **Q.      Let's talk a little bit about this**

13  **procedure.  What dental work did you have done**

14  **in Jamaica?**

15     A.      I had these front teeth here.

16     **Q.      The bottom front?**

17     A.      No, the top.

18     **Q.      The top front?**

19     A.      Yes.

20     **Q.      Okay.**

21     A.      They were being made from scratch.

22     **Q.      Who told you that you would need**

23  **to have this dental work done?**

24     A.      It was my personal observation.  I

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 135

1    mean, nobody knows my body like me.  I know

2    what's happening, so I took that decision on

3    myself to do that.

4        Q.      **Did you see a dentist here in the**

5    **United States that told you you needed to have**

6    **work done?**

7        A.      Did I, yes.

8        Q.      **Who was that?**

9        A.      I don't recall his name.

10       Q.      **Was it your regular dentist who**

11   **you saw on a regular basis?**

12       A.      No.

13       Q.      **But a dentist here in the United**

14   **States --**

15       A.      Yes.

16       Q.      **-- told you that you needed**

17   **certain work done?**

18       A.      Yes.

19       Q.      **You have no idea who that was?**

20       A.      I can't recall.

21       Q.      **What town were they in?**

22       A.      In Amherst.

23       Q.      **In Amherst?**

24       A.      Yes.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 136

1      Q.      Was it a male or female?

2      A.      A male.  I don't remember his

3  name.

4      Q.      Do you know what address, where

5  the office was?

6      A.      No.  I can't recall.

7

8              (At this time, Mr. Lewis left the

9              deposition)

10

11     Q.      (By Mr. Hart)  When did you see

12  this dentist that told you that you needed to

13  have this work done?

14     A.      Some time in the summer.

15     Q.      In the summer of 2003?

16     A.      Yes.

17     Q.      And at that time, did this dentist

18  tell you how much it would cost to do that

19  work?

20     A.      Yes.  He proposed almost $5,000 to

21  have it done.

22     Q.      And as an employee at Coca-Cola,

23  you had dental insurance, correct?

24     A.      Yes.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 137

1     Q.     How much of this work would your

2  dental insurance cover?

3     A.     I don't think it would cover

4  everything. I don't remember how much of that

5  it would cover, but after doing the economic

6  analysis, going to Jamaica having it done would

7  cost far less than what was being done here.

8     Q.     Even including the plane ticket?

9     A.     Yes.

10     Q.     Did you bring anyone else with you

11  to Jamaica?

12     A.     No.

13     Q.     None of your kids?

14     A.     No.

15     Q.     So just you traveled alone?

16     A.     Yes.

17     Q.     So the total bill was $5,000, but

18  you don't know how much of it would have been

19  covered by your insurance?

20     A.     I don't recall. It's within the

21  policy which stipulates what work you're going

22  to do and how much they would cover.

23     Q.     In the past when you've had dental

24  work done, have you had dental work done in the

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 138

1  past?

2      A.      No.

3      Q.      **You never had dental work done on**

4  **the Coke plan?**

5      A.      Except a cleaning in Hadley.

6  There was an office in Hadley that I did

7  cleaning.

8      Q.      **And was it the same office that**

9  **you went to?**

10     A.      No.

11     Q.      **So what caused you to go to this**

12  **dentist in Amherst?**

13     A.      Thinking -- I was just scouting

14  around to find what the best cost to do.

15

16                  (At this time, Mr. Lewis returned

17                  to the deposition)

18

19     Q.      **(By Mr. Hart)  Did you see several**

20  **dentists?**

21     A.      I saw one in Hadley.

22     Q.      **And one in Amherst?**

23     A.      One in Amherst.

24     Q.      **And you don't remember what street**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 139

```
 1    it was on?
 2         A.      The one in Hadley was at the
 3    Hadley Mall.
 4         Q.      Okay, and the other one?
 5         A.      Somewhere --
 6              MR. SHEA:  The Amherst one?
 7              MR. HART:  Yes.
 8              MR. SHEA:  I think he already said
 9         he didn't know that.
10              THE WITNESS:  I don't remember the
11         name of the street where he's at.
12         Q.      (By Mr. Hart)  Can you just
13    describe kind of what is it near?
14         A.      It's within the town.
15         Q.      In the town center?
16         A.      I think it's in the vicinity --
17    what's the name of this road.  It's so long.
18    Not going to UMass side, it was the other side.
19         Q.      The other side?
20         A.      The Amherst College side.
21         Q.      The Amherst College side?
22         A.      Yeah.
23         Q.      Now, was this a chain like Gentle
24    Dental, or was it just a solo dental --
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 140

1      A.    I don't know.

2      **Q.    Do you know if there were other**

3  **dentists' office there?**

4      A.    I don't recall.

5      **Q.    This dentist that you saw, was he**

6  **black or white?**

7      A.    White.

8      **Q.    How old was he?**

9      A.    I don't know.

10      **Q.    Do you think he was under 40, over**

11  **40?**

12      A.    Maybe he could be in his 40s.

13      **Q.    In his 40s?**

14      A.    I don't know.  I'm not a good

15  judge of age.

16      **Q.    Was it on a main street, or was it**

17  **on a side street?**

18      A.    I think it was a main street?

19      **Q.    On a main street in Amherst?**

20      A.    Yes.

21      **Q.    And then the one in the Hadley**

22  **Mall, what was that?**

23      A.    There was a dental center there

24  where my boys would go for cleaning and my

**DUDLEY THOMPSON**
**April 13, 2006**

Page 147

1    Jamaican Dollars.

2         Q.    You're sure that that was the

3    amount that you paid; you're not sure about the

4    exchange rate?

5         A.    Right.

6         Q.    Did you pay by check?

7         A.    No, cash.

8         Q.    You gave him cash?

9         A.    Yeah.

10        Q.    Do you still maintain bank

11   accounts in Jamaica?

12        A.    Yes.

13        Q.    Did you maintain a bank account in

14   Jamaica at that time?

15        A.    Yes.

16        Q.    Did you receive any documentation

17   about this dental work while you were in

18   Jamaica?

19        A.    Yes.

20        Q.    Did you ever submit any of that

21   documentation to Coca-Cola?

22        A.    No, but I told them about it, and

23   nobody --

24        Q.    But you never gave them any

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 148

1   documents?

2              MR. SHEA:  Can he finish his

3        answer?

4              THE WITNESS:  I told them about it

5        and nobody requested the information at

6        that time.

7        Q.      (By Mr. Hart)  But you never gave

8   it to anyone at Coca-Cola?

9        A.      No, and it's within some papers

10   that I have that I'm trying hard to find.

11       Q.      But at the time they told you that

12   you may be suspended and perhaps terminated,

13   you didn't pull out this documentation and --

14       A.      I told them about it.

15       Q.      But you didn't give it to them?

16       A.      No.

17       Q.      Okay.  Why didn't you submit the

18   documentation for at least reimbursement under

19   the insurance policy as an out-of-network

20   insurance claim?

21       A.      Because I didn't get a chance to

22   do that, because in the day as I got back, I

23   was hit with a letter, then the meeting, then

24   suspension, so, you know, I didn't --

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 154

1      Q.      You did an analysis.  Did you take

2    any notes when you did this analysis?

3      A.      No.

4      Q.      You did an analysis that it would

5    be more efficient for you, cheaper --

6      A.      Yes.

7      Q.      -- to fly to Jamaica and have the

8    work done --

9      A.      Yes.

10      Q.      -- than to have it done here?

11      A.      Yes.

12      Q.      And you didn't consult anyone

13    regarding the dental insurance benefits that

14    the company offered in making this decision?

15            MR. SHEA:  I don't think he said

16        that.  I think he said he didn't know.

17            MR. HART:  I asked him if he asked

18        anyone about it.

19            MR. SHEA:  You can answer.  I

20        think it's been asked and answered.

21      Q.      (By Mr. Hart)  Did you ask anyone?

22      A.      No.

23      Q.      Did you have any figures from the

24    company as to what they would pay to figure

**DUDLEY THOMPSON**
**April 13, 2006**

Page 155

1    into your economic analysis?

2         A.      I think, based on what was gleaned

3    from other people, the contribution that would

4    be given would be -- it would be more

5    advantageous to do it in Jamaica.

6

7                 (At this time, Mr. Lewis left the

8                 deposition)

9

10        Q.      (By Mr. Hart)  So in your

11   analysis, what was a part of your analysis that

12   you did?

13        A.      Finding out the cost of doing the

14   bridge work, how much it would cost in Jamaica.

15   I think I could find, at the time, how much the

16   maximum that you would get from the dental

17   persons, and when I factored that into the

18   overall cost, it would have been more

19   advantageous for me to do it in Jamaica.

20

21                (At this time, Mr. Lewis returned

22                to the deposition)

23

24        Q.      (By Mr. Hart)  Who told you what

**DUDLEY THOMPSON**
**April 13, 2006**

Page 156

1   it would cost you to have it done here in

2   America?

3              MR. SHEA:  I think we covered

4        that.  Objection, asked and answered, but

5        go ahead, answer that question.

6              THE WITNESS:  Hadley, I went to

7        Hadley, and then I went to -- I don't

8        remember the name of the dentist, and I

9        went to another dentist, which gave a

10       quotation.

11       Q.     (By Mr. Hart)  And neither of

12   these dentists, nor yourself, had any

13   information form the company's insurance

14   carrier as to what portion they would pay?

15       A.     I can't recall.

16       Q.     You can't recall?

17       A.     No.

18       Q.     So you don't know if you had

19   any --

20       A.     I know I had coverage.

21       Q.     Yes.

22       A.     And the maximum coverage that you

23   could get.

24       Q.     How much was that?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 157

1      A.      I don't recall at this time, but

2  when I factored the maximum amount of coverage

3  that I could get, through not even talking to

4  the guys at the benefit place, but through some

5  booklet which gives you the guidelines, it

6  would make sense.

7      Q.      You said you talked to some other

8  people who told you what the benefit would be.

9  Who were those other people you talked to?

10     A.      I think I talked to Hector, who I

11  think did some work.

12     Q.      So Hector told you what the

13  benefit would have been?

14     A.      Yes.  Plus, I think I went in and

15  saw what was the maximum amount for doing that.

16     Q.      And this happened sometime in the

17  fall of 2003 that you did this analysis?

18     A.      Yes.

19     Q.      Sometime in December, first or

20  second week of December, you started to make

21  your plans to go to Jamaica?

22     A.      Yes.

23     Q.      The first person you talked to at

24  the plant was Hector, right?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 160

1

2          MR. HART:   Back on the record.

3      Could you read back the last question and

4      answer, please?

5

6          *  (Question read)

7

8      **Q.      (By Mr. Hart)   Who was the next**

9  **person at the Coca-Cola Northampton plant that**

10  **you spoke to regarding your time off in**

11  **December 2003?**

12      A.      Dennis Williams.

13      **Q.      And when did you talk to Mr.**

14  **Williams?**

15      A.      When he was at the plant in

16  December.

17      **Q.      What day?**

18      A.      I don't recall which day.

19      **Q.      Do you know what day of the week**

20  **it was?**

21      A.      No, I don't recall, but during his

22  visit there, while he was there, he called me

23  and we went up to the pouch office that was

24  Darrin's, Plawinski, and we sat in that office,

**DUDLEY THOMPSON**
**April 13, 2006**

Page 161

1    and I asked him if I could get the time to do

2    my dental work, and he said yes, but I should

3    pass it by Jerry.

4            The time line for that was the

5    20th of December, running up until the 2nd of

6    January 2004, and if need be, I would take

7    additional days from my 2004 vacation to cover,

8    and that was approved.

9        Q.    I'm sorry.  That's what you told

10   Mr. Williams?

11       A.    Yes.

12       Q.    That you would be out from the

13   20th until January 2nd?

14            MR. SHEA:  No.  That's not what he

15       just said.

16            MR. HART:  He said the time line

17       was --

18            MR. SHEA:  He just finished

19       telling you from the 20th of December to

20       January 9th of '04.

21            MR. HART:  Could you read back

22       that answer, please?

23

24            *  (Answer read)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 163

1          A.        Not directly, but Dennis called me

2     to his office, to the office that Darrin

3     Plawinski used to occupy, so from that point in

4     view, telling me about what he expects, and so

5     I took liberty at that point to assume he was

6     taking over from Jerry and then I could discuss

7     my vacation plans with him.

8          **Q.        But no one came to you and said,**

9     **from this day forward, you are to report to**

10    **Dennis Williams, no one said that?**

11               MR. SHEA:  With those specific

12         words?

13               THE WITNESS:  No.

14         **Q.        (By Mr. Hart)  Or no one told you**

15    **with those words, or just generally no one told**

16    **you that you were to report to Dennis Williams**

17    **instead of Jerry?**

18         A.        No, but communication went out

19    that we have a new manager, operations manager,

20    and he'll be starting in December.

21         **Q.        Could you please look at Exhibit**

22    **B, the December calendar.  Let's recreate a**

23    **little bit of your work days.  Well, first of**

24    **all, looking at this calendar, does that**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 164

1    refresh your memory as to when you had this

2    conversation with Mr. Williams?

3        A.    To a point.  I don't know the

4    specific day, but sometime during this time.

5        Q.    Was it sometime during that second

6    week, which would be sometime between the 8th

7    and the 12th or 13th?

8            MR. SHEA:  I think he said the

9        first week, but go ahead.

10            THE WITNESS:  Yes.  I think it's

11        somewhere when he was there.

12        Q.    (By Mr. Hart)  When who was there?

13        A.    First there, Dennis Williams.

14        Q.    The first week, so the week of

15    December 1st through the 6th?

16        A.    Could be.

17            MR. SHEA:  He's not certain.  He

18        said whenever he was there.

19            THE WITNESS:  Whenever he was

20        there.

21        Q.    (By Mr. Hart)  And I asked him if

22    looking at the calendar refreshed his memory,

23    and he said somewhat, so  which --

24        A.    It could either be the first week

**DUDLEY THOMPSON**
**April 13, 2006**

Page 167

1    in some respect; isn't that correct?

2         A.      Just to let him know what was

3    approved by him.

4         Q.      **And then when did you talk to Mr.**

5    **Duval?**

6         A.      Mr. Duval knew tentatively about

7    it even before I spoke to Mr. Williams.

8         Q.      **Mr. Williams.**

9         A.      After Mr. Williams gave me the

10   go-ahead, the week before, in the presence of

11   Hector Lepage, in my office, I spoke to Marty

12   Duval that I would be going on to do the dental

13   work and there is a possibility that I would be

14   asking for extension time out of my 2004

15   vacation.  He said, "Yes, but just send me an

16   e-mail to what you're saying."  And I said,

17   "Okay, I will send it."  That's why I sent that

18   e-mail to him the last minute, because it was

19   just confirmation of what was agreed on.

20        Q.      **When did you have this**

21   **conversation with Mr. Duval?**

22        A.      That was the week before the -- I

23   think it was the week before I actually went

24   away.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 170

1      Q.      So you worked until Saturday
2  morning?
3      A.      I didn't complete the Saturday
4  morning.  I asked Sean for coverage for maybe
5  two hours because I would have to leave early
6  in order to catch the flight, and Sean agreed
7  to do that and he actually did.
8      Q.      So if you worked on the 19th into
9  the 20th, when was the next time that you were
10  on, you were scheduled to work?
11      A.      I would be off that weekend.
12      Q.      Because that would be Mr. Duval's
13  time to work, right?
14      A.      Yes.
15      Q.      He would work the night of the
16  20th into the 21st, the night of the 21st into
17  the 22nd, and then when in that week would you
18  have next scheduled to --
19      A.      The schedule will dictate that.
20          MR. SHEA:  If he wasn't on
21      vacation?
22          MR. HART:  Yes, when was he
23      scheduled to work?
24          THE WITNESS:  I would have to look

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

1    **24th?**

2         A.    I don't know.

3         Q.    **Do you know if the plant was open**

4    **on Christmas Day?**

5         A.    I don't know.

6         Q.    **Do you know if it was open on the**

7    **26th?**

8         A.    Those days would have been posted

9    by HR to say when the plant would be closed,

10    the holidays that are plant holidays, and that

11    would be posted.

12         Q.    **Why didn't you send Mr. Duval an**

13    **e-mail right after you purchased your ticket?**

14         A.    I don't know if I purchased the

15    ticket before Duval or after.  I can't recall

16    at this point.

17         Q.    **So it's possible that you**

18    **purchased your ticket after December 18th?**

19              MR. SHEA:  He's talking about the

20         conversation, not the e-mail.  Are you

21         talking the e-mail?

22              MR. HART:  E-mail.

23              MR. SHEA:  I'm confused, but go

24         ahead.

**DUDLEY THOMPSON**
**April 13, 2006**

Page 173

1          THE WITNESS:  The e-mail was sent

2      from the Thursday of that week, but he

3      would not have received that e-mail until

4      the Saturday, reasons being it was a

5      verbal agreement, and therefore that was

6      just to do that.

7          Q.      (By Mr. Hart)  But I'm asking you

8  why you didn't send him an e-mail right after

9  you purchased your ticket or as you were

10  purchasing your ticket?

11          A.      Because the verbal agreement was

12  binding.

13          Q.      Do you know if Mr. Duval had plans

14  to spend this week of Christmas with his

15  family?

16          A.      He told me it was okay.

17          Q.      But I'm just saying, do you know

18  if he had plans?

19          A.      I don't know.  He told me it was

20  okay, and if he didn't want to do it, he could

21  have said no.

22          Q.      What would you have done if you

23  had already purchased your ticket?

24          A.      I don't know.  When I got to that

**DUDLEY THOMPSON**
**April 13, 2006**

Page 174

1   bridge, I would have made a decision.

2         Q.     Can you turn to Exhibit 6, please?

3   The second page of that exhibit, could you look

4   at the e-mail at the bottom of that exhibit,

5   which is page number TCC0019?

6         A.     Yes.

7         Q.     Is that the e-mail that you sent

8   to Mr. Duval?

9         A.     Yes.

10        Q.     And that was sent at 10:27 p.m. on

11  December 18, 2003?

12        A.     Yes.

13        Q.     Let me just read this.  Hi Marty,

14  I will be off on December 23rd, 27th, 28th and

15  29th.  However, there is a possibility that I

16  could also be off on January 2nd, 6th and 7th

17  if my dental work is not completed.  Dudley.

18               Did I read that properly --

19        A.     Yes.

20        Q.     Is that what that says?  Let's be

21  clear.  You did not, in this e-mail, or this

22  e-mail does not say that you are confirming

23  your verbal agreement via e-mail.  It doesn't

24  say that, does it?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 175

1          MR. SHEA:  In other words, it

2      doesn't use the words, this confirms our

3      verbal agreement.  Is that what you're

4      asking?

5          MR. HART:  That's what I'm asking

6      him.

7          THE WITNESS:  That's not there.

8      Q.      **(By Mr. Hart)  That's not there.**

9      A.      But it is understood.

10     Q.      **But does it reference any other**

11  **conversation in any other way?**

12         MR. SHEA:  Objection.  If you can

13     answer, go ahead.

14         THE WITNESS:  I couldn't be

15     sending him this without having a

16     go-ahead from him to cover.  If I didn't

17     get his go-ahead, this e-mail would be,

18     you know, wouldn't be right.

19     Q.      **(By Mr. Hart)  So if you didn't**

20  **arrange with him to cover in advance, it would**

21  **not be right to send him an e-mail one day**

22  **before you leaving, that would not be right?**

23     A.      That would not be right.

24     Q.      **Let's talk about what was the**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 176

1  vacation policy for production supervisors in

2  December of 2003.  How would you obtain

3  vacation time?

4      A.    By asking for the time, getting

5  your peer to cover, entering it on the G-drive

6  spreadsheet, and that's it.

7      Q.    Were you also required to contact

8  either Mr. Lane or Mr. Goodsell?  Were they

9  involved in the policy at all?

10      A.    What happened is that as long as

11  your manager approved, then you're okay.

12      Q.    And your manager would have been

13  Mr. Goodsell?

14      A.    No.  It would have been Dennis

15  Williams at that time, as I assumed, and I did

16  pass it by Mr. Goodsell.

17      Q.    When did you talk to Mr. Goodsell?

18      A.    On the night of Friday.

19      Q.    Friday the 19th?

20      A.    Yes.

21      Q.    You talked to Mr. Goodsell saying

22  that you were leaving that day?

23      A.    Yes.

24      Q.    What did he say?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 177

1            MR. SHEA:  Well, that's not all

2      that was said, but go ahead.  I don't

3      know if you want the whole conversation.

4            MR. HART:  No, I just want him to

5      answer the questions that I ask.

6            THE WITNESS:  Can you ask again,

7      please?

8            MR. SHEA:  Well, your question

9      assumes that he said something limited,

10     and I'll object for the record that

11     that's not what Mr. Goodsell said.  There

12     was much more to what he said than what

13     you've assumed in your question, so I'm

14     objecting to the form, but go ahead.

15           THE WITNESS:  I outlined to Mr.

16     Goodsell about what I told Mr. Williams

17     about going to Jamaica to do dental work

18     and there's a possibility that I would

19     need extra time if the dental work was

20     completed, and he did not say no, I can't

21     have my vacation.  He asked about

22     coverage; I told him there was coverage

23     and that even Sean was coming in that

24     morning to cover.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 178

```
 1        Q.       (By Mr. Hart)  How could he tell

 2   you not to go if you had already purchased the

 3   ticket and were planning to get on a plane that

 4   same night?

 5                 MR. SHEA:  Objection.

 6                 THE WITNESS:  It's not what --

 7                 MR. SHEA:  Objection.  You're

 8            asking him how Mr. Goodsell could?

 9                 MR. HART:  I'm asking him, how

10            could he have told you that?

11                 MR. SHEA:  I think he could have

12            just told him.

13                 THE WITNESS:  It's not what is

14            prudent on his behalf, but what is for

15            the operation of the company.  Plus, he,

16            in my view, was on a part of harassment

17            and retaliation about me being who I am.

18        Q.       (By Mr. Hart)  Did you leave

19   anyone at the plant your cell phone when you

20   went away?  Do you have a cell phone?

21        A.       Yes.

22        Q.       Did you carry it with you --

23        A.       The number was posted in the

24   supervisor office.
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 179

1      Q.      Your cell phone number was?

2      A.      The cell phone number, home number

3   that could be accessed.

4      Q.      Did you have a voice mail machine

5   or answering machine at home?

6      A.      Yes, I do.

7      Q.      And did you check those messages

8   while you were in Jamaica?

9      A.      My wife would check every day when

10   I called and no voice mail was recorded.

11      Q.      What would the policy be if you

12   were already out on vacation and you need to

13   extend that vacation?  How would one go about

14   doing that, in your opinion?

15      A.      Would call, would give your

16   manager notice maybe two days ahead of when the

17   original time would be exhausted, which I did,

18   in terms of voice mail to Jerry Goodsell, and

19   which I did talking to Mr. Marty Duval.

20      Q.      Prior to December 2003, had you

21   ever extended a vacation?

22      A.      No.

23      Q.      Never in your employment with

24   Coca-Cola did you have to come back a few days

**DUDLEY THOMPSON**
**April 13, 2006**

Page 180

1    late?

2            A.      No.

3            Q.      While you were in Jamaica, did you

4    send any e-mail to anyone at Coke?

5            A.      No.

6            Q.      Did you fax anything to the plant?

7            A.      No.

8            Q.      Did you have your dentist fax

9    anything?

10           A.      No.

11           Q.      Can you please tell me what your

12   damages are in this matter?  What are you

13   seeking?

14                   MR. SHEA:  I'm going to object for

15           the record, legal conclusion, but go

16           ahead.

17                   THE WITNESS:  Compensation for

18           damage done.

19           Q.      (By Mr. Hart)  How have you been

20   damaged?

21           A.      Emotionally, being out of work for

22   nine months.

23           Q.      How does the --

24                   MR. SHEA:  Anything else?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 181

1              THE WITNESS:   Being humiliated as

2        a Black man with Jamaican heritage, with

3        management handling the situation in a

4        way to put me down as being inferior.

5        That's it.

6        **Q.      (By Mr. Hart)   How does the**

7   **emotional damage manifest itself?**

8        A.      Not having to be able to pay my

9   bills on time, losing my regular pay, having a

10  child in college that's dependent on me --

11             MR. SHEA:   I think he's asking you

12        how it makes you feel, how emotionally it

13        makes you feel, if I'm right.

14             MR. HART:   Yes.

15       **Q.      (By Mr. Hart)   Have you sought any**

16  **care from any mental health professionals --**

17       A.      No.

18       **Q.      -- as a result of this case?**

19       A.      I was depressed at home.  After

20  applying for jobs, and I was told why did you

21  not have a job, and I told them what had

22  transpired, that made it very difficult.

23       **Q.      But you've never sought any care**

24  **for any emotional issues?**

**DUDLEY THOMPSON**
**April 13, 2006**

Page 191

1      Q.      And you're still with Pepsi?

2      A.      Yes.

3              MR. HART:  Please mark this as

4      Exhibit F.

5

6              (Exhibit F, e-mail, marked)

7

8      Q.      (By Mr. Hart)  Sir, could you take

9      a look at the e-mail that's at the top of this

10     document that I've handed to you.  Actually, on

11     the second page, I'm sorry.  You can read the

12     first page, but could you take a look at the

13     second page?

14     A.      Yes.

15

16             (At this time, Mr. Lewis left the

17             deposition)

18

19     Q.      (By Mr. Hart)  Do you remember

20     receiving this e-mail on or about August 29,

21     2003?

22             MR. SHEA:  Don't speculate.

23     You're asking him if he has a specific

24     memory of receiving that?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

**DUDLEY THOMPSON**
**April 13, 2006**

Page 192

1              THE WITNESS:  No.

2         Q.      (By Mr. Hart)  Do you remember

3    ever receiving this e-mail?

4         A.      Sometime.

5         Q.      So it's not foreign to you; you

6    recognize it?

7         A.      Yes.

8         Q.      Could you flip over to the next

9    page, the first page, and look at the e-mail at

10   the bottom, which states:  I looked at the

11   vacation scheduler on the G-drive this a.m. and

12   noticed that it is not current.  Per the e-mail

13   below, please update the vacation

14   taken/scheduled on the spreadsheet ASAP.  I

15   will look at it again on Friday and expect it

16   to be current.

17              That being sent on September 8,

18   2003, do you remember receiving that e-mail?

19        A.      Not specifically.

20

21              (At this time, Mr. Lewis returned

22              to the deposition)

23

24        Q.      (By Mr. Hart)  Do you have any

**DUDLEY THOMPSON**
**April 13, 2006**

Page 193

1    memory in seeing it?

2         A.    But I should have responded to it.

3         Q.    **You should have responded?**

4         A.    I responded to it.

5         Q.    **You did?**

6         A.    Yes.

7         Q.    **So did you enter in your December**

8    **vacation at that time?**

9         A.    I don't recall doing that.

10        Q.    **Do you know when you entered your**

11   **December vacation into the spreadsheet?**

12        A.    I can't recall.

13        Q.    **Did you, on the 20th or the 19th,**

14   **either on your way out of the plant or your way**

15   **to the airport, did you access that**

16   **spreadsheet?**

17        A.    On my way Friday night I looked

18   at, I went to, that site to insure that I had

19   actually put in the system what was approved.

20        Q.    **Did you make any alterations to**

21   **the spreadsheet at that time?**

22        A.    No.

23        Q.    **So your testimony is that you just**

24   **viewed what was on the spreadsheet?**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

EXHIBIT 2

**MARTIN WAYNE DUVAL**
**April 11, 2006**



COPY

Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                   No.:  06-30168-MAP

4

5      *******************************

6      DUDLEY THOMPSON,                    *

7              Plaintiff                   *

8              vs.                         *

9      THE COCA-COLA COMPANY,              *

10             Defendant                   *

11     *******************************

12

13

14          DEPOSITION OF:  MARTIN WAYNE DUVAL

15          CATUOGNO COURT REPORTING SERVICES

16             1414 Main Street, 6th Floor

17             Springfield, Massachusetts

18          April 11, 2006       3:03 p.m.

19

20

21

22

23               Ian F. Galloway

24               Court Reporter

MARTIN WAYNE DUVAL
April 11, 2006

Page 11

1      Q.      **Maintaining machinery?**

2      A.      Maintaining machinery, building

3   facilities.

4      Q.      **Both?**

5      A.      Everything.

6      Q.      **How long did you hold that job?**

7      A.      I think two months.

8      Q.      **Why did you leave that job?**

9      A.      For Coca-Cola.  They gave me a

10  call-back.

11      Q.      **Did you work for Coca-Cola before**

12  **that?**

13      A.      No.

14      Q.      **Did you say they gave you a call-**

15  **back?**

16      A.      Well, they called me.

17      Q.      **They called you?**

18      A.      Made me a job offer.

19      Q.      **And when did you start there?**

20      A.      Five years ago.  I think in June,

21  as a matter of fact.

22      Q.      **What position did you start as?**

23      A.      Supervisor.

24      Q.      **Is that the same position you hold**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**MARTIN WAYNE DUVAL**
**April 11, 2006**

Page 12

1    today, production supervisor?

2         A.    Yes.

3         Q.    Did you ever receive any warnings

4    or reprimands at any job?

5         A.    Yes.

6         Q.    For what?

7         A.    I received one at Coca-Cola.

8         Q.    For what?

9         A.    Not maintaining production

10   standards.

11        Q.    Who gave you that warning?

12        A.    That was Jerry Goodsell.

13        Q.    When did you get that warning?

14        A.    Two years ago.  I don't know the

15   exact date.

16        Q.    When you say not maintaining

17   production standards, what do you mean by that?

18        A.    Not maintaining the production

19   rates.

20        Q.    The levels?

21        A.    Yes.

22        Q.    Any other warnings that you

23   received?

24        A.    No.

**MARTIN WAYNE DUVAL**
**April 11, 2006**

Page 14

1    Q.    Was Mr. Thompson working there at
2    the time?

3    A.    I think so.

4    Q.    Do you know when Mr. Thompson
5    stopped working at Coca-Cola in Northampton?

6    A.    Not exact dates.

7    Q.    Do you remember what year?

8    A.    No, not really.

9    Q.    What other disagreements did you
10   have with Mr. Goodsell, any others, or was it
11   just over the warning?

12   A.    Probably just over the warning.

13   Q.    Did he ever yell at you?

14   A.    Yes.

15   Q.    Did he ever use profanities with
16   you or no?

17   A.    Yes.

18   Q.    What did he say?  If it's a
19   vulgarity, you can say it.

20   A.    It's a vulgarity.

21   Q.    You can say it for the record.
22   It's okay.  You have my permission.

23   A.    Probably it was I was being a
24   fucking asshole.

**MARTIN WAYNE DUVAL**
**April 11, 2006**

Page 15

1       **Q.**      **Anything else?**

2       A.      No.

3       **Q.**      **What did you do in response?**

4       A.      Got very upset.

5       **Q.**      **What did you do?**

6       A.      ~~In basic,~~ I told him if he was

7  going to make an accusation, he's got to have

8  something to back it up.

9       **Q.**      **Meaning what, he was lying?**

10      A.      Meaning that he made an accusation

11  that I was making adjustments to the machines.

12      **Q.**      **Which wasn't true?**

13      A.      Which wasn't true, and I told him

14  back it up.

15      **Q.**      **And what did he say?**

16      A.      I don't remember exactly.

17      **Q.**      **Was there more than one incident**

18  **like this?**

19      A.      I don't understand the question.

20      **Q.**      **Was there more than one incident**

21  **where you had a confrontation with him where he**

22  **wasn't being honest with you?**

23      MR. HART:  Objection.  You may

24      answer.

**MARTIN WAYNE DUVAL**
**April 11, 2006**

Page 40

```
1        A.      I don't know what it was.

2        Q.      Did Mr. Thompson bring that to the

3   attention of management?

4        A.      I don't know.

5        Q.      Was she reprimanded for it?

6        A.      I don't know.

7        Q.      She's no longer with the company?

8        A.      Yes.

9        Q.      Do you know why?

10       A.      No, I do not.

11       Q.      Did you ever hear any rumors of

12   Mr. Goodsell making racial comments?

13       A.      No, I have not.

14       Q.      Does the term unauthorized

15   vacation time mean anything to you?

16       A.      That means it wasn't authorized.

17       Q.      Authorized by who?

18       A.      Depends on who.

19       Q.      A supervisor?

20       A.      If it's an hourly employee.

21       Q.      Well, who did Mr. Thompson request

22   vacation time from, Mr. Goodsell?

23       A.      I don't know who he requested

24   vacation time from.
```

EXHIBIT 3

COPY

Page 1

1               UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                  No.:  06-30168-MAP

4

5     *******************************

6    DUDLEY THOMPSON,                *

7              Plaintiff            *

8              vs.                  *

9    THE COCA-COLA COMPANY,          *

10             Defendant            *

11    *******************************

12

13

14            DEPOSITION OF:  DIEGO GARCIA

15        CATUOGNO COURT REPORTING SERVICES

16            1414 Main Street, 6th Floor

17            Springfield, Massachusetts

18        April 11, 2006       1:37 p.m.

19

20

21

22

23              Ian F. Galloway

24              Court Reporter

**DIEGO GARCIA**
**April 11, 2006**

Page 26

```
 1    somebody disagrees with him or gives a

 2    difference of opinion.

 3            Q.     So he yelled at you?

 4            A.     Yes.

 5            Q.     On many occasions?

 6            A.     Yes.

 7            Q.     Did he ever make any comments

 8    about your Hispanic heritage?

 9            A.     Never.

10            Q.     Did he ever see you speak Spanish?

11            A.     Yes.

12            Q.     Did he ever make any racial

13    comments at work?

14            A.     No.

15            Q.     Do you know whether he made any

16    racial comments about Mr. Thompson?

17            A.     No.

18            Q.     You don't know either way?

19            A.     No.

20            Q.     When you say he belittled you,

21    what do you mean by that?

22            A.     He treated me as though -- I felt

23    as though he didn't treat me as an adult; he

24    treated me as though I was a child making a
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DIEGO GARCIA**
**April 11, 2006**

Page 29

1    employee.

2         Q.    **What is his or her name?**

3         A.    Harry Shelky.

4         Q.    **Harry Shelky?**

5         A.    Yes.

6         Q.    **Do you know the spelling of his**

7    **last name?**

8         A.    S-H-E-L-K-Y.

9         Q.    **White, Caucasian?**

10        A.    Yes.

11        Q.    **Is Mr. Shelky Jewish, do you know?**

12        A.    I don't know.  I think he might be

13   nonpracticing Roman Catholic.

14        Q.    **Has Mr. Goodsell been spoken to**

15   **about his conduct in this regard?**

16             MR. HART:  Objection.

17             THE WITNESS:  I don't know.

18        Q.    **(By Mr. Shea)  Have you complained**

19   **about his conduct?**

20        A.    Yes.

21        Q.    **To whom?**

22        A.    Walter Klenzing.  He was my

23   production manager at one time.

24        Q.    **And what did Mr. Klenzing say?**

EXHIBIT 4

**GERARD P. GOODSELL**
**April 11, 2006**



Page 1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                  No.:  06-30168-MAP

4

5     ******************************

6     DUDLEY THOMPSON,                *

7              Plaintiff            *

8              vs.                  *

9     THE COCA-COLA COMPANY,         *

10             Defendant            *

11    ******************************

12

13

14        DEPOSITION OF:  GERARD P. GOODSELL

15        CATUOGNO COURT REPORTING SERVICES

16           1414 Main Street, 6th Floor

17           Springfield, Massachusetts

18        April 11, 2006        10:55 a.m.

19

20

21

22

23             Ian F. Galloway

24             Court Reporter

**GERARD P. GOODSELL**
**April 11, 2006**

Page 15

1    give me an overview of how your

2    responsibilities changed?

3         A.    Well, I've always had the roles

4    and responsibility of the plant engineer, but

5    during that time frame, I held the acting

6    production manager's position on two different

7    occasions.  One was somewhere in between 1999

8    and 2000; I'm thinking it's about seven months.

9    I'm not exactly sure.  That was just we lost

10   our production manager and we were waiting to

11   get another one.

12        Q.    And who was that?

13        A.    That person's name was Jay

14   Stevens.

15        Q.    And there was a second time when

16   you stepped in as acting production manager?

17        A.    Yes.  The second time I stepped in

18   was right at the end of August in 2003 until

19   around the second week of January 2004.

20        Q.    And why was that?

21        A.    The production manager quit.

22        Q.    And do you know why?

23        A.    He decided he wanted to move to

24   Florida.

**GERARD P. GOODSELL**
**April 11, 2006**

Page 16

1       Q.      So he voluntarily left?

2       A.      Yes.

3       Q.      In the position of acting

4  production manager in August of 2003 to January

5  of 2004, what were your job responsibilities in

6  that role?

7       A.      I was to work with the production

8  supervisors to coordinate the day-to-day

9  operations, what products we were running, when

10  we would be changing over, and be there as a

11  resource.

12       Q.      Did you have any other job

13  responsibilities in that role?

14       A.      Yes, I did.

15       Q.      What were they?

16       A.      I was also still the plant

17  engineer, and I was also the safety manager.

18       Q.      Now, those are two different roles

19  separate and distinct from the acting

20  production manager role, correct?

21       A.      Yes.

22       Q.      I'm just focusing on the acting

23  production manager role.  Did you have any

24  other job responsibilities in that role, other

**GERARD P. GOODSELL**
**April 11, 2006**

Page 18

1      A.    I think his performance was sub-

2  par in my period of time where I was

3  supervising him between September and December.

4      Q.    **September of?**

5      A.    2003.

6      Q.    **To when?**

7      A.    September through December.

8      Q.    **Of 2003?**

9      A.    Yes.

10     Q.    **Did you say that's when you were**

11  **supervising him?**

12     A.    Yes.

13     Q.    **Were you also supervising him in**

14  **August 2003?**

15     A.    That's when the transition took

16  place with the outgoing manager, for

17  approximately a week, maybe a week and a half.

18     Q.    **Who was the outgoing manager?**

19     A.    Darrin Plawinski.

20     Q.    **And why did he leave?**

21     A.    He's the one that decided to leave

22  to go to Florida.

23     Q.    **And who took his place?**

24     A.    I filled in until a manager was

**GERARD P. GOODSELL**
**April 11, 2006**

Page 19

1  hired.

2       Q.       **And when was a manager hired?**

3       A.       A manager transferred from another

4  plant and assumed full responsibilities, I

5  believe, the first week of January.

6       Q.       **Are you sure about that?**

7       A.       The manager came from the

8  Hightstown plant.  He came into the plant on

9  occasion, but did not assume full

10  responsibilities for that role until he

11  actually relocated, and I believe that was

12  right around the first week, maybe the second

13  week, of January.

14       Q.       **And who was that manager?**

15       A.       Dennis Williams.

16       Q.       **Did Dennis Williams start working**

17  **in the Northampton facility of December of**

18  **2003?**

19       A.       He was visiting the plant before

20  he relocated just to get the lay of the land,

21  so to speak.

22       Q.       **What were his hours?**

23       A.       I don't know.

24       Q.       **Was he there all day?**

**GERARD P. GOODSELL**
**April 11, 2006**

Page 20

1       A.      No, he wasn't.  He was there, but

2   he was in and out because of travel, and I

3   couldn't tell you what his hours were.

4       Q.      **Did he have any responsibilities**

5   **when he was at the facility in Northampton in**

6   **December of 2003?**  **Was he on the job in any**

7   **respect?**

8       A.      I had all responsibilities for

9   production.  Whatever Dennis was doing beyond

10  that, I'm not sure.

11      Q.      **So you don't know whether Mr.**

12  **Williams had any responsibilities, was on the**

13  **job, doing anything in December of 2003?**

14      A.      Not as far as production was

15  concerned.  I still assumed those

16  responsibilities.

17      Q.      **But you don't know whether he was**

18  **handling other job functions at that time?**

19      A.      I don't know.

20      Q.      **Now, you mentioned a sub-par**

21  **performance with respect to Mr. Thompson?**

22      A.      Yes.

23      Q.      **Can you tell me what you mean by**

24  **that?**

**GERARD P. GOODSELL**
**April 11, 2006**

Page 31

1      Q.      **Do you know when he went on**
2  **vacation?**
3      A.      He went on vacation that following
4  morning.  I believe it was the 20th of
5  December, and the content of the conversation
6  was that he had to catch a plane, I believe,
7  4:00 in the morning to go on vacation.
8      Q.      **Where did this conversation take**
9  **place?**
10      A.      He called me at home.
11      Q.      **Was that normal for an employee to**
12  **call you at home?**
13      A.      Yeah, during that time, I got a
14  lot of calls at home, typically production
15  related.
16      Q.      **And how many times had you been**
17  **involved in scheduling time off for employees**
18  **at this point in time?**
19      A.      I had not been involved in
20  scheduling time off.
21      Q.      **So Mr. Thompson's attempt to**
22  **schedule vacation with you was the first time**
23  **your experienced this, correct?**
24      A.      Yes, to my knowledge.

**GERARD P. GOODSELL**
**April 11, 2006**

Page 32

1    Q.    Can you tell me everything that

2    was said in that conversation by you and Mr.

3    Thompson to the best of your memory?  And

4    again, I'm focusing on the conversation where

5    you talked by phone the night before he left

6    for vacation.

7    A.    He called me.  I'm thinking it was

8    right around 7:00, because I had just finished

9    dinner, and he brought up to my attention

10   something in production.  I don't remember

11   exactly what the production issue is, and after

12   we discussed that production issue, he said,

13   "Oh, by the way, I asked Sean to come in early

14   for me so I could catch a plane."  And I asked

15   him where he was going, and he said he was

16   going on vacation, and that he would be back on

17   the 2nd of January.

18        I told him that he didn't follow

19   the proper protocol and asked him if he had

20   coverage while he was going to be gone, and he

21   told me yes, and that was about it.

22   Q.    That was about it?

23   A.    Um-hmm.

24   Q.    So there was nothing else said in

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**GERARD P. GOODSELL**
**April 11, 2006**

Page 33

1    that conversation?

2         A.    No.

3         Q.    **About anything?**

4         A.    No.

5         Q.    **So how did you leave the vacation,**

6    **that he could go on vacation?**

7         A.    Well, at the time, I didn't feel

8    as though there was anything I could do.  He

9    was leaving -- he was getting on a plane at

10   4:00 in the morning.  My concern at the time

11   was to make sure that I had coverage to run the

12   plant.

13        Q.    **Right, and there was coverage?**

14        A.    Um-hmm.

15        Q.    **Yes?**

16        A.    Yes.

17        Q.    **So that concern was addressed,**

18   **right?**

19        A.    It was addressed during the phone

20   call when Dudley told me that he had coverage

21   set up.

22        Q.    **So I'm simply asking you whether**

23   **you took issue with it at that point in time?**

24        A.    Issue with the vacation?

**GERARD P. GOODSELL**
**April 11, 2006**

Page 42

1     A.    To my knowledge, no.

2     Q.    So it's your belief that you

3  didn't know about any dental work before he

4  went on vacation?

5     A.    I did not know.

6     Q.    Did you know about the possibility

7  of medical treatment or dental work?

8     A.    I did not know.

9     Q.    Did Mr. Williams know that, do you

10  know?

11     A.    I don't know.

12     Q.    Well, did you ever ask Mr.

13  Williams if he knew that?

14     A.    No.

15     Q.    Why not?

16     A.    I didn't -- why would I ask him?

17  I didn't know.

18     Q.    At some point, did you have a

19  meeting with Mr. Thompson after January 2nd?

20     A.    I had a meeting with Mr. Thompson,

21  Celine Lasonde, and James Lane.

22     Q.    And what was that meeting about?

23     A.    It was just to do a fact-finding

24  to find out why Mr. Thompson didn't return to

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**GERARD P. GOODSELL**
**April 11, 2006**

Page 43

1  work.

2      Q.      And for what purpose?

3      A.      At that point, potential

4  discipline.

5      Q.      And at that point, the potential

6  discipline did not include termination, right?

7      A.      I don't know.  I don't have any

8  responsibilities nor authority to terminate

9  anybody.

10      Q.      Did you ever?

11      A.      No.

12      Q.      Did you ever have the ability to

13  make a recommendation with respect to Mr.

14  Thompson's termination of employment?

15      A.      I never have.

16      Q.      You never have?

17      A.      No, I have not.

18      Q.      Did you have that ability?

19      A.      I'm not sure.  All terminations go

20  through HR and corporate.

21      Q.      Let me back up to the December

22  voice mail message.  What was on that voice

23  mail message?

24      A.      The December 29th was he just left

**GERARD P. GOODSELL**
**April 11, 2006**

Page 48

1    anything.  I'm not sure exactly what was said

2    by who.

3        Q.      And after that meeting, what

4    happened?

5        A.      Dudley went home, and it was in

6    the Human Resources Department's hands from

7    both Northampton and Atlanta.

8        Q.      Meaning who?

9        A.      Celine Lasonde, and I'm not sure

10   who in corporate.

11       Q.      And who made the decision to

12   terminate Mr. Thompson's employment?

13       A.      I believe it was corporate Human

14   Resources Department.

15       Q.      Did you have any role in that

16   decision?

17       A.      No, I did not.

18       Q.      None whatsoever?

19       A.      No.

20       Q.      Would that have been part of your

21   responsibilities at the time?

22       A.      No.

23       Q.      Not at all?

24       A.      No.

**GERARD P. GOODSELL**
**April 11, 2006**

Page 49

1          Q.       But you don't know who made the

2     decision.   Is that fair to say?

3          A.       I'm not sure who in corporate it

4     was.

5          Q.       Did you convey any information to

6     corporate?   When you say corporate, I assume

7     you mean Atlanta?

8          A.       Right.

9          Q.       Did you convey any information to

10     Atlanta?

11          A.       Personally, no.

12          Q.       Did you indirectly convey

13     information?

14          A.       The information that we discussed

15     with the telephone call, with the call of

16     planning the vacation, all of that was through

17     our local, our site, HR department.

18          Q.       What did you convey to anyone

19     about the vacation time issue?

20          A.       I conveyed to the general manager

21     on the following day that Mr. Thompson called

22     me that night and told me he was leaving and he

23     was going on a plane at 4:00 in the morning to

24     return on January 2nd.

**GERARD P. GOODSELL**
**April 11, 2006**

Page 50

1  Q.  **And what did he say?**

2  A.  I don't remember exactly.  He was

3 not very happy about it, because the protocol

4 that he put in place was not followed.

5  Q.  **Who did you talk to next?**

6  A.  That's about it.

7  Q.  **Well, at some point, you talked to**

8 **someone else about the vacation time issue,**

9 **right?**

10  A.  I only remember having a

11 discussion with Mr. Lane on the vacation time

12 issue.

13  Q.  **Did you tell Mr. Lane about the**

14 **voice mail message that you received from Mr.**

15 **Thompson?**

16  A.  Right, but that was not the same

17 issue.

18  Q.  **That was a different issue?**

19  A.  Yes.

20  Q.  **I'm just trying to get a sense of**

21 **who you talked to and when.  Why don't we just**

22 **follow it on somewhat of a time line here.**

23  A.  Okay.

24  Q.  **On the 21st is when Mr. Thompson**

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**GERARD P. GOODSELL**
**April 11, 2006**

Page 69

1      Q.    So did Mr. Duval come to you with

2  that information, or did you go to him?

3      A.    I asked Mr. Duval if he had

4  arranged to cover for Mr. Thompson while he was

5  out and when he did that, and Mr. Duval said

6  that he did not know he was out until he came

7  to work that evening and opened up his e-mail.

8      Q.    The evening of the 20th?

9      A.    Yes.

10     Q.    Was Mr. Duval not able to cover

11  Mr. Thompson's shifts while he was on vacation?

12     A.    Mr. Duval covered Mr. Thompson's

13  shift for the allotted time that Mr. Thompson

14  told me he was going to be out, and that was

15  through January 2nd.

16     Q.    And did he cover any of Mr.

17  Thompson's time after January 2nd?

18     A.    Yes, but I covered two days for

19  Mr. Duval to give him a break, because he was

20  working every day.

21     Q.    So when is it that Mr. Duval

22  received the e-mail?  You said you weren't

23  sure.

24     A.    I believe -- when he received Mr.

EXHIBIT 5

 COPY

Page 1

1            UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                No.:  06-30168-MAP

4

5     ******************************

6     DUDLEY THOMPSON,              *

7              Plaintiff           *

8              vs.                  *

9     THE COCA-COLA COMPANY,        *

10             Defendant            *

11    ******************************

12

13

14        DEPOSITION OF:  JAMES G. LANE

15    CATUOGNO COURT REPORTING SERVICES

16        1414 Main Street, 6th Floor

17        Springfield, Massachusetts

18    April 12, 2006        11:05 a.m.

19

20

21

22

23            Ian F. Galloway

24            Court Reporter

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**JAMES G. LANE**
**April 12, 2006**

Page 17

1    present?

2         A.    Right.

3         Q.    **Did you ever have brought to your**

4    **attention any type of discrimination or**

5    **harassment?**

6              MR. HART:  You said 2000.  I think

7         he said 2002.

8         Q.    **(By Mr. Shea)  I'm sorry.  Was it**

9    **2002?**

10        A.    It was 2002.  I'm sorry.  I missed

11   that.

12        Q.    **I apologize.**

13        A.    2002 to now.

14        Q.    **Okay.  During that time, did you**

15   **ever have brought to your attention any type of**

16   **issues of discrimination or harassment?**

17        A.    The only thing that comes to my

18   mind is the comment that Donna Harris made back

19   in 2002, which was...

20        Q.    **What?**

21        A.    That was addressed.  At the time,

22   that was the only thing that I can think of

23   that's been brought to my attention.

24        Q.    **What was the comment?**

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES G. LANE**
**April 12, 2006**

Page 18

1      A.      It was a comment that was

2   overheard by one of the other employees, Ron

3   McKeithen, and it was not directed at Dudley.

4      Q.      **Are you sure about that?**

5      A.      My understanding is it wasn't.  I

6   mean, it wasn't at him.  He wasn't present when

7   it was said.

8      Q.      **Do you know if it was directed at**

9   **him though?**

10      A.      I don't know.

11      Q.      **And what was the comment, do you**

12   **recall?**

13      A.      It was a comment that Donna made.

14   I think Ron approached Donna to do something,

15   and it was around Jamaican bimbo, and that's

16   the only thing that I can remember from the

17   four years that I've been there.

18      Q.      **Was that investigated?**

19      A.      Yes, it was.

20      Q.      **Is Ron McKeithen still with the**

21   **company?**

22      A.      No, he's not.

23      Q.      **Do you know why?**

24      A.      He was terminated approximately

**JAMES G. LANE**
**April 12, 2006**

Page 19

```
 1    three weeks ago for a violence-in-the-workplace
 2    issue.
 3         Q.      Was that investigated by the
 4    company?
 5         A.      Yes, it was.
 6         Q.      And what were the conclusions of
 7    that investigation?
 8         A.      That he made physical contact
 9    towards another individual in the QA
10    department.
11         Q.      And who was that?
12         A.      Andy Whittaker.
13         Q.      And Andy Whittaker is Caucasian?
14         A.      Yes, he is.
15         Q.      And Ron McKeithen is African
16    American?
17         A.      Yes, he is.
18         Q.      And was Donna Harris investigated
19    concerning this statement?
20         A.      Yes.
21         Q.      And what happened there?
22         A.      My understanding of the
23    investigation was that one of the things that
24    was said that lead up to that was some comments
```

JAMES G. LANE
April 12, 2006

Page 20

1    that Dudley had made, some derogatory comments,

2    around American women, and the follow-up was

3    conducted with her supervisor, who I believe

4    was John Newton at the time, counseled, was

5    required to apologize, and was assigned to

6    attend civil treatment training.

7         Q.      And what were the comments about

8    American women?

9         A.      I don't remember.  I don't

10   remember.

11        Q.      And was Mr. Thompson reprimanded

12   or counseled regarding any comments about

13   American women?

14        A.      I don't remember.  I don't

15   remember what.

16        Q.      Do you know anything more about

17   the Donna Harris, other than what you've just

18   said?

19        A.      Not really, no.  That's all that I

20   can recall.

21        Q.      So am I correct in assuming, from

22   what you just said, that Donna Harris made

23   comments about Jamaicans in response to Dudley

24   Thompson making comments about American women?

**JAMES G. LANE**
**April 12, 2006**

Page 21

1          MR. HART:  Objection.  You may

2     answer.

3          Q.    **(By Mr. Shea)  You can answer.**

4          A.    I really can't.  I don't -- I

5     mean, that's my understanding, but again,

6     without having --

7          Q.    **Okay.  Did Mr. Jerry Goodsell make**

8     **any racial comments at work that you're aware**

9     **of?**

10         A.    No.  Nothing has ever been

11    reported to me.

12         Q.    **Did his son?**

13         A.    No.  Nothing has ever been

14    reported to me.

15         Q.    **Would those comments have**

16    **necessarily have been reported to you if they**

17    **had been made?**

18         A.    I can say they should have been.

19         Q.    **Why do you say that?  Is there**

20    **some policy that would be followed in that**

21    **regard?**

22         A.    Any type of racial comment is

23    taken very seriously, and I would expect that

24    that would be reported to me.

**JAMES G. LANE**
**April 12, 2006**

Page 44

1        A.      I don't remember.

2        Q.      **Did Ms. Lasonde have any**

3    **conversations with Mr. Goodsell about Mr.**

4    **Thompson's performance in that time frame?**

5              MR. HART:  Objection.

6              THE WITNESS:  I don't remember.

7        Q.      **(By Mr. Shea)  Did you convey in**

8    **writing what your recommendation was when you**

9    **made a recommendation for termination?  You**

10   **three, Ms. Lasonde, yourself, and Mr. Goodsell,**

11   **did you make that recommendation in writing to**

12   **the Atlanta committee?**

13       A.      Yes.

14       Q.      **And what did that say?  What did**

15   **that recommendation say?**

16       A.      I don't remember.  I don't

17   remember the exact wording of the

18   recommendation.

19       Q.      **Do you remember what it said in**

20   **general?**

21       A.      Again, I know that it referenced a

22   specific event, and outside of that, I don't

23   remember.

24       Q.      **Did it reference Mr. Thompson's**

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES G. LANE**
**April 12, 2006**

Page 45

1    **past performance?**

2         A.    I don't remember.

3              MR. SHEA:  Was that produced in

4         discovery, that document?

5              MR. HART:  No, it was not.

6              MR. SHEA:  And why was that?

7              MR. HART:  That document is

8         privileged.

9              MR. SHEA:  And how is it

10        privileged?

11             MR. HART:  It's prepared with the

12        assistance and under the advice of

13        counsel.

14             MR. SHEA:  Which counsel?

15             MR. HART:  Which counsel?

16             MR. SHEA:  Yes.

17             MR. HART:  Lawyers for the company

18        in Atlanta.

19             MR. SHEA:  Can you tell me who,

20        just so I know?

21             MR. HART:  Linda Spencer.

22             MR. SHEA:  Anybody else?

23             MR. HART:  I don't believe so.

24        Q.    (By Mr. Shea)  What's the document

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES G. LANE**
**April 12, 2006**

Page 46

1    entitled, this recommendation?  Is there a

2    title to it, or is it just a letter, or what is

3    it?

4         A.    It's called a white-paper.

5         Q.    Did you get assistance of counsel

6    in preparing that white-paper?

7              MR. HART:  Objection.

8         Q.    (By Mr. Shea)  I don't want to

9    know conversations.  I just want to know were

10   you assisted?

11             MR. HART:  Well, my objection is

12        more so that he never said that he

13        prepared that document.

14        Q.    (By Mr. Shea)  Who prepared that

15   document, the white-paper?

16        A.    It's something that Celine Lasonde

17   would prepare with assistance, and I don't know

18   the level of assistance outside of the plant.

19        Q.    Well, did she prepare the

20   white-paper?

21        A.    I believe so.

22        Q.    With respect to Mr. Thompson?

23        A.    Yes.

24        Q.    And you read it?

**JAMES G. LANE**
**April 12, 2006**

Page 47

1      A.      I'm sure I did.  I know I did.

2      Q.      **And whose names are on it as being**

3  **the senders of the white-paper?**

4      A.      I don't remember.  I don't

5  remember.

6      Q.      **But you three, the three --**

7      A.      Right.

8      Q.      **-- yourself, Ms. Lasonde, and**

9  **Jerry Goodsell participated --**

10     A.      Right.

11     Q.      **-- in that white-paper?**

12     A.      Yes.

13     Q.      **Drafting of it, yes?**

14     A.      Yes.

15     Q.      **To your knowledge, did anyone else**

16  **participate in the drafting of that white-**

17  **paper?**

18     A.      Again, I don't know how much

19  interaction there was between Celine and

20  Atlanta.  I really don't know.

21     Q.      **Is it normal for legal counsel to**

22  **be involved in the drafting of the white-paper?**

23     A.      Her interaction would have been

24  more with human resources, not so much with

JAMES G. LANE
April 12, 2006

Page 48

1    legal.

2        Q.      So you don't know whether she

3    contacted legal?

4        A.      I don't remember.  I don't

5    remember, to be honest with you.

6        Q.      Do you know a Linda Spencer?

7        A.      Yes, I do.

8        Q.      Do you know whether she

9    participated in the drafting of the

10   white-paper?

11       A.      I don't remember.  I don't know if

12   she was involved at that point.

13       Q.      Now, a white-paper, can you just

14   describe for the record what that is?

15       A.      It's really a recommendation which

16   highlights the specific incident,

17   recommendations, and that's really all it is.

18   It's basically a plant recommendation to move

19   forward?

20       Q.      For termination?

21       A.      Right.

22       Q.      Does white-paper always mean

23   termination?

24       A.      I don't know if it always does.  I

**JAMES G. LANE**
**April 12, 2006**

Page 49

1    think it usually does.

2        Q.    **What does the term come from?  Is**

3    **that just a lingo?**

4        A.    I don't know.  That's what it's

5    always -- I don't know.

6        Q.    **Is it just a regular letter?**

7        A.    Yeah.  That's really all it is.  I

8    mean, there is a specific format.  As far as

9    what's on that, I don't remember exactly.

10   There's a number -- there is a certain amount

11   of information that's on there, and then

12   there's a description of the specific event.

13       Q.    **And the specific event listed in**

14   **Mr. Thompson's white-paper is the what?**

15       A.    His --

16       Q.    **The vacation extension issue?**

17       A.    Right.

18       Q.    **Yes?**

19       A.    Right.

20       Q.    **And did it talk about any other**

21   **incidents or anything else, to your knowledge?**

22       A.    That's what I said before.  I

23   don't remember.  Those discussions would have

24   taken place after the initial submittal.

**JAMES G. LANE**
**April 12, 2006**

Page 50

1    Q.    I mean in the papers.

2    A.    Right.  That's what I can't -- I

3    don't remember.

4    Q.    **What did you hear back in response**

5    **to the white-paper?  What did your plant hear?**

6    A.    Basically, there was an agreement.

7    The Separation Committee was in agreement with

8    our recommendation.

9    Q.    **Did they respond in writing?**

10   A.    I don't remember.  They usually

11   do.  It's usually an e-mail response, but I

12   don't know.  I don't know in this case whether.

13   Q.    **I know you don't know names; I**

14   **think you made that clear, but who's on this**

15   **Separation Committee?**

16   A.    It's really human resources and

17   legal.

18   Q.    **Have you seen a number of these**

19   **white-papers come out of your facility?**

20   A.    I can't tell you how many.  I

21   wouldn't say it's a large amount.

22   Q.    **Have you ever seen legal counsel**

23   **involved in drafting a white-paper?**

24   A.    No.  I mean, a white-paper is

**JAMES G. LANE**
**April 12, 2006**

Page 51

1    really our    first -- it's really a plant

2    recommendation.  Now, there sometimes are

3    communications between Celine and HR as she's

4    preparing the white-paper, but outside of that,

5    I...

6            Q.       I'll get back to that in a minute.

7    I want to jump back to your e-mail that you say

8    outlines the vacation approval process.

9                    You said that e-mail explicitly

10   says that you're to be e-mailed, correct?

11           A.       (Witness nodding)

12           Q.       Yes, you have to answer for the

13   record.

14           A.       Yes.  I'm sorry.  Yes.

15           Q.       And again, I'm going to do a

16   little role play here.  I'm Mr. Thompson in

17   December in late 2003, and I'm looking for a

18   vacation.  I'm supposed to e-mail you, and what

19   am I supposed to say?

20           A.       Your supposed to say that I would

21   like these dates off.  I've already had

22   discussion with my fellow supervisor.  We are

23   in agreement that these dates are acceptable,

24   and this person is willing to work for me, and

**JAMES G. LANE**
**April 12, 2006**

Page 52

1    then there's a tracking device that we had on

2    the computer system, which is really just a

3    record of -- just to keep track of past

4    vacations.  It really -- the discussion needs

5    to take place between the supervisors, myself,

6    and Jerry.

7         **Q.**      **Jerry Goodsell?**

8         A.      (Witness nodding)

9         **Q.**      **Did Mr. Thompson have a**

10   **conversation with Mr. Goodsell before he went**

11   **on vacation about taking vacation?**

12        A.      I think I answered that earlier.

13   I don't know.  I believe that they did, but I

14   don't know.  The dates that I'm aware of are

15   limited to the end of the year, but my

16   understanding is there was no conversation at

17   all about the extended dates.

18        **Q.**      **If Mr. Thompson had had a**

19   **conversation with Mr. Goodsell, and I'm not**

20   **asking you to agree with these facts.  I'm**

21   **giving you a hypothetical for purposes of our**

22   **discussion here, had had a conversation with**

23   **Mr. Goodsell and Mr. Goodsell said that's okay,**

24   **if you need some extra time for medical**

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES G. LANE**
**April 12, 2006**

Page 53

1    treatment, that would be okay, is that

2    acceptable?

3                MR. HART:  Objection.

4         Q.      (By Mr. Shea)  Would that have

5    been acceptable under your vacation policy?

6         A.      As long as it was worked through

7    with the fellow supervisors and there was

8    agreement across the board that there were not

9    going to be any gaps in coverage.

10        Q.      Is there any particular time frame

11   that I would have to, as Mr. Thompson, start

12   the scheduling process that you've described,

13   or approval process, prior to the vacation?

14        A.      No.  That wasn't defined.

15        Q.      There's no set number of days or

16   anything like that?

17        A.      No.  The expectation is to allow

18   enough coverage -- allow enough time so that

19   you can provide coverage on your shift, make

20   sure that you have an opportunity to talk to

21   your fellow supervisors, make sure there's

22   coverage and there's no gaps in production.

23        Q.      And as long as you have coverage,

24   you're okay?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JAMES G. LANE**
**April 12, 2006**

 1              MR. HART:  Objection.

 2              THE WITNESS:  As long as it's

 3      approved by your manager.

 4         Q.    **(By Mr. Shea)  The production**

 5      **manager, Mr. Goodsell?**

 6         A.    Yes.

 7         Q.    **You didn't approve vacation time?**

 8         A.    When e-mails were sent to me, I

 9      talked to Jerry together.  Again, this was a

10      transition period where Darrin left and Jerry

11      was filling in temporarily.  The expectation is

12      to make me aware and Jerry would be brought

13      into the loop.

14         Q.    **And did Jerry bring you into the**

15      **loop with respect to Mr. Thompson's vacation?**

16         A.    Only after the gap was identified

17      and we knew we didn't have coverage.

18         Q.    **Did Mr. Goodsell bring you into**

19      **the loop with respect to any vacation that Mr.**

20      **Thompson took in December or January?**

21         A.    I don't remember any other

22      vacation, I don't.  I don't know.

23         Q.    **I'm talking as part of the**

24      **vacation that was taken in December and**

**JAMES G. LANE**
**April 12, 2006**

Page 55

1    January.  December of '03 and January of '04,

2    did Mr. Goodsell talk to you about that

3    vacation at all?

4         A.    I don't remember.

5         Q.    **Do you know whether Mr. Thompson**

6    **spoke to any of the other supervisors about**

7    **coverage for this vacation and the extension**

8    **that he referred to?**

9         A.    My understanding is there was

10   conversation around the original dates, but not

11   on the extension.

12        Q.    **Conversations with whom?**

13        A.    I believe Marty Duval, Martin

14   Duval.

15        Q.    **Anybody else?**

16        A.    I don't know of anybody else, I

17   don't.

18        Q.    **And what conversations did Mr.**

19   **Thompson have with Marty Duval?**

20        A.    I don't know.

21        Q.    **Did you ever know?  Did you ever**

22   **know what those conversations were?**

23        A.    I don't remember.  I don't

24   remember being involved, I mean, the specific

**JAMES G. LANE**
**April 12, 2006**

Page 56

1  conversations.  The agreement is they need to

2  work the vacation time out between themselves.

3          Q.      And did Mr. Thompson ask Mr. Duval

4  to cover for him prior to going on vacation?

5                  MR. HART:  Objection.

6                  THE WITNESS:  I don't know.

7          Q.      (By Mr. Shea)  Well, you made a

8  recommendation, along with two others, to

9  terminate Mr. Thompson's employment, and I'm

10  just trying to ascertain what you knew before

11  you made that recommendation.  What did you

12  know?

13          A.      Well, I just can't confirm the

14  conversation.  My understanding is that

15  conversation didn't get into the extended time.

16  There was an agreement to cover up until -- I

17  don't remember the exact, but beyond that date

18  was not agreed to.

19          Q.      Do you know whether Mr. Thompson

20  spoke to Mr. Duval or anyone else about any

21  medical treatment issue that may extend that

22  vacation?

23                  MR. HART:  Objection.

24                  THE WITNESS:  I do not know.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JAMES G. LANE**
**April 12, 2006**

Page 57

1    Q.    (By Mr. Shea)  If that had taken

2  place, would that have altered your

3  recommendation?

4    A.    If it were done and agreed to up

5  front, and everybody knew going into it, that

6  there was coverage arranged for that time

7  period, I would say it probably would.

8    Q.    That would be okay?

9    A.    As long as it was agreed to, and

10  arranged, and approved up front.

11    Q.    So do you know generally what the

12  conversation between Mr. Thompson and Mr. Duval

13  was about covering vacation in 2003, the end of

14  2003?

15        MR. HART:  Objection.

16        THE WITNESS:  I don't know the

17    specific conversation they had.

18    Q.    (By Mr. Shea)  Well, I'm asking

19  generally if you know what it was?

20    A.    (Witness shaking head)

21    Q.    You don't?  You have to answer for

22  the record.

23    A.    No, I don't know the specific

24  conversation.

**JAMES G. LANE**
**April 12, 2006**

Page 58

1      Q.      I'm asking generally.

2      A.      My understanding is that there was

3   an agreement to cover up until a certain date,

4   but the coverage requirement exceeded that.

5      Q.      Do you know where Mr. Thompson

6   went on his vacation time?

7      A.      I believe he went to Jamaica.

8      Q.      And do you know whether he

9   received any medical treatment while he was

10  away?

11     A.      I don't know.

12     Q.      At some point -- I think it's your

13  company's position that Mr. Thompson just

14  didn't show up for work; is that correct?

15             MR. HART:  Objection.

16     Q.      (By Mr. Shea)  Is that right?

17     A.      He did not follow the scheduled

18  vacation policy.

19     Q.      And so when he went out on

20  vacation, was there any communication between

21  Mr. Thompson and anyone at Coca-Cola after he

22  left for vacation in December of 2003?

23     A.      I don't know.

24     Q.      Did anyone investigate the

**JAMES G. LANE**
**April 12, 2006**

Page 59

1   circumstances surrounding this whole extension

2   of vacation time issue prior to Mr. Thompson's

3   termination?

4        A.    Yes.

5        Q.    And who did that?

6        A.    It would have been a joint between

7   Jerry --

8        Q.    Jerry Goodsell?

9        A.    And Jerry probably would have

10  headed that up with Celine, and --

11       Q.    Well, I'm not asking probably or

12  would have.  I'm just --

13       A.    Jerry, Jerry Goodsell.

14       Q.    And what were the results of his

15  investigation, do you know?

16       A.    The results were -- I believe

17  there was some communication that was sent to

18  Marty Duval that Marty did not receive until he

19  showed up for his shift that night, and I don't

20  remember the specific dates.

21       Q.    That was an e-mail to Mr. Duval?

22       A.    Right.

23       Q.    Do you know what that said?

24       A.    I believe it requested the

JAMES G. LANE
April 12, 2006

Page 60

1  extension dates that we're talking about.

2      **Q.      For medical reasons?**

3      A.      That, I don't remember the details

4  of the e-mail.

5      **Q.      But you're saying the e-mail**

6  **requested an extension?**

7      A.      I don't remember the wording of

8  the e-mail, but I believe it did, but it was

9  sent to Marty.  Marty didn't receive it until

10  he arrived to work and didn't have a chance to

11  prearrange that with Dudley.

12      **Q.      And you believe that Mr. Thompson**

13  **was already on vacation at that point in time?**

14      A.      Yes.  I mean -- at the time that

15  the e-mail was sent?

16      **Q.      Yes.**

17      A.      I don't know.  I didn't know

18  exactly when he was leaving.

19      **Q.      Well, you said Jerry Goodsell told**

20  **you about this e-mail, right, as part of his**

21  **investigation, correct?**

22      A.      Right.

23      **Q.      What else did he tell you?**

24      A.      That was really it.  The e-mail

JAMES G. LANE
April 12, 2006

Page 61

1    was not received, and there was no prior

2    discussion before the time that Marty received

3    that e-mail.  By the time Marty received it, it

4    was already too late.

5         Q.    Did Mr. Goodsell tell you whether

6    anyone called, Mr. Thompson called Coca-Cola

7    while he was out on vacation?

8         A.    That, I don't remember.

9         Q.    So you don't know sitting here

10   today, and you didn't know then, when Mr.

11   Thompson was terminated, whether he called in

12   to anyone at Coca-Cola about extending the days

13   of his vacation?

14              MR. HART:  Objection.

15        Q.    (By Mr. Shea)  Do you know?

16        A.    I'm saying I don't remember.  I

17   believe there was a call, but I don't remember

18   two and a half years ago whether that was -- I

19   was heavily involved at the time during the

20   investigation.  Sitting here today, I...

21        Q.    Did anyone else conduct the

22   investigation other than Mr. Goodsell?

23        A.    I know Celine was involved.

24        Q.    And how was she involved?

**JAMES G. LANE**
**April 12, 2006**

Page 62

1    A.    I don't remember exactly who she

2  spoke with and how -- the details of her

3  involvement in the investigation.

4    **Q.    Did Mr. Goodsell report everything**

5  **to you that he learned in his investigation?**

6    MR. HART:  Objection.

7    THE WITNESS:  I can't confirm

8    that.

9    **Q.    (By Mr. Shea)  Do you believe he**

10  **did?**

11    A.    I believe he did.

12    **Q.    And so he reported an e-mail to**

13  **you, and possibly a phone call, from Mr.**

14  **Thompson.  Do I have that right?**

15    A.    I remember the e-mail after the

16  fact.  It was after the...

17    **Q.    Do you remember anything else that**

18  **Mr. Goodsell told you about the results of his**

19  **investigation?**

20    A.    Those were the two key things.

21  There was a communication, but it was after the

22  fact.

23    **Q.    When Mr. Thompson called in, who**

24  **did he talk to, do you know?**

**JAMES G. LANE**
**April 12, 2006**

Page 63

1    A.    I don't remember.

2    Q.    Did Mr. Goodsell ever tell you who

3    he talked to?

4    A.    I don't remember the conversation.

5    Q.    You don't remember whether Mr.

6    Goodsell told you that or not, whether Mr.

7    Thompson called in while he was on vacation?

8    A.    I'm not 100 percent sure.

9    Q.    And so Mr. Thompson went out on

10   vacation; part of it you believe was approved.

11   There was an extension of that vacation

12   according to Mr. Thompson, and according to the

13   company, there was not, and so when Mr.

14   Thompson is out on vacation, including those

15   extended days, what happens next?  What

16   happened next between the company and Mr.

17   Thompson?

18   A.    I believe we confronted Dudley

19   with the situation soon after he returned.

20   Q.    Did the company try to call him or

21   contact him in any way while he was on vacation

22   or the extended part?

23   A.    I believe we did, but I can't

24   confirm that.

**JAMES G. LANE**
**April 12, 2006**

Page 64

1      Q.      You're not sure?

2      A.      No.  I believe we did, but I can't

3  confirm.

4      Q.      Well, if you believe you did, who,

5  when, and how did you try to communication with

6  him or do you know?

7      A.      I don't.

8      Q.      And when he came back, how did he

9  end up at the company?  How did he end up in a

10  meeting with you at the company when he came

11  back?

12      A.      I mean, I don't remember the

13  specific events, but we set up a meeting to

14  confront him with the violation of policy.

15      Q.      Who set the meeting up?

16      A.      I'm fairly certain it was Celine

17  Lasonde.

18      Q.      Anyone else?

19      A.      No.  She would have set it up, I

20  believe.

21      Q.      And so she called who to the

22  meeting, Mr. Thompson?

23      A.      Me and Jerry.

24      Q.      And what was discussed in the

**JAMES G. LANE**
**April 12, 2006**

Page 65

1    meeting, and where was it held?

2        A.      The meeting was held in the

3    upstairs conference room in the plant.

4        Q.      And what was said?

5        A.      Basically, from what I remember,

6    we confronted him with the violation of policy.

7    At that point, placed him on suspension pending

8    investigation.

9        Q.      Suspension without pay at that

10    point?

11        A.      I don't remember.  I don't

12    remember whether it was or not.

13        Q.      And what did Mr. Thompson say in

14    that meeting?

15        A.      I don't remember.

16        Q.      Do you remember whether he

17    mentioned medical condition, a medical

18    condition, or not?

19        A.      I don't remember the specific

20    conversation that took place.

21        Q.      Do you remember whether he told

22    you and the others in the meeting that he had

23    prior approval for his vacation and the time

24    that he was out?

EXHIBIT 6

 COPY

**DENNIS ALLEN WILLIAMS**
**April 11, 2006**

Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                  No.:  06-30168-MAP

4

5        *******************************

6    DUDLEY THOMPSON,                    *

7              Plaintiff               *

8              vs.                      *

9    THE COCA-COLA COMPANY,             *

10             Defendant               *

11       *******************************

12

13

14        DEPOSITION OF:  DENNIS ALLEN WILLIAMS

15        CATUOGNO COURT REPORTING SERVICES

16           1414 Main Street, 6th Floor

17           Springfield, Massachusetts

18        April 11, 2006        9:00 a.m.

19

20

21

22

23             Ian F. Galloway

24             Court Reporter

**DENNIS ALLEN WILLIAMS**
**April 11, 2006**

Page 42

1                 * (Question read)

2

3        Q.       (By Mr. Shea)   The issue at this

4    time was there was a perception that there was

5    some unapproved vacation time with respect to

6    Mr. Thompson, right?

7        A.       As I understand it, yes.

8        Q.       What vacation time did Mr.

9    Thompson take that was unapproved?

10       A.       I can't specifically answer that.

11       Q.       Do you have any idea?

12       A.       Not specifically, no.   Like I

13   said, I was not the...

14       Q.       Do you have any idea generally?

15       A.       Generally, it was some time at the

16   end of December, end of January, generally as I

17   understand it.

18       Q.       When you talked to Mr. Thompson

19   about the vacation time, and you referred to

20   that conversation earlier, did you tell him to

21   speak with Mr. Goodsell about it?

22       A.       Are you referring to when he

23   talked to me in December?

24       Q.       Yes.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**DENNIS ALLEN WILLIAMS**
**April 11, 2006**

Page 43

1        A.      Yes, I told him to talk to Mr.

2    Goodsell and to Ms. Lasonde.

3        **Q.      Do you remember when in December**

4    **you said this?**

5        A.      Not specifically, middle of

6    December.

7        **Q.      And do you know whether Mr.**

8    **Thompson spoke to Mr. Goodsell about taking**

9    **vacation time?**

10       A.      I do not know specifically.

11       **Q.      Did you have any issue with Mr.**

12   **Thompson taking that vacation time yourself?**

13       A.      I could not answer that, at the

14   time.  I had no idea of his vacation status.

15       **Q.      Why was Mr. Thompson speaking to**

16   **you about his vacation time at that time in**

17   **mid-December?**

18              MR. HART:  Objection.

19              THE WITNESS:  Because I was going

20         to become the operations manager.

21       **Q.      (By Mr. Shea)  And why did you**

22   **tell him to speak with Mr. Goodsell and Ms.**

23   **Lasonde about vacation time?**

24       A.      Because I had not taken the reins

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

**DENNIS ALLEN WILLIAMS**
**April 11, 2006**

Page 44

1  of the department yet, and I was going to be on

2  -- I was on vacation and moving the rest of the

3  year.

4       **Q.      Earlier in your deposition, you**

5  **referred to this vacation time approval process**

6  **as a protocol; is that right?**

7       A.      I don't remember calling -- I

8  don't remember if I referred to it as a

9  protocol or a process.

10      **Q.      Was it a written policy of Coca-**

11 **Cola?**

12      A.      It was a plant procedure.

13      **Q.      Was it a written policy of Coca-**

14 **Cola or procedure?**

15      A.      I don't know specifically.

16      **Q.      You didn't know that then, and you**

17 **don't know that today, right?**

18      A.      Not specifically, no.

19      **Q.      Do you know generally whether it's**

20 **writing, in writing, or verbal?**

21      A.      My understanding, it was in

22 writing and in an e-mail.

23      **Q.      Where is it in writing?  Have you**

24 **seen it before?**

**DENNIS ALLEN WILLIAMS**
**April 11, 2006**

Page 53

1     Q.      (By Mr. Shea)   When did you start

2   working in Northampton?

3     A.      I came to the plant two weeks in

4   December of 2004, but just to get a feel for

5   the plant.

6              MR. LEWIS:   2003 or 2004.

7              THE WITNESS:   2003, sorry, and

8         then actually took over and transitioned

9         in January of 2004.

10    Q.      (By Mr. Shea)   When in January of

11  2004 did you take over?

12    A.      I'm trying to think of when I

13  moved, so early January.

14    Q.      The date you can't pinpoint?

15    A.      Not specifically right now.

16    Q.      But sometime prior to this meeting

17  that you referred to with Mr. Thompson, you

18  were in fact in the Northampton facility acting

19  as the production manager --

20    A.      Yes.

21    Q.      -- operations manager, correct?

22    A.      In the process of transitioning,

23  yes.

24    Q.      But you were in that position

EXHIBIT 7



COPY

1           UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3              No.:  06-30168-MAP

4

5    *******************************

6    DUDLEY THOMPSON,              *

7           Plaintiff             *

8           vs.                   *

9    THE COCA-COLA COMPANY,        *

10          Defendant             *

11   *******************************

12

13

14         DEPOSITION OF:  CELINE LASONDE

15    CATUOGNO COURT REPORTING SERVICES

16         1414 Main Street, 6th Floor

17         Springfield, Massachusetts

18      April 12, 2006       1:37 p.m.

19

20

21

22

23           Ian F. Galloway

24           Court Reporter

**CELINE LASONDE**
**April 12, 2006**

Page 31

1    Q.    And who was that?

2    A.    John Newton.

3    Q.    What is white-paper?  What does

4    that refer to?

5    A.    It's just a company term for the

6    documentation that goes forward to Atlanta for

7    review in the event that we are making

8    recommendation for termination.

9    Q.    And did you do a white-paper for

10   Mr. Thompson?

11   A.    I did, yes.

12   Q.    And what did you do to prepare

13   that?

14   A.    Interviewed Sean Rutherford, Diego

15   Garcia, Martin Duval, Jerry Goodsell, reviewed

16   the time lines, basically collected all that

17   data and put it in the white-paper.

18   Q.    Did Mr. Goodsell do any

19   investigation concerning this vacation issue,

20   which was the subject of Mr. Thompson's

21   termination of employment?

22   A.    Did he do an investigation?

23   Q.    Yes.

24   A.    Separate from mine?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**CELINE LASONDE**
**April 12, 2006**

Page 32

1      Q.     Yes.

2      A.     No.

3      Q.     Did he do any investigation that

4  you're aware of?

5      A.     No.

6      Q.     Did anyone other than you do an

7  investigation concerning the vacation time,

8  which was the subject of Mr. Thompson's

9  termination of employment?

10     A.     No.  I'm -- no.

11     Q.     And you physically typed up the

12  white-paper that went to Atlanta?

13     A.     Yes.

14     Q.     Did you fax it down to somebody?

15     A.     I didn't fax it.

16     Q.     You didn't?

17     A.     It was e-mailed.

18     Q.     Who did you e-mail it to?

19     A.     To the HR director, the legal

20  counsel, and the employee relations director.

21     Q.     And who are they?

22     A.     Cathy Spain.

23     Q.     Which one was which?

24     A.     HR is Cathy Spain.  Legal is Linda

**CELINE LASONDE**
**April 12, 2006**

Page 35

1   written.

2        Q.      **Is it a vote?**

3        A.      It's not a vote.  We certainly

4   discuss, and if there's any exceptions, we just

5   consider what the facts are.  Have we ever had

6   any nonconsensus, no.

7        Q.      **It was unanimous, right?**

8        A.      It was.

9        Q.      **Was there any hesitation on**

10  **anyone's part?**

11       A.      No.

12       Q.      **What did each of these people know**

13  **when they were sitting here at this meeting?**

14  **When was the meeting, I should say?**

15       A.      Probably after the 12th of 2004

16  when Dudley came in to explain to us.

17               MR. HART:  The 12th of January?

18               THE WITNESS:  January, yeah, 2004.

19       Q.      **(By Mr. Shea)  And you had one**

20  **meeting?**

21       A.      We had the meeting with Dudley,

22  and then following that, we may have met once

23  or twice to discuss what had happened during

24  that time period and then what the information

**CELINE LASONDE**
**April 12, 2006**

Page 36

1   Dudley had provided us, what that did for what
2   had happened.
3        Q.    **Well, when did you meet with**
4   **Dudley?**
5        A.    January 12, 2004.
6        Q.    **And who met with Dudley?**
7        A.    The whole leadership team.
8        Q.    **Everyone you've just described?**
9        A.    Yeah.  I'm pretty sure everybody
10  was there.
11       Q.    **And then where did you meet?**
12       A.    In our training room.
13       Q.    **What did Mr. Thompson say in that**
14  **meeting?**
15       A.    Well, we offered this to be --
16  that being the opportunity for him to disclose
17  to us why he hadn't been at work and to discuss
18  the -- what's the word?  Discuss his
19  noncompliance with the vacation notice, and
20  what he told us was that he had had dental
21  problems beginning in November of '03, and
22  Aetna was going to charge him $5,000 more for
23  the dental work than what someone in Jamaica
24  was able to do for him.

**CELINE LASONDE**
**April 12, 2006**

1          He did agree, I remember this,

2  that he agreed, that he had not given us

3  appropriate notice.  Then he also mentioned

4  something about the night that he was planning

5  on leaving, Sean came in late, and therefore he

6  had to leave later.

7      Q.    **Did he say anything else in this**

8  **meeting, Mr. Thompson?**

9      A.    No, not that I can recall.

10      Q.    **Do you remember any more**

11  **specifically than what you just testified to as**

12  **to what he said?**

13      A.    No.

14      Q.    **What is appropriate notice under**

15  **the vacation policy that was in place?  Was**

16  **there a vacation policy in place?**

17      A.    The directive from Jim Lane that

18  had been sent out in August of '03 was very

19  clear about what the expectation was for

20  providing appropriate notice.

21      Q.    **And what was that?**

22      A.    That the supervisors were expected

23  to request the vacation time from their

24  manager, ensure that there is coverage, and

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**CELINE LASONDE**
**April 12, 2006**

Page 41

1    earlier from Atlanta.

2        Q.    **Did they actually physically sign**

3    **it?**

4        A.    They did.

5        Q.    **What do you mean signed off?**

6        A.    There is signature spaces for them

7    to sign.

8        Q.    **I'm a little confused.  The white**

9    **letter went out of your office, right?**

10        A.    Um-hmm.

11            MR. HART:  You mean white-paper?

12            THE WITNESS:  White-paper.

13            MR. SHEA:  White-paper, sorry.

14        Q.    **(By Mr. Shea)  The white-paper**

15    **came out of your office the end of the week of**

16    **the 12th?**

17        A.    Yeah, I would say so, about then.

18        Q.    **Did someone sign off on that**

19    **before it went out to Atlanta?**

20        A.    No.  It goes to Atlanta.  We have

21    a conference call.  Everything is covered, and

22    then it will -- it's signed off.  Everybody

23    signs off on it.

24        Q.    **Meaning there's a signature line**

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**CELINE LASONDE**
**April 12, 2006**

Page 42

1    for each one of them on their end.  It's

2    e-mailed to them.  They sign it and send it

3    back to you?

4         A.     I think actually there was one --

5    from there, they had a hard copy that each of

6    them signed off on and came back to me.

7         Q.     And that is the white letter?

8         A.     The white-paper.

9         Q.     White-paper, sorry.  You had a

10   conference call, you said?

11        A.     Um-hmm.

12        Q.     Yes?

13        A.     Yes.

14        Q.     And when was that?

15        A.     Probably the week after, the week

16   after the 12th, so it would have been the week

17   of the 19th.

18        Q.     Did you put the results of your

19   investigation in the white-paper?

20        A.     Yes.  I included the time line,

21   the time frame, all the details.

22        Q.     Did you have any attorney at

23   Coca-Cola help you with that letter?

24        A.     No.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**CELINE LASONDE**
**April 12, 2006**

Page 43

```
1              MR. SHEA:  I'm going to ask that
2         that be produced.  I mean, I don't see
3         how that is privileged in any way.  I
4         mean, we can discuss it later, but I
5         don't see how that document is in any way
6         privileged, and I think it should have
7         been produced, and I think I'm going to
8         have to take that position.
9              MR. HART:  We can certainly talk
10        about it, but the document that's
11        prepared for an attorney so that the
12        attorney can give legal advice is not
13        only privileged, but also covered by the
14        Work-Product Doctrine.
15        Q.     (By Mr. Shea)  Were you seeking
16   any sort of legal advice as a result of this
17   white-paper?
18        A.     The white-paper is the vehicle for
19   the attorney, attorneys, in Atlanta and the HR
20   people to discuss the situation.
21        Q.     Was it a vehicle by which you were
22   asking for some legal advice?
23        A.     I would say yes.  In other words,
24   I do not make those decisions in a vacuum.
```

**CELINE LASONDE**
**April 12, 2006**

Page 44

1      Q.      **What decisions?**

2      A.      To terminate.

3      Q.      **And so what legal advice do you**

4  **think you were seeking as a result of creating**

5  **this white-paper that went down to Atlanta?**

6      A.      It's there -- it's the company's

7  structure for ensuring that legal is pulled

8  into any of our employee issues.  So their

9  advice is -- we can't make the decision without

10 them, without their input.

11     Q.      **But were you asking for a legal**

12 **opinion?**

13     A.      That's what we get.

14     Q.      **You get a legal opinion?**

15     A.      Correct.

16     Q.      **And did you get a legal opinion**

17 **with respect to Mr. Thompson's termination?**

18     A.      Yes.

19     Q.      **And is that legal opinion in**

20 **writing?**

21     A.      Is that legal opinion I writing?

22 I don't know how to answer that.  The legal

23 advisories sign off.

24     Q.      **Did they sign off as lawyers**

**CELINE LASONDE**
**April 12, 2006**

Page 85

1      A.      There might have been one earlier
2  in the year, but I can't remember.
3      Q.      **So you can't remember anything**
4  **about that, what it might have said?**
5      A.      Right.
6      Q.      **Were you copied on this e-mail?**
7      A.      I don't remember, but I probably
8  was.
9      Q.      **Would you consider this, Exhibit**
10 **6, the first e-mail, 0018, a vacation policy, a**
11 **written vacation policy, that was in place that**
12 **applied to Mr. Thompson?**
13     A.      Yes.
14     Q.      **And has that changed since this**
15 **e-mail?**
16     A.      No.
17     Q.      **It's exactly the same?**
18     A.      Yes.
19     Q.      **Do you know who took over Mr.**
20 **Thompson's job after he was terminated?**
21     A.      We've been covering with Diego,
22 Sean, and Martin.
23     Q.      **But immediately after he was**
24 **terminated, was there a Bill -- can you help me**

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**CELINE LASONDE**
**April 12, 2006**

1  out with that name?

2            MR. HART:  Dermody.

3            THE WITNESS:  Dermody, yeah.

4       Q.      (By Mr. Shea)  Did he take over

5  Mr. Thompson's --

6       A.      He did not take over his position.

7  He was covering.  He did not move into that

8  position.  He's a quality, QA, supervisor.

9       Q.      What was his position when Mr.

10  Thompson was terminated?

11      A.      I think he had just moved up from

12  Hightstown as well, so he was hired for the QA

13  supervisor position.

14      Q.      Was he a production supervisor at

15  the time?

16      A.      In Hightstown he was.

17      Q.      And was he here?

18      A.      He may have been providing

19  coverage on the floor, but he was never

20  designated as a production supervisor.

21      Q.      For how long did he assume Mr.

22  Thompson's responsibilities?

23      A.      I don't know.

24      Q.      If I told you it was from January