UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-30168-MAP

DUDLEY THOMPSON,
                        Plaintiff

v.

THE COCA-COLA COMPANY,
                        Defendant



## PLAINTIFF'S STATEMENT OF MATERIAL FACT IN DISPUTE

Pursuant to Local Rule 56.1, the Plaintiff lists the following material facts in dispute,

concerning which genuine issues remain.[1] These material facts of record, together with the

Plaintiff's Memorandum in Opposition to the Defendant's Motion for Summary Judgment, show

that such genuine issues preclude the granting of summary judgment.[2]

1.     The Plaintiff does not dispute the contents of the Defendant's Paragraph 1 of its

Statement of Material Facts ("Defendant's Facts").

2.     The Plaintiff does not dispute the contents of Paragraph 2 of the Defendant's Facts.

3.     The Plaintiff does not dispute the contents of Paragraph 3 of the Defendant's Facts,

except to state the Defendant failed to follow its policy regarding harassment and discrimination.

4.     The Plaintiff does not dispute the contents of Paragraph 4 of the Defendant's Facts.

5.     The Plaintiff does not dispute the contents of Paragraph 5 of the Defendant's Facts.

6.     The Plaintiff does not dispute the contents of Paragraph 6 of the Defendant's Facts.

---

[1] The numbered paragraphs contained herein correspond to the numbered paragraphs appearing in the Defendant's
Statement of Material Facts through ¶92.
[2] Attached hereto are Exhibits composed of documents from which the within facts are taken, and to which the
Plaintiff cites throughout this Statement of Material Facts.

7.     The Plaintiff does not dispute the contents of Paragraph 7 of the Defendant's Facts.

8.     The Plaintiff does not dispute the contents of Paragraph 8 of the Defendant's Facts.

9.     The Plaintiff does not dispute the contents of Paragraph 9 of the Defendant's Facts.

10.    The Plaintiff does not dispute the contents of Paragraph 10 of the Defendant's Facts.

11.    The Plaintiff does not dispute the contents of Paragraph 11 of the Defendant's Facts.

12.    The Plaintiff does not dispute the contents of Paragraph 12 of the Defendant's Facts.

13.    The Plaintiff does not dispute the contents of Paragraph 13 of the Defendant's Facts.

14.    The Plaintiff does not dispute the contents of Paragraph 14 of the Defendant's Facts.

15.    The Plaintiff does not dispute the contents of Paragraph 15 of the Defendant's Facts.

16.    The Plaintiff does not dispute the contents of Paragraph 16 of the Defendant's Facts.

17.    The Plaintiff does not dispute the contents of Paragraph 17 of the Defendant's Facts.

18.    From 2001 to 2003, Mr. Klenzing held the production manager position. (Klenzing Dep. pg. 16; Exh. 1) Mr. Klenzing indicated that he supervised the Plaintiff from January to May or June of 2003. (Klenzing Dep. pg. 41; Exh. 1) Darrin Plawinski took over as the Plaintiff's supervisor and then left sometime in the fall. Mr. Williams then applied for, and eventually took over Mr. Plawinski's position. (Klenzing Dep. pg. 41; Exh. 1) Mr. Klenzing said that Jerry Goodsell was the production manager between the time that Mr. Plawinski left and Mr. Williams took over. (Klenzing Dep. pg. 42; Exh. 1)

19.    Gerald Goodsell took the maintenance manager position at Coca-Cola in the Northampton facility in 1995. (Goodsell Dep. pg. 12; Exh. 2) In 1996, his position changed to plant engineer, where he responsible for coordinating the start up, hiring people, coordinating the start up of two new lines, purchasing parts and putting a preventative maintenance program together. (Goodsell Dep. pg. 13; Exh. 2) Mr. Goodsell has held this position since 1996, and it is

2

his current position with Coca-Cola. (Goodsell Dep. pgs. 13-14; Exh. 2) Mr. Goodsell has always had the roles and responsibilities of the plant engineer, but during that time frame, he also held the acting production manager's position on two different occasions. (Goodsell Dep. pgs. 14-15; Exh. 2) The first time he held the production manager's position was sometime between 1999 and 2000, for about seven months. (Goodsell Dep. pg. 15; Exh. 2) The second time was at the end of August 2003 until the second week of January 2004. (Goodsell Dep. pg. 15; Exh. 1)

20.    Dennis Williams testified that his job responsibilities in the Northampton Coca-Cola facility were to oversee two production supervisors and two production lines. (Williams Dep. pg. 14; Exh. 3) Dennis Williams has held this position from 2003 to the present. (Williams Dep. pg. 15; Exh. 3) The Plaintiff was told through communications that Mr. Williams was going to be the new operations manager and that he was starting in December. (Thompson Dep. pg.163; Exh. 4) Mr. Williams said that he was "transitioning" at the end of 2003. (Williams Dep. pgs. 24-25; Exh. 3) Mr. Williams indicated that, at the time of the meeting concerning the Plaintiff's vacation, that he was acting production manager. (Williams Dep. pg. 52; Exh. 3) Mr. Williams then stated that, sometime prior to the meeting with the Plaintiff, Mr. Williams was, in fact, in the Northampton facility acting as the production manager in the process of transitioning. (Williams Dep. pg. 52-54; Exh. 3) Mr. Williams stated that he was being paid in that position and on the job at that time. (Williams Dep. pg. 54; Exh. 3) Mr. Lane testified that Mr. Williams came to the Northampton plant in December 2003. (Lane Dep. pg. 24; Exh. 5) Mr. Williams was transitioning. (Lane Dep. pg. 24; Exh. 5) Mr. Lane said that Mr. Williams was there for a week in December 2003. (Lane Dep. pg. 24; Exh. 5) Mr. Duval said that Dennis Williams could have been employed at the Northampton facility as a production manager in December 2003. (Duval Dep. pg. 50; Exh. 6) Mr. Klenzing said that Mr. Williams was working in the Northampton

3

facility in December 2003. (Klenzing Dep. pgs. 22-23; Exh. 1) Mr. Klenzing was asked whether
Mr. Williams was working as a production manager after Thanksgiving 2003 to the time that
2004 came around and Mr. Klenzing said, "I would say yes. He was awarded the job, yes."
(Klenzing Dep. pg. 42; Exh. 1) Mr. Garcia said that Mr. Williams was working in Northampton
in December of 2003 for about a week. He believed it was the first or second week in
December. (Garcia Dep. pg. 48; Exh. 7)

21.    The Plaintiff feels as though his job performance was negatively evaluated for
discriminatory reasons. (Thompson Dep. pg. 49; Exh. 4) The Plaintiff believes that his shift was
the top performing shift. (Thompson Dep. pg. 49; Exh. 4) Mr. Goodsell said that Coca-Cola had
a progressive discipline policy. (Goodsell Dep. pg. 82; Exh. 2) According to Mr. Goodsell, that
policy was a coaching, a verbal warning, written warning, suspension, termination. (Goodsell
Dep. pg. 82; Exh. 2) Mr. Goodsell indicated that coaching could occur as much as the supervisor
wanted to give on any specific subject. (Goodsell Dep. pg. 82; Exh. 2) Mr. Goodsell indicated
that this was the policy when the Plaintiff had the vacation issue that was the subject of his
termination and it is the same policy today. (Goodsell Dep. pgs. 83-84; Exh. 2) Mr. Goodsell
said that, other than the Plaintiff not returning to work when he said he would, there was no other
basis that he was aware of for the termination of the Plaintiff's employment. (Goodsell Dep. pg.
85; Exh. 2) If the vacation issue had not surfaced, the Plaintiff would not have been terminated
in January 2004. (Lasonde Dep. pgs. 91-92; Exh. 8)

22.    The Plaintiff also believed that his negative performance evaluations were a form of
discrimination, harassment and retaliation. (Thompson Dep. pgs. 70-72; Exh. 4) The Plaintiff
refuted the contents of his performance evaluation done by Walter Klenzing in 2001. (Thompson
Dep. pgs. 56-57; Exh. 4) The Plaintiff disputes his performance evaluation in 2003 done by

4

Darrin Plawinski. (Thompson Dep. pgs. 60-62; Exh. 4) The Plaintiff refuted the contents of this performance evaluation to Mr. Plawinski and Ms. Lasonde, as it was the first time that the Plaintiff had been made aware of alleged performance issues. (Thompson Dep. pg. 60; Exh. 4) The performance evaluations contained information that was not true. (Thompson Dep. pg. 60; Exh. 4)

23.     The Plaintiff disputes that he was late to the point that it was a violation of company policy. (Thompson Dep. pgs. 53-55; Exh. 4) The Plaintiff was not tardy to the extent that it affected the performance of his shift. (Thompson Dep. 53; Exh. 4) The Plaintiff testified that coming in late on occasion did not effect his production. (Thompson Dep. pg. 54; Exh. 4) The Plaintiff was not chronically tardy for his shifts. (Thompson Dep. pg. 62; Exh. 4) The Plaintiff indicated that he was tardy no more than other employees. (Thompson Dep. pg. 63; Exh. 4) Individuals on both the first and third shifts were often tardy for relieving duties. (Thompson Dep. pg. 63; Exh. 4) Despite the Defendant's allegations concerning tardiness, other than the Plaintiff allegedly not returning to work when he said he would after his vacation, there was no other basis for the termination of the Plaintiff's employment. (Goodsell Dep. pg. 85; Exh. 2) If the vacation issue had not surfaced, the Plaintiff would not have been terminated in January 2004. (Lasonde Dep. pgs. 91-92; Exh. 8)

24.     The Plaintiff testified that he was late on occasion, due to the fact that he lived in Amherst, and the bridge that connected Northampton and Hadley was being extended. (Thompson Dep. pgs. 52-53; Exh. 4) The bridge work made the traffic pattern unpredictable. (Thompson Dep. pg. 53; Exh. 4) The Plaintiff was not tardy to the extent that it affected the performance of his shift. (Thompson Dep. 53; Exh. 4) The Plaintiff testified that coming in late on occasion did not effect his production. (Thompson Dep. pg. 54; Exh. 4) The Plaintiff was not

5

chronically tardy for his shifts. (Thompson Dep. pg. 62; Exh. 4) The Plaintiff indicated that he was tardy no more than other employees. (Thompson Dep. pg. 63; Exh. 4) Additionally, the Plaintiff brought the issue regarding the bridge construction to the attention of his managers. (Thompson Dep. pg. 53; Exh. 4) Despite the Defendant's allegations of tardiness, other than the Plaintiff allegedly not returning to work when he said he would after his vacation, there was no other basis for the termination of the Plaintiff's employment. (Goodsell Dep. pg. 85; Exh. 2) If the vacation issue had not surfaced, the Plaintiff would not have been terminated in January 2004. (Lasonde Dep. pgs. 91-92; Exh. 8)

25.     See facts set forth in Paragraphs 23 and 24 above, which are incorporated herein by reference.

26.     There is a progressive discipline policy at Minute Maid/Coca-Cola. It is corrective action, including initial counseling, moving to a verbal, written through what is called a performance improvement plan where there are time periods laid out that improvement is supposed to be demonstrated. (Lasonde Dep. pg. 105; Exh. 8) Ms. Lasonde did not know whether the Plaintiff was on a performance plan at the time of his termination. (Lasonde Dep. pg. 105; Exh. 8) Ms. Lasonde did not recall the Plaintiff being on any kind of probation at the time of his termination. (Lasonde Dep. pg. 105; Exh. 8) Mr. Goodsell said that Coca-Cola had a progressive discipline policy. (Goodsell Dep. pg. 82; Exh. 2) According to Mr. Goodsell, that policy was a coaching, a verbal warning, written warning, suspension, termination. (Goodsell Dep. pg. 82; Exh. 2) Mr. Goodsell indicated that coaching could occur as much as the supervisor wanted to give on any specific subject. (Goodsell Dep. pg. 82; Exh. 2) Mr. Goodsell indicated that this was the policy when the Plaintiff had the vacation issue that was the subject of his termination and it is the same policy today. (Goodsell Dep. pgs. 83-84; Exh. 2) Despite the

6

Defendant's allegations concerning performance, other than the Plaintiff allegedly not returning to work when he said he would after his vacation, there was no other basis that he was aware of for the termination of the Plaintiff's employment. (Goodsell Dep. pg. 85; Exh. 2) If the vacation issue had not surfaced, the Plaintiff would not have been terminated in January 2004. (Lasonde Dep. pgs. 91-92; Exh. 8)

27.     Mr. Klenzing supervised the Plaintiff from 2001 to 2003. (Klenzing Dep. pg. 18; Exh. 1) Mr. Klenzing indicated that the Plaintiff's performance was, at times, where it should be, and there were times when Mr. Klenzing thought it could have been better. (Klenzing Dep. pg. 20; Exh. 1) Mr. Klenzing said that he thought his relationship with the Plaintiff was good. (Klenzing Dep. pg. 56; Exh. 1) Mr. Klenzing indicated that the Plaintiff's overall production was fair and consistent. (Klenzing Dep. pg. 63; Exh. 1) Mr. Klenzing said that the Plaintiff's production during the time that he was under the supervision of Mr. Klenzing was good. (Klenzing Dep. pg. 59; Exh. 1)

28.     The Plaintiff refuted the contents of his performance evaluation done by Walter Klenzing in 2001. (Thompson Dep. pgs. 56-57; Exh. 4) Mr. Klenzing said that he would rate the Plaintiff's overall performance as fair. (Klenzing Dep. pg. 48; Exh. 1) Mr. Klenzing indicated that he counseled the Plaintiff. (Klenzing Dep. pg. 51) Mr. Klenzing stated that overall production was good at times and that the quotas were met. (Klenzing Dep. pg. 63; Exh. 1) Mr. Klenzing said that the Plaintiff's overall performance was good. (Klenzing Dep. pg. 63; Exh. 1) The Plaintiff's performance evaluation dated January 21, 2003 was prepared by Mr. Klenzing. (Performance Valuation January 21, 2003; Exh. 9)   Mr. Klenzing awarded the Plaintiff an overall valuation of 3.1, indicating that the Plaintiff was performing at a "satisfactory value." (Performance Valuation January 21, 2003; Exh. 9)

7

29.     Mr. Klenzing said that he measured the Plaintiff's production by measuring the
performance, how the Plaintiff was doing, and how the production was getting done and handled.
(Klenzing Dep. pg. 61; Exh. 1)  Regarding Mr. Klenzing's view of the Plaintiff's production
while Mr. Klenzing managed him, Mr. Klenzing stated that it was consistently fair.  (Klenzing
Dep. pg. 62; Exh. 1)

30.     In regard to an email Mr. Klenzing wrote to Mr. Goodsell, in January 2002, Mr. Klenzing
indicated that the Plaintiff was "doing well" other than with some performance issues outlined
addressed in the email. (Klenzing Dep. pgs. 35-36; Exh. 1)  The Plaintiff's performance
evaluation dated January 21, 2003 was prepared by Mr. Klenzing. (Performance Valuation
January 21, 2003; Exh. 9)   Mr. Klenzing awarded the Plaintiff an overall valuation of 3.1,
indicating that the Plaintiff was performing at a "satisfactory value."  (Performance Valuation
January 21, 2003; Exh. 9)

31.     The Plaintiff disputes his performance evaluation in 2003 done by Darrin Plawinski.
(Thompson Dep. pgs. 60-62; Exh. 4)  The Plaintiff refuted the contents of this performance
evaluation to Mr. Plawinski and Ms. Lasonde, as it was the first time that the Plaintiff had been
made aware of alleged performance issues.  (Thompson Dep. pg. 60; Exh. 4)  The performance
evaluations contained information that was not true. (Thompson Dep. pg. 60; Exh. 4)

32.     There is a progressive discipline policy at Minute Maid/Coca-Cola. It is corrective
action, including initial counseling, moving to a verbal, written through what is called a
performance improvement plan where there are time periods laid out that improvement is
supposed be demonstrated. (Lasonde Dep. pg. 105; Exh. 8) Ms. Lasonde did not know
whether the Plaintiff was on a performance plan at the time of his termination. (Lasonde Dep. pg.
105; Exh. 8) Ms. Lasonde did not recall the Plaintiff being on any kind of probation at the time

8

of his termination. (Lasonde Dep. pg. 105; Exh. 8) Mr. Goodsell said that, other than the Plaintiff not returning to work when he said he would, there was no other basis that he was aware of for the termination of the Plaintiff's employment. (Goodsell Dep. pg. 85; Exh. 2) If the vacation issue had not surfaced, the Plaintiff would not have been terminated in January 2004. (Lasonde Dep. pgs. 91-92; Exh. 8)

33.     The Plaintiff also felt harassed and retaliated against based upon Mr. Goodsell's conduct, and based upon statements made by Mr. Goodsell that the Plaintiff believed were hostile. (Thompson Dep. pgs. 79-81; Exh. 4) The Plaintiff says that he was continuously harassed while other Caucasian supervisors were not. (Thompson Dep. pgs. 84-85; Exh. 4) Mr. Duval said that he was not aware of another employee being terminated for taking unauthorized vacation time. (Duval Dep. pg. 45; Exh. 6) Mr. Duval said that he heard rumors that the Plaintiff was terminated for job abandonment. (Duval Dep. pg. 46; Exh. 6) Mr. Duval received a warning at Coca-Cola for not maintaining production standards. He was given this warning two years ago by Jerry Goodsell. (Duval Dep. pg. 12; Exh. 6) Mr. Garcia said that he was on a performance plan in 2000 or 2001 for performance, including tardiness, some business decisions, failing to call his supervisor, things like that. (Garcia Dep. pg. 11; Exh. 7) Mr. Garcia said that Dirk Lunsford, acting plant manager at the time, place him on this plan. (Garcia Dep. pg. 13; Exh. 7) Mr. Garcia said that, in 2005, there was a specific procedure that he failed to follow up on and an employee was burned. (Garcia Dep. pgs.13-14; Exh. 7) Mr. Garcia said he was not warned, but counseled by his manager at the time, Dennis Williams. (Garcia Dep. pg. 14; Exh. 7) Mr. Garcia was asked if he himself had any punctuality problems and he said yes. (Garcia Dep. pg. 17; Exh. 7) In regard to his own performance, Mr. Garcia said that when he had punctuality problems, his

9

performance was not up to what was expected of his position, so he was failing in his performance in that respect. (Garcia Dep. pg. 17; Exh. 7)

34.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 34 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

35.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 35 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

36.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 36 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

37.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 37 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

38.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 38 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

39.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 39 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

40.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 40 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

41.    The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 41 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

42.    The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 42 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

43.    The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 43 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

44.    The Plaintiff does not dispute the contents of Paragraph 44 of the Defendant's Facts.

45.    The Plaintiff does not dispute the contents of Paragraph 45 of the Defendant's Facts.

46.    Donna Harris was a second shift quality assurance supervisor. (Thompson Dep. pgs. 35, 36; Exh. 4) Mr. Williams stated that Donna Harris was a QA supervisor with Coca-Cola. (Williams Dep. pg. 57; Exh. 3) Mr. Williams believed that Ms. Harris resigned after an issue regarding use of the computer for personal reasons at work. (Williams Dep. pg. 57; Exh. 3) Donna Harris resigned following and investigation concerning internet abuse. (Lasonde Dep. pg. 27; Exh. 8)

47.    The Plaintiff reported an incident where Donna Harris was supposed to be at work and was on vacation without notifying anyone, and was not reprimanded in any way. (Thompson Dep. pgs. 88-90; Exh. 4) The Plaintiff talked with Hunter Alexander, a coworker of Ms. Harris, regarding the fact that Donna Harris did not show up for work. (Thompson Dep. pg. 88-90; Exh. 4) The Plaintiff was told that Ms. Harris was on vacation. (Thompson Dep. pgs. 88-90; Exh. 4) Ms. Harris did not notify the Plaintiff or Ms. Alexander. (Thompson Dep. pgs. 88-90; Exh. 4)

11

The Plaintiff was also told by Robert Camacho that Ms. Harris was on vacation on the same day. (Thompson Dep. pgs. 88-91; Exh. 4)

48.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 48 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

49.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 48 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them.

50.     See the facts set forth in Paragraph 47 above, which are incorporated herein by reference.

51.     The Plaintiff said there were three discriminatory statements made by Mr. Goodsell and one discriminatory statement made by Donna Harris. (Thompson Dep. pg. 32; Exh. 4) With respect to the statement made by Donna Harris, Ms. Harris was speaking to Ron McKeithen, a coworker that is also of Jamaican heritage. Ms. Harris said words to the effect, "I'm not one of his Jamaican bimbos." (Thompson Dep. pgs. 32-35; Exh. 4) The Plaintiff took this statement to mean that being married to a Jamaican woman is like being married to a bimbo. (Thompson Dep. pg. 34; Exh. 4) Donna Harris knew that the Plaintiff was Jamaican. (Thompson Dep. pg. 35; Exh. 4) The Plaintiff had made complaints about Donna Harris' work performance. (Thompson Dep. pgs. 36-37; Exh. 4) The statement made by Ms. Harris was made sometime in 2002. (Thompson Dep. pg. 37; Exh. 4) The Plaintiff did not hear the comment but Mr. McKeithen told him about it. (Thompson Dep. pg. 37; Exh. 4) The Plaintiff also testified that there were other discriminatory statements that Mr. McKeithen mentioned to him. (Thompson Dep. pg. 76; Exh. 4) The Defendant was made aware of a comment that Donna Harris made regarding discrimination and race. (Lasonde Dep. pg. 28; Exh. 8) Donna Harris made a remark. (Lasonde

12

Dep. pg. 107; Exh. 8) The statement was related to the Plaintiff. (Lasonde Dep. pg. 108; Exh. 8)

It had something to do with an indirect response to a request that the Plaintiff had made, and Ms.

Harris made the comment in Ron McKeithen's presence, but not in the Plaintiff's presence.

(Lasonde Dep. pg. 108; Exh. 8) Mr. Goodsell said he heard that Donna Harris was accused of

making discriminatory statements and that he heard that they were addressed to the Plaintiff.

(Goodsell Dep. pg. 61; Exh. 2) The gist of the statements was that Donna Harris said something

to the effect of Jamaican bimbo. (Goodsell Dep. pg. 61; Exh. 2) Mr. Goodsell did not know

whether this was investigated. (Goodsell Dep. pg. 62; Exh. 2) Mr. Williams said that he was

generally aware that Ms. Harris was accused of making racial comments to the Plaintiff.

(Williams Dep. pg. 58; Exh. 3) Mr. Duval said that he heard rumors that Donna Harris made

some derogatory remarks. (Duval Dep. pg. 39; Exh. 6) Mr. Duval said that one of the remarks

was towards the Plaintiff. (Duval Dep. pg. 39; Exh. 6)

52.     The Plaintiff reported the Jamaican bimbo statement to John Newton. (Thompson Dep.

pg. 43; Exh. 4) The Plaintiff did not know what the result of that report was. (Thompson Dep.

pg. 44; Exh. 4) The Plaintiff also brought up the Donna Harris comment to Ms. Lasonde

hypothetically. (Thompson Dep. pgs. 87-89; Exh. 4) The individual that overheard the comment,

Ron McKeithen, told his supervisor, John Newton, about the comment and he told his supervisor

or manager about the comment. (Lasonde Dep. pg. 28; Exh. 8) She made a reference to Jamaican

bimbos in the presence of Ron McKeithen who took affront to it and told the QA manager, John

Newton. (Lasonde Dep. pg. 107; Exh. 8) John Newton then made Ms. Lasonde aware of it.

(Lasonde Dep. pg. 107) Mr. Newton was instructed by Ms. Lasonde to sit down with Donna and

discuss the inappropriateness, and have to her apologize to Ron. (Lasonde Dep. pg. 107; Exh. 8)

The Plaintiff asked Mr. Newton if it had been addressed, and the Plaintiff was informed that it

13

was addressed. (Lasonde Dep. pg. 107; Exh. 8) Mr. Goodsell said that his interpretation of the harassment policy is that harassment is defined as any single incident or pattern of behavior where the affect, intentional or unintentional creates a hostile, offensive or intimidating work environment. (Goodsell Dep. pg. 101; Exh. 2) Mr. Goodsell stated that he believed that Donna Harris' comments were offensive. (Goodsell Dep. pgs. 101-102; Exh. 2) The Plaintiff brought up discrimination or harassment prior to his termination regarding Donna Harris. (Lane Dep. pg. 76; Exh. 5)

53.    Ms. Harris was also making the Plaintiff's job environment quite hostile after this report was made. (Thompson Dep. pg. 44-46; Exh. 4) The Defendant refused or neglected to properly respond to the complaint about Ms. Harris made by the Plaintiff (Thompson Dep. pgs. 48-49; Exh. 4) Instead the Plaintiff continued to be harassed by Ms. Harris. (Thompson Dep. pgs. 48-49; Exh. 4) The Plaintiff felt like he was targeted because he reported the Donna Harris situation to Jerry Goodsell. (Thompson Dep. pgs. 86-89; Exh. 4) The Plaintiff also testified that there were other discriminatory statements made by management that Mr. McKeithen mentioned to him. (Thompson Dep. pg. 76; Exh. 4)

54.    The Plaintiff testified that there were instances of discrimination in the form of two statements made by Jerry Goodsell. (Thompson Dep. pg. 5; Exh. 4) One of the statements made by Jerry Goodsell was made at the annual Christmas party in 2002. Mr. Goodsell "I hate Jamaican music and Jamaicans." (Thompson Dep. pg. 6; Exh. 4) That occurred sometime in December 2002 or January 2003. (Thompson Dep., pg. 6-7; Exh. 4) The music being played at the time was African-American and reggae mix. (Thompson Dep. pgs. 8-9; Exh. 4) The D.J. was African-American. (Thompson Dep. pg. 9; Exh. 4) The Plaintiff said that his perception of African-American music is rap with a Jamaican D.J., that the music is initiated by Jamaicans and

14

it is deemed to be African-American music. (Thompson Dep. pgs. 77-78; Exh. 4)  The Plaintiff

was appalled by the comment made by Mr. Goodsell. (Thompson Dep. pgs. 10-11; Exh. 4)  Ms.

Lasonde did not know whether Mr. Goodsell made any discriminatory statements during his

tenure at Coca-Cola. (Lasonde Dep. pg. 110; Exh. 8)

55.     The Plaintiff believed that he would be terminated if he reported this incident.

(Thompson Dep. pg. 11; Exh. 4)  Mr. Goodsell would also scream at the Plaintiff for no reason.

(Thompson Dep. pg. 29; Exh. 4)  The Plaintiff also felt harassed and retaliated against based

upon Mr. Goodsell's conduct, and based upon statements made by Mr. Goodsell that the Plaintiff

believed were hostile. (Thompson Dep. pgs. 79-81; Exh. 4)  The Plaintiff felt that Mr. Goodsell's

approval of the Plaintiff's vacation time, and then lying about his role in approving the vacation

time, was a form of discrimination and harassment. (Thompson Dep. pgs. 81-84; Exh. 4)

56.     There was another statement made by Mr. Goodsell that appeared to be under the

influence of alcohol at the time.  Mr. Goodsell said, "I'll deal with you, you fucking Jamaican."

(Thompson Dep.13-15; Exh. 4)  This comment was made in August or September 2003.

(Thompson Dep. pg. 15; Exh. 4)  Mr. Goodsell told the Plaintiff that he was going to deal with

him on more than one occasion, saying "I'll deal with you." (Thompson Dep. pg. 18; Exh. 4)  The

Plaintiff considered these comments to be racially derogatory, particularly given the way that

they were said. (Thompson Dep. pg. 28; Exh. 4)

57.     Mr. Goodsell admitted that he raised his voice to the Plaintiff.  (Goodsell Dep. pgs. 106-

107; Exh. 2)  Mr. Goodsell said that on one occasion he got very upset, raised his voice to the

Plaintiff and told him, "we'll deal with this tomorrow."  (Goodsell Dep. pgs. 106-107; Exh. 2)

Mr. Goodsell said this occurred sometime in September 2003. (Goodsell Dep. pg. 107; Exh. 2)

Mr. Goodsell said he was angry with the Plaintiff. (Goodsell Dep. pg. 107; Exh. 2)

15

58.     Mr. Duval responded "absolutely" when asked if there were times when he did not get along with Mr. Goodsell. (Duval Dep. pg. 13; Exh. 6)  Mr. Duval testified that Mr. Goodsell yelled at him and used profanities. (Duval Dep. pg. 14; Exh. 6)  Mr. Duval said that Mr. Goodsell probably said that Mr. Duval was being a "fucking asshole." (Duval Dep. pg. 14; Exh. 6)  Mr. Duval said that he thought, at times, that Mr. Goodsell and the Plaintiff antagonized each other. (Duval Dep. pg. 18; Exh. 6)  Mr. Duval said that he heard Mr. Goodsell yell at the Plaintiff "I'll deal with you on this later." (Duval Dep. pg. 19; Exh. 6)

59.     Mr. Garcia stated that Mr. Goodsell tends to shout when he speaks, and get agitated very easily when somebody disagrees with him or gives a difference of opinion. (Garcia Dep. pgs. 25-26; Exh. 7)  Mr. Garcia said that Mr. Goodsell yelled at the Plaintiff. (Garcia Dep. pg. 27; Exh. 7)  Mr. Garcia witnessed Mr. Goodsell yell at the Plaintiff. (Garcia Dep. pg. 27; Exh. 7)  Mr. Garcia said that Mr. Goodsell used inappropriate descriptors and profanity when speaking. (Garcia Dep. pgs. 27-28; Exh. 7)  Mr. Garcia said that Mr. Goodsell used the word "fucking" as an adjective. (Garcia Dep. pg. 28; Exh. 7)  As an example, Mr. Garcia indicated that Mr. Goodsell would say things such as "how can you make a fucking decision like that?" (Garcia Dep. 28; Exh. 7)  Mr. Garcia complained about Mr. Goodsell to Walter Klenzing, Mr. Garcia's production manager at the time. (Garcia Dep. pg. 29; Exh. 7)  Mr. Garcia believes that he formally complained to Mr. Klenzing about Mr. Goodsell twice in 2002 or 2003. (Garcia Dep. pg. 30; Exh. 7)  Mr. Garcia said that he believed that the Plaintiff was an honest person. (Garcia Dep. pg. 39; Exh. 7)

60.     The Plaintiff is without sufficient information to form a specific belief as to the actual truth or falsity of the statements contained in Paragraph 60 of the Defendant's Facts, and therefore, the Plaintiff neither admits nor denies them, except to state that the Plaintiff was

16

mistreated for his Jamaican management style. (Thompson Dep. pgs. 50-53; Exh. 4) Mr.

Goodsell would not scream at other supervisors, managers or employees at the plant. (Thompson

Dep. pg. 29; Exh. 4) Mr. Goodsell told the Plaintiff that he was going to deal with him on more

than one occasion, saying "I'll deal with you." (Thompson Dep. pg. 18; Exh. 4) The Plaintiff

considered Goodsell's comments to be racially derogatory, particularly given the way that they

were said. (Thompson Dep. pg. 28; Exh. 4)

61.     The instructions to email Mr. Lane regarding vacation time were in an email he sent to

production supervisors in August 2003. (Lane Dep. pg. 34; Exh. 5) Mr. Lane indicated that the

email is the detailed process that should be followed when requesting vacation time. (Lane Dep.

pg. 35; Exh. 5) Mr. Lane said he sent this email in an effort to stop supervisors from swapping

shifts and having extended time off. (Lane Dep. pg. 36; Exh. 5) The email was sent again in

September 2003. (Lane Dep. pg. 37; Exh. 5) Mr. Lane resent this email to make sure people had

a clear understanding of the policy. (Lane Dep. pg. 37; Exh. 5) Mr. Lane said that

hypothetically, if the Plaintiff had a conversation with Mr. Goodsell and Mr. Goodsell said it was

okay if the Plaintiff needed some extra vacation time for medical treatment, it would be

acceptable under the vacation policy as long as it was worked through with the fellow

supervisors and there was agreement across the board that there were not going to be any gaps in

coverage. (Lane Dep. pg. 53; Exh. 5)

62.     Other than the email that outlined the vacation approval procedure, there was no other

procedure or policy regarding vacation approval for production supervisors. (Lane Dep. pg. 81;

Exh. 5) Nothing has been formally implemented into a policy handbook regarding the same

subject. (Lane Dep. pg. 82; Exh. 5) Mr. Lane said there was no particular time frame that the

Plaintiff would have to start the scheduling process or approval process prior to the vacation.

(Lane Dep. pg. 53; Exh. 5) The expectation regarding the policy was to allow enough time so that coverage could be provided on the shift, make sure that you have an opportunity to talk to your fellow supervisors, make sure there is coverage and that there is no gaps in production. (Lane Dep. pg. 53; Exh. 5) Ms. Lasonde stated that the email directive from Jim Lane in August 2003 stated that the supervisors were expected to request the vacation time from their manager, ensure that there is coverage, and place the planned vacation time out on the G-drive. (Lasonde Dep. pgs. 37-38; Exh. 8) When asked whether there was a certain number of days this was to be done before the actual vacation, Ms. Lasonde said it would be expected that people would give sufficient notice for business planning purposes. (Lasonde Dep. pg. 38; Exh. 8) Mr. Klenzing was not aware of any written rule regarding how far in advance these steps would need to be done. (Klenzing Dep. pg. 30; Exh. 1) Mr. Klenzing said that to his knowledge, there was no rule on what was adequate notice. (Klenzing Dep. pg. 31; Exh. 1) Mr. Goodsell indicated that there was no certain number of days in advance that the Plaintiff had to requested vacation time off and get approval as long as the coverage was arranged prior to the vacation. (Goodsell Dep. pgs. 72-73; Exh. 2)

63.     The Plaintiff does not dispute the contents of Paragraph 63 of the Defendant's Facts.

64.     Mr. Garcia said that he could not remember whether there was a discipline policy with respect to not following vacation procedure. (Garcia Dep. pg. 51; Exh. 7) Mr. Garcia indicated that, other than the email, he could not remember anything in writing concerning vacation approval. (Garcia Dep. pg. 52; Exh. 7) Mr. Garcia said that, to his knowledge, there was nothing in a handbook or policy or procedure manual regarding vacation approval. (Garcia Dep. pg. 52; Exh. 7) Mr. Duval testified that, at the time of the Plaintiff's employment, Coca-Cola had a vacation approval policy that the employee would document it into the system and notify the

18

next of supervisors and the employee would notify his boss to make sure that it was acceptable. (Duval Dep. pg. 23; Exh. 6) Mr. Duval said that, as far as he knows, there was nothing in writing concerning this vacation approval policy. (Duval Dep. pg. 24; Exh. 6)  Mr. Duval again said that he did not know whether the vacation policy was in writing or in the books. (Duval Dep. pg. 33-34; Exh. 6)  Mr. Duval indicated that, under the policy, usually employees would check to make sure that there was not an overlap with the other supervisors, inform the other supervisors that they were putting it in for it, and then notify Mr. Goodsell that coverage was taken care of. (Duval Dep. pg. 38; Exh. 6)

65.    The Defendant alleges that the Plaintiff was not present to cover his shift, but the Plaintiff maintains that there was some confusion about coverage for a shift that was not his fault. (Thompson Dep. pgs. 118-122; Exh. 4) The Plaintiff testified that in September 2003, he had an arrangement with Mr. Duval to swap shifts. (Thompson Dep. pg. 117; Exh. 4) There was then communication from management that swapping was to be discontinued, as Mr. Lane wanted continuity of the supervisors. (Thompson Dep. pg. 117; Exh. 4) The Plaintiff indicated that he took it that the arrangement he had with Mr. Duval was to be off. (Thompson Dep. pg. 117-118; Exh. 4) It was a miscommunication between the supervisors. (Thompson Dep. pg. 118; Exh. 4) The Plaintiff assumed that Mr. Duval would be working his regular shift, as there was a discussion among the supervisors that they would no longer swap shifts. (Thompson Dep. pgs. 119-120; Exh. 4) Upon receiving a telephone call from management that day, the Plaintiff responded immediately, got ready and went in to work. (Thompson Dep. pg. 117-118; Exh. 4)

66.    Mr. Goodsell verbally counseled the Plaintiff regarding a supervisor's meeting that the Plaintiff allegedly missed in September 2003. (Goodsell Dep. pgs. 24-25; Exh. 2) Mr. Goodsell indicated that a verbal counseling is a coaching step to help correct behavior before it gets to the

19

warning stage, the discipline stage. (Goodsell Dep. pg. 25; Exh. 2)  Mr. Goodsell indicated that

he did not warn or discipline the Plaintiff during the time frame that he was acting as manager.

(Goodsell Dep. pg. 28; Exh. 2) Mr. Goodsell indicated that he believed that coaching was trying

to correct behavior as a constructive process and not a disciplinary process. (Goodsell Dep. pgs.

28-29; Exh. 2) Mr. Gareia indicated that another production supervisor, Sean Rutherford, was

late to a meeting. (Garcia Dep. pg. 21; Exh. 7)  Despite the Defendant's allegations concerning

the alleged missed meeting, other than the Plaintiff allegedly not returning to work when he said

he would after his vacation, there was no other basis for the termination of the Plaintiff's

employment. (Goodsell Dep. pg. 85; Exh. 2)  If the vacation issue had not surfaced, the Plaintiff

would not have been terminated in January 2004. (Lasonde Dep. pgs. 91-92; Exh. 8)

67.    See facts set forth in Paragraph 66 above, which are incorporated herein by reference.

68.    In the fall of 2003, the Plaintiff did an analysis in terms of the financial cost of his dental

work. (Thompson Dep. pgs.153-155; Exh. 4)  The Plaintiff figured it would be more

advantageous to have the procedure done in Jamaica rather than in the United States. (Thompson

Dep. pgs. 154-156; Exh. 4)

69.    The Plaintiff's dental work became an emergency in December. (Thompson Dep. pgs.

140-141; Exh. 4) The Plaintiff did not have any insurance to cover his dental work and paid for it

out of his pocket. (Thompson Dep. pgs.144-145; Exh. 4)  The Plaintiff informed management

that he was going to make plans to go to Jamaica to have dental work done. (Thompson Dep.

pgs. 64-70; Exh. 4)  In December 2003, the Plaintiff made arrangements to travel to Jamaica

approximately one week before the trip. (Thompson Dep. pgs. 122-124; Exh. 4) The Plaintiff

purchased the ticket on e-ticket online. (Thompson Dep. pg. 124; Exh. 4) The Plaintiff had his

teeth repaired in Jamaica. (Thompson Dep. pgs.134-135; Exh. 4)  The Plaintiff told them that he

had dental problems beginning in November of 2003 and Aetna was going to charge him $5,000 more for the dental work than what someone in Jamaica was able to do for him. (Lasonde Dep. pg. 36; Exh. 8)

70.    When the Plaintiff started to make plans in the first or second week in December to go to Jamaica for dental work, he spoke to Hector Lepage at the plant. (Thompson Dep. pgs. 157-158; Exh. 4) Hector Lepage was the Plaintiff's leader. The Plaintiff communicated his plans to take vacation time to Hector Lepage. (Thompson Dep. pg. 158; Exh. 4) The Plaintiff then talked to Martin Duval about taking vacation time for his dental work. (Thompson Dep. pg. 158; Exh. 4) The Plaintiff told Mr. Duval that there was a possibility that he may need to go to Jamaica and that there could be an extension due to the gravity of his situation and his need for dental work. (Thompson Dep. pgs.158-159; Exh. 4) The Plaintiff spoke to Mr. Duval in November or December 2003 regarding his need for vacation and possible extension. (Thompson Dep. pg. 159; Exh. 4) Also, in December 2003, the Plaintiff spoke to Dennis Williams about taking time off. (Thompson Dep. pg. 160; Exh. 4) Mr. Williams gave the Plaintiff permission to take the vacation time. (Thompson Dep. pgs. 160-162; Exh. 4) Dennis Williams only told the Plaintiff to pass it by Jerry Goodsell. (Thompson Dep. pg. 161; Exh. 4) The time proposed was from December 20, 2003 through January 9, 2004. Mr. Williams was the Plaintiff's manager at the time of the conversation. (Thompson Dep. pg. 162; Exh. 4) The Plaintiff was simply told by Mr. Williams to tell Mr. Goodsell that this vacation time had been approved. (Thompson Dep. pgs. 166-167; Exh. 4) Mr. Duval had already known about the tentative vacation time. (Thompson Dep. pg. 167; Exh. 4) After he spoke to Mr. Williams, the Plaintiff spoke to Mr. Duval about a possible extension of the vacation time. Mr. Duval said "yes, just send me an email to what you are saying." The Plaintiff said he would send it. (Thompson Dep. pg. 167; Exh. 4) The Plaintiff,

in fact, sent Mr. Duval an email confirming what was agreed upon. (Thompson Dep. pg.167; Exh. 4) This conversation with Mr. Duval occurred approximately one week before the Plaintiff actually went away on vacation. (Thompson Dep. pg. 167; Exh. 4) The Plaintiff had a conversation with Mr. Duval that the vacation time may be beyond January 9, 2004 by a few days. (Thompson Dep. pg. 168; Exh. 4) Mr. Duval said that was okay. Mr. Duval said, "just send me an email." (Thompson Dep. pg. 168; Exh. 4) The Plaintiff asked Sean Rutherford, his coworker, for coverage for a few hours to catch a flight, and Sean agreed. (Thompson Dep. pg. 170; Exh. 4)

71.    When asked why Mr. Thompson was speaking to him about vacation time in mid-December, Mr. Williams indicated that the Plaintiff did so because Mr. Williams was to become the operations manager. (Williams Dep. pg. 43; Exh. 3) Mr. Williams agreed that if the Plaintiff had gone to him and mentioned vacation time, and Mr. Williams told him to go to Mr. Goodsell and talk to Mr. Goodsell about it, and the Plaintiff had gone to Mr. Goodsell and obtained approval for the vacation time and logged it in the computer, that the Plaintiff would have followed the necessary steps to secure vacation time under Coca-Cola policy. (Williams Dep. pgs. 62-63; Exh. 3) Mr. Goodsell did not know whether Mr. Williams told the Plaintiff that he could go on vacation. (Goodsell Dep. pg. 77; Exh. 2) Again, Mr. Williams gave the Plaintiff permission to take the vacation time. (Thompson Dep. pgs. 160-162; Exh. 4) Dennis Williams only told the Plaintiff to pass it by Jerry Goodsell. (Thompson Dep. pg. 161; Exh. 4) The time proposed was from December 20, 2003 through January 9, 2004. (Thompson Dep. pg. 161; Exh. 4) Mr. Williams was the Plaintiff's manager at the time of the conversation. (Thompson Dep. pg. 162; Exh. 4)

22

72.    At the time, it would have been Dennis Williams that the Plaintiff would have had to have approve his vacation time. (Thompson Dep. pg. 176; Exh. 4) Mr. Williams stated that, sometime prior to the meeting with the Plaintiff, Mr. Williams was, in fact, in the Northampton facility acting as the production manager in the process of transitioning. (Williams Dep. pg. 52-54; Exh. 3) Mr. Williams stated that he was being paid in that position and on the job at that time. (Williams Dep. pg. 54; Exh. 3) Mr. Lane testified that Mr. Williams came to the Northampton plant in December 2003. (Lane Dep. pg. 24; Exh. 5) Mr. Williams was transitioning. (Lane Dep. pg. 24; Exh. 5) Mr. Lane said that Mr. Williams was there for a week in December 2003. (Lane Dep. pg. 24; Exh. 5) Mr. Duval said that Dennis Williams could have been employed at the Northampton facility as a production manager in December 2003. (Duval Dep. pg. 50; Exh. 6) Mr. Klenzing said that Mr. Williams was working in the Northampton facility in December 2003. (Klenzing Dep. pgs. 22-23; Exh. 1) Mr. Klenzing was asked whether Mr. Williams was working as a production manager after Thanksgiving 2003 to the time that the new year came around and Mr. Klenzing said, "I would say yes. He was awarded the job, yes." (Klenzing Dep. pg. 42; Exh. 1)

73.    Mr. Duval said that he talked to the Plaintiff several times about the Plaintiff's vacation before the Plaintiff went on vacation. (Duval Dep. pg. 25; Exh. 6) Mr. Duval said he asked that Plaintiff beginning in November when he was taking his vacation. (Duval Dep. pg. 26; Exh. 6) Mr. Duval said that the Plaintiff called up and told him that he was getting some dental work and may be back late. (Duval Dep. pg. 27-28; Exh. 6) Mr. Duval could not remember if this was in December or January. (Duval Dep. pg. 28; Exh. 6) Mr. Duval told the Plaintiff that it was okay to take the vacation time. (Thompson Dep. pg. 173; Exh. 4) The Plaintiff confirmed the vacation time with Mr. Duval in an email. (Thompson Dep. pgs. 174-175; Exh. 4) Mr. Lane indicated

23

that his understanding was that there were conversations between the Plaintiff and Martin Duval around the original dates of vacation, but not the extension. (Lane Dep. pg. 55; Exh. 5) Mr. Lane indicated that the agreement was that the Plaintiff and Martin Duval would work the vacation time out between themselves. (Lane Dep. pgs. 55-56; Exh. 5) Mr. Lane did not know whether the Plaintiff spoke to Mr. Duval or anyone else about a medical treatment issue that may extend that vacation. (Lane Dep. pg. 56; Exh. 5) Mr. Lane said that an extension to the vacation time would be okay as long as it was agreed to, and arranged, and approved up front. (Lane Dep. pg. 57; Exh. 5)

74.    Mr. Garcia denied knowledge of whether the Plaintiff was out for any medical issues during that vacation, but then admitted that he heard that the Plaintiff was also trying to get his teeth fixed in Jamaica. (Garcia Dep. pg. 55; Exh. 7) Mr. Garcia indicated that he heard this from the Plaintiff. (Garcia Dep. pg. 56; Exh. 7) Mr. Garcia said that he could not specifically remember when heard it from the Plaintiff, but that it was before the Plaintiff took the vacation. (Garcia Dep. pg. 56; Exh. 7) Mr. Garcia indicated that he knew that the Plaintiff had coverage for the vacation that he took in late December of 2003 to early 2004 because Martin Duval had told Mr. Garcia that the Plaintiff had asked for coverage. (Garcia Dep. pg. 60-61; Exh. 7) Mr. Garcia also stated that Martin Duval, the week before the Plaintiff left on vacation, had heard from Hector Lepage that the Plaintiff was leaving on vacation. (Garcia Dep. pg. 63; Exh. 7) Mr. Garcia stated that he learned that the Plaintiff had not come back because Hector Lepage commented that the Plaintiff did not come back from vacation because of his teeth or medical procedure. (Garcia Dep. pg. 64-65; Exh. 7) However, Mr. Goodsell testified that, to his knowledge, no one at Coca-Cola was aware that the Plaintiff was having dental work done while he was on vacation prior to the Plaintiff leaving for vacation. (Goodsell Dep. pg. 42)

24

75.    Mr. Duval had already known about the tentative vacation time. (Thompson Dep. pg. 167; Exh. 4) After he spoke to Mr. Williams, the Plaintiff spoke to Mr. Duval about a possible extension of the vacation time. Mr. Duval said "yes, just send me an email to what you are saying." The Plaintiff said he would send it. (Thompson Dep. pg. 167; Exh. 4) The Plaintiff, in fact, sent Mr. Duval an email confirming what was agreed upon. (Thompson Dep. pg. 167; Exh. 4) Mr. Duval said that he received an email from the Plaintiff about the Plaintiff's vacation time. (Duval Dep. pg. 41; Exh. 6) Mr. Duval said that in the email that he received from the Plaintiff concerning the Plaintiff's vacation, the Plaintiff could have said he may be a little longer because the Plaintiff had a dental procedure. (Duval Dep. pg. 49; Exh. 6) Mr. Duval said that, because he never saw the Plaintiff, he asked Mr. Goodsell to check with the Plaintiff to see when the Plaintiff was taking his vacation period. Mr. Duval said that he had heard rumors that the Plaintiff was taking vacation time, and he requested that Mr. Goodsell check on it and let Mr. Duval know. (Duval Dep. pgs. 29-30; Exh. 6) Mr. Duval said he also had this conversation with Diego Garcia. (Duval Dep. pg. 30; Exh. 6) Mr. Duval said that these conversations occurred before the Plaintiff went on vacation. (Duval Dep. pg. 30; Exh. 6) Mr. Duval said that Mr. Garcia only told him that the Plaintiff would let Mr. Duval know in enough time. (Duval Dep. pg. 30; Exh. 6) Mr. Duval was not responded to by Mr. Goodsell or Mr. Duval aside from that. (Duval Dep. pgs. 30-31; Exh. 6) Mr. Garcia said that he went on vacation the last two weeks of 2003 and prior to that time he was aware that the Plaintiff was going out on vacation and was going to have some medical dental work done. (Garcia Dep. pg. 68; Exh. 7) Mr. Garcia said that he was aware of the Plaintiff's vacation about a week before Mr. Garcia left for vacation. (Garcia Dep. pg. 68; Exh. 7) Mr. Garcia said that Martin Duval knew that the Plaintiff was going. (Garcia Dep. pg. 69; Exh. 7) Mr. Garcia said he did not know whether the Plaintiff had

25

approval to take vacation in the last two weeks of December 2003. (Garcia Dep. pg. 46-47; Exh. 7)

76.     In December 2003, the Plaintiff spoke to Dennis Williams about taking this vacation time. Prior to that, the Plaintiff spoke to his lead Hector Lepage, who knew about it. Martin Duval was also told tentatively that the Plaintiff had to go take some time off. (Thompson Dep. pgs.151-153; Exh. 4) Mr. Lane said that he believed that the Plaintiff had conversations about taking vacation to a certain point, but that there was an extension of that vacation that was not communicated. (Lane Dep. pgs. 27-28; Exh. 5) Mr. Lane said that some of the Plaintiff's vacation time was approved. (Lane Dep. pg. 28; Exh. 5) Mr. Williams said that he did not know specifically whether the Plaintiff arranged for coverage, or had approval from management in regard to his vacation time. (Williams Dep. pg. 45; Exh. 3) Mr. Garcia indicated that he knew that the Plaintiff had coverage for the vacation that he took in late December of 2003 to early 2004 because Martin Duval had told Mr. Garcia that the Plaintiff had asked for coverage. (Garcia Dep. pg. 60-61; Exh. 7) Mr. Garcia also stated that Martin Duval, the week before the Plaintiff left on vacation, had heard from Hector Lepage that the Plaintiff was leaving on vacation. (Garcia Dep. pg. 63; Exh. 7) Mr. Garcia stated that he learned that the Plaintiff had not come back because Hector Lepage commented that the Plaintiff did not come back from vacation because of his teeth or medical procedure. (Garcia Dep. pg. 64-65; Exh. 7)

77.     At the time, Dennis Williams would have had to approve the Plaintiff's vacation time. (Thompson Dep. pg. 176; Exh. 4) The Plaintiff also passed it by Mr. Goodsell on the night of Friday, December 19, 2004. (Thompson Dep. pg. 176; Exh. 4) The Plaintiff outlined with Mr. Goodsell what he told Mr. Williams about going to Jamaica to do dental work and that there was a possibility that he may need extra time if the dental work required it. Mr. Goodsell asked him

26

about coverage and the Plaintiff said that Sean Rutherford was coming in to cover for him in the morning. (Thompson Dep. pg. 177; Exh. 4) Mr. Goodsell then asked the Plaintiff if he had coverage while he was going to be gone, the Plaintiff said yes, and nothing else was said in that conversation. (Goodsell Dep. pgs. 32-33; Exh. 2) Mr. Goodsell testified that his concern at the time was to make sure that he had coverage to run the plant. (Goodsell Dep. pg. 33; Exh. 2) Mr. Goodsell testified that there was coverage. (Goodsell Dep. pg. 33; Exh. 2) Mr. Goodsell was asked whether the Plaintiff was required to have vacation approval by him by a certain number of days before his vacation. Mr. Goodsell responded "only to make sure that the coverage was set up." At the time the Plaintiff told Mr. Goodsell, Mr. Goodsell believed that the Plaintiff had done that. (Goodsell Dep. pgs. 36-37; Exh. 2) Mr. Goodsell did not tell the Plaintiff that he could not go on vacation. (Goodsell Dep. pg. 37; Exh. 2) Mr. Goodsell again said that his biggest concern at the time was that Mr. Goodsell had coverage. (Goodsell Dep. pgs. 37-38; Exh. 2) Mr. Goodsell said that he did not ever say anything to the Plaintiff to the effect that he could be terminated, disciplined or reprimanded if he went on vacation. (Goodsell Dep. pg. 38; Exh. 2) Mr. Goodsell said that the Plaintiff spoke with him before he went on vacation. (Goodsell Dep. pg. 36; Exh. 2) Mr. Goodsell said that he did not know whether there is any policy or procedure of Coca-Cola that says that you have to have vacation approved a certain number of days prior to the vacation. (Goodsell Dep. pg. 36; Exh. 2)

78.     See facts set forth in Paragraph 77 above, which is incorporated herein by reference.

79.     The Plaintiff informed management that he was going to make plans to go to Jamaica to have dental work done. (Thompson Dep. pgs. 64-70; Exh. 4) In December 2003, the Plaintiff made arrangements to travel to Jamaica approximately one week before the trip. (Thompson Dep. pgs. 122-124; Exh. 4) The Plaintiff purchased the ticket on e-ticket online. (Thompson Dep.

27

pg. 124; Exh. 4) The Plaintiff had his teeth repaired in Jamaica. (Thompson Dep. pgs. 134-135; Exh. 4) The Plaintiff's dental work became an emergency in December. (Thompson Dep. pgs. 140-141; Exh. 4) The Plaintiff did not have any insurance to cover his dental work and paid for it out of his pocket. (Thompson Dep. pgs. 144-145; Exh. 4) See also, the facts set forth in Paragraph 77 above, which are incorporated herein by reference.

80.    The Plaintiff does not dispute the contents of Paragraph 80 of the Defendant's Facts.

81.    Mr. Williams gave the Plaintiff permission to take the vacation time. (Thompson Dep. pgs. 160-162; Exh. 4) Dennis Williams only told the Plaintiff to pass it by Jerry Goodsell. (Thompson Dep. pg. 161; Exh. 4) The time proposed was from December 20, 2003 through January 9, 2004. (Thompson Dep. pg. 161; Exh. 4) Mr. Williams was the Plaintiff's manager at the time of the conversation. (Thompson Dep. pg. 162; Exh. 4) The Plaintiff was simply told by Mr. Williams to tell Mr. Goodsell that this vacation time had been approved. (Thompson Dep. pgs. 166-167; Exh. 4) Mr. Duval had already known about the tentative vacation time. (Thompson Dep. pg. 167; Exh. 4) After he spoke to Mr. Williams, the Plaintiff spoke to Mr. Duval about a possible extension of the vacation time. Mr. Duval said "yes, just send me an email to what you are saying." The Plaintiff said he would send it. (Thompson Dep. pg. 167; Exh. 4) The Plaintiff, in fact, sent Mr. Duval an email confirming what was agreed upon. (Thompson Dep. pg. 167; Exh. 4) This conversation with Mr. Duval occurred approximately one week before the Plaintiff actually went away on vacation. (Thompson Dep. pg. 167; Exh. 4) The Plaintiff had a conversation with Mr. Duval that the vacation time may be beyond January 9, 2004 by a few days. (Thompson Dep. pg. 168; Exh. 4) Mr. Duval said that was okay. Mr. Duval said, "just send me an email." (Thompson Dep. pg. 168; Exh. 4) Mr. Goodsell said that the Plaintiff contacted him around the 29th or 30th of December 2003 and left a voice message stating

28

that he would be taking a purchased vacation day, and a week's vacation because his dental work was not complete. (Goodsell Dep. pg. 41; Exh. 2) The Plaintiff did not enter his vacation time in the spreadsheet beyond December 2003 because the spreadsheet did not go into the next year, 2004. There was no way to enter any time for 2004 in the spreadsheet documentation submitted to the company. (Thompson Dep. pg. 194; Exh. 4)  Mr. Goodsell indicated that there was one message from the Plaintiff left for him on his voice mail answering machine after he had already gone on vacation saying that he was extending his vacation. (Goodsell Dep. pg. 30; Exh. 2) Hypothetically, if the Plaintiff had gone to Mr. Goodsell the day before he left for vacation and said he had to take a vacation, said he had coverage, and Mr. Goodsell said it was okay and it was entered in the computer, this would not violated the verbal policy. (Lasonde Dep. pgs. 74-78; Exh. 8)Mr. Lane said that hypothetically, if the Plaintiff had a conversation with Mr. Goodsell and Mr. Goodsell said it was okay if the Plaintiff needed some extra vacation time for medical treatment, it would be acceptable under the vacation policy as long as it was worked through with the fellow supervisors and there was agreement across the board that there were not going to be any gaps in coverage. (Lane Dep. pg. 53; Exh. 5)

82.   The Plaintiff left his cell phone number and his home phone number so that he could be contacted by Coca-Cola while he was away on vacation. (Thompson Dep. pgs. 178-179; Exh. 4) The phone numbers were posted in the supervisor's office. (Thompson Dep. pgs. 178-179; Exh. 4)  The Plaintiff had voice mail on his cell phone and an answering machine at his home phone number. (Thompson Dep. pg. 179; Exh. 4)  The Plaintiff's wife checked the messages every day when the Plaintiff would call home, and no voice mail was recorded. (Thompson Dep. pg. 179; Exh. 4)

29

83. On the December 19, 2003, the Plaintiff informed Mr. Goodsell that he had coverage. (Goodsell Dep. pgs. 73-74; Exh. 2)  Mr. Goodsell said that the Plaintiff said that he had already arranged coverage with Mr. Duval during his vacation, at least through the 2nd of January, 2004 and that Mr. Duval would be the person covering for him. (Goodsell Dep. pg. 74; Exh. 2)  Martin Duval covered the days that the Plaintiff was out. (Lane Dep. pg. 74; Exh. 5)  Mr. Goodsell said that he and Martin Duval covered the Plaintiff's time off. (Goodsell Dep. pg. 45; Exh. 2)  Mr. Goodsell said there were no issues with stoppage of machinery or any costs that were incurred by the company as a result. (Goodsell Dep. pg. 45; Exh. 2)  Martin Duval sent an email to management stating that the Plaintiff told him that he was taking vacation or expected to be out and asked him to cover. (Lasonde Dep. pg. 49; Exh. 8)  Mr. Garcia indicated that he knew that the Plaintiff had coverage for the vacation that he took in late December of 2003 to early 2004 because Martin Duval had told Mr. Garcia that the Plaintiff had asked for coverage. (Garcia Dep. pg. 60-61; Exh. 7)  Mr. Garcia also stated that Martin Duval, the week before the Plaintiff left on vacation, had heard from Hector Lepage that the Plaintiff was leaving on vacation. (Garcia Dep. pg. 63; Exh. 7)  Mr. Garcia stated that he learned that the Plaintiff had not come back because Hector Lepage commented that the Plaintiff did not come back from vacation because of his teeth or medical procedure. (Garcia Dep. pg. 64-65; Exh. 7)

84. Ms. Lasonde wrote a letter inquiring as to his whereabouts and that it was considered an unauthorized leave of absence. (Lasonde Dep. pg. 72; Exh. 8)  However, the Plaintiff left his cell phone number and home phone number so that he could be contacted by Coca-Cola while he was away. (Thompson Dep. pgs. 178-179; Exh. 4)  The numbers were posted in the supervisor's office. (Thompson Dep. pgs. 178-179; Exh. 4)  The Plaintiff had voice mail on his cell phone and an answering machine at his home phone number. (Thompson Dep. pg. 179; Exh. 4)  The

30

Plaintiff's wife checked every day for messages and the Plaintiff called home and no voicemail was left for him by anyone from the company. (Thompson Dep. pg. 179; Exh. 4)

85.     Mr. Goodsell had a "fact-finding" meeting with the Plaintiff, Celine Lasonde, and James Lane to find out why the Plaintiff did not return to work for the purpose of determining potential discipline. (Goodsell Dep. pgs. 42-43; Exh. 2)  Ms. Lasonde indicated that the plant leadership team had the meeting with the Plaintiff on January 12, 2004. (Lasonde Dep. pg. 36; Exh. 8) The Plaintiff was confronted in a meeting held with Mr. Lane, Mr. Goodsell, and Celine Lasonde regarding the violation of policy and placed on suspension pending investigation. (Lane Dep. pgs. 64-65; Exh. 5)  Mr. Goodsell indicated that there was no investigation of the vacation issue, other than the fact-finding conference with the HR manager, general manager, plant manager and the Plaintiff to hear why the Plaintiff did not come back to work based on the protocol that the plant manager had set for scheduling vacation. (Goodsell Dep. pgs. 46-47; Exh. 2)  Mr. Goodsell said that the HR manager, Celine Lasonde called this meeting, and that it was held in mid-January 2004. (Goodsell Dep. pg. 47; Exh. 2)  Ms. Lasonde indicated that the plant leadership team met and discussed the matter at hand and reviewed the circumstances, the time line and the dates and so forth, and once they reached a consensus, a white-paper was written. (Lasonde Dep. pg. 35; Exh. 8)

86.     The Plaintiff did not provide any documentation relating to his dental work to Coca-Cola because they never asked for it, but he would have had they asked for it. (Thompson Dep. pgs. 147-149; Exh. 4)  The Plaintiff did tell management at Coca-Cola that he did have documentation relating to his dental treatment. (Thompson Dep. pgs. 147-149; Exh. 4)

87.     In regard to the decision to terminate the Plaintiff's employment, there is a process that involves a review with a Separation Committee in Atlanta. A recommendation is made, and

31

based upon feedback from the Separation Committee, the decision is made. (Lane Dep. pg. 26; Exh. 5) The white-paper is a company term for the documentation that goes to Atlanta for review in the event that there is a recommendation for termination. (Lasonde Dep. pg. 31; Exh. 8) The document entitled Separation Proposal is the "white-paper." (Separation Proposal; Exh. 10) The white-paper is sent after the investigation process is under way and management feels comfortable with its recommendation for termination. (Lane Dep. pg. 67; Exh. 5) There was a unanimous consensus to write the white-paper regarding the Plaintiff's termination. (Lasonde Dep. pg. 35; Exh. 8)

88.     Regarding the alleged investigation, Mr. Goodsell had a "fact-finding" meeting with the Plaintiff, Celine Lasonde, and James Lane to find out why the Plaintiff did not return to work for the purpose of determining potential discipline. (Goodsell Dep. pgs. 42-43; Exh. 2) The Plaintiff indicated that he had put his vacation time for December 20, 2003 through January 2, 2004 in the vacation planner. (Goodsell Dep. pg. 58-59; Exh. 2) There was no way to enter any time for 2004 in the spreadsheet documentation submitted to the company. (Thompson Dep. pg. 194; Exh. 4) The Plaintiff indicated that he had dental work done in Jamaica and that it was not completed within his vacation time frame. (Goodsell Dep. pg. 59; Exh. 2) Mr. Goodsell testified that he did not review the Plaintiff's personnel file prior to his termination of employment. (Goodsell Dep. pg. 24; Exh. 2) Mr. Goodsell did not know whether anyone reviewed the Plaintiff's personnel file prior to the Plaintiff's termination. (Goodsell Dep. pg. 24; Exh. 2) Mr. Goodsell said he did not know whether the Plaintiff received a written warning at Coca-Cola. (Goodsell Dep. pg. 95; Exh. 2) Mr. Goodsell said he did not know whether the Plaintiff received a verbal warning. (Goodsell Dep. pg. 95; Exh. 2) Mr. Lane testified that Mr. Goodsell conducted an investigation. (Lane Dep. pgs. 67-68; Exh. 5) As part of the investigation, Mr. Goodsell

interviewed supervisors that were directly involved. (Lane Dep. pg. 71; Exh. 5)   Mr. Goodsell also interviewed the Plaintiff. (Lane Dep. pg. 71; Exh. 5)   If the investigation had continued after that meeting, Mr. Goodsell and Celine Lasonde would have continued it. (Lane Dep. pg. 69; Exh. 5)   However, Ms. Lasonde indicated that she was the only one at Coca-Cola that investigated the vacation issue which was the subject of the Plaintiff's termination. (Lasonde Dep. pgs. 111-112; Exh. 8)   Ms. Lasonde did not take written statements from any of the individuals that she spoke to regarding the Plaintiff's vacation issue. (Lasonde Dep. pg. 112)   Ms. Lasonde is not specifically sure whether she asked Sean Rutherford, Diego Garcia, Martin Duval, and Jerry Goodsell if they talked to the Plaintiff prior to him going on vacation about his vacation time. (Lasonde Dep. pgs. 51-52; Exh. 8)   Ms. Lasonde could not give specifics as to a conversation that may have occurred between the Plaintiff and Mr. Goodsell on December 19, 2003 with regard to the Plaintiff's vacation time.   Ms. Lasonde did not know whether Mr. Goodsell told the Plaintiff that he could not go on vacation during the conversation on December 19, 2003. (Lasonde Dep. pgs. 56-58; Exh. 8)   Ms. Lasonde said it would be important to know this prior to making the recommendation for termination. (Lasonde Dep. pgs. 60-61; Exh. 8)   Ms. Lasonde did not know whether the Plaintiff was on a performance plan at the time of his termination. (Lasonde Dep. pg. 105; Exh. 8)   Ms. Lasonde did not recall the Plaintiff being on any kind of probation at the time of his termination. (Lasonde Dep. pg. 105; Exh. 8)   Ms. Lasonde does not recall whether she reviewed the Plaintiff's personnel file prior to the termination of his employment. (Lasonde Dep. pg. 90; Exh. 8)   The only person in management at Coca-Cola that would have reviewed the Plaintiff's personnel file before he was terminated was Ms. Lasonde. (Lasonde Dep. pg. 90; Exh. 8)   Ms. Lasonde did not recall interviewing anyone after the 12th of January, 2004. (Lasonde Dep. pg. 40; Exh. 8)   Ms. Lasonde indicated

that the white-paper went out to Atlanta at the end of that week, around January 17, 2004.
(Lasonde Dep. pg. 40; Exh. 8)   Mr. Williams said he did not know specifically whether there
was any kind of investigation done by any of the manager or anyone at Coca-Cola concerning
the vacation of the Plaintiff. (Williams Dep. pg. 40; Exh. 3)   Mr. Williams said that he did not
know whether the Plaintiff's work performance and history at Coca-Cola were investigated
before the termination decision was made. (Williams Dep. pg. 61; Exh. 3) Mr. Lane did not
know whether anyone reviewed the Plaintiff's personnel file prior to the termination of his
employment. (Lane Dep. pg. 43; Exh. 5)   Mr. Lane said this would have been important. (Lane
Dep. pg. 43; Exh. 5)

89.   A recommendation concerning the Plaintiff's termination was conveyed to corporate in
writing by Ms. Lasonde, Mr. Lane, and Mr. Goodsell. (Lane Dep. pg. 44; Exh. 5)   The specific
event listed in the Plaintiff's "white-paper" is the vacation extension issue. (Lane Dep. pg. 49;
Exh. 5)   The Separation Committee was in agreement with the recommendation. (Lane Dep. pg.
50; Exh. 5)

90.   Mr. Goodsell recommended that the Plaintiff be terminated. (Lane Dep. pg. 40; Exh. 5)
Mr. Goodsell had a "fact-finding" meeting with the Plaintiff, Celine Lasonde, and James Lane to
find out why the Plaintiff did not return to work for the purpose of determining potential
discipline. (Goodsell Dep. pgs. 42-43; Exh. 2) Information concerning the Plaintiff's vacation
was provided by Mr. Goodsell and was documented in the "white-paper." (Separation Proposal;
Exh. 10) Mr. Lane said that he, Celine Lasonde, and Jerry Goodsell made recommendations to
the Separation Committee concerning the termination of the Plaintiff's employment. (Lane Dep.
pg. 29; Exh. 5) Jerry Goodsell gave input regarding the allegations that the vacation policy was
not followed in combination with a number of performance issues the Plaintiff allegedly had

34

over the years. (Lane Dep. pgs. 29-30; Exh. 5) Mr. Lane believed that Mr. Goodsell conducted an investigation prior to the meeting and that the investigation continued after the meeting. (Lane Dep. pgs. 67-68; Exh. 5) As part of the investigation, Mr. Goodsell interviewed supervisors that were directly involved. (Lane Dep. pg. 71; Exh. 5) Mr. Goodsell also interviewed the Plaintiff. (Lane Dep. pg. 71; Exh. 5) If the investigation had continued after that meeting, Mr. Goodsell and Celine Lasonde would have continued it. (Lane Dep. pg. 69; Exh. 5) Mr. Williams said he did not know specifically who was involved in the termination of the Plaintiff's employment, but that generally, Jerry Goodsell would have been part of the process in terms of providing information regarding vacation time. (Williams Dep. pg. 61; Exh. 3) Mr. Goodsell was asked if he had the ability to terminate an employee, and he responded, "I'm not sure. All terminations go through HR and corporate." (Goodsell Dep. pg. 43; Exh. 2)

91.     The Plaintiff stated that the termination of his employment was a form of discrimination, harassment and retaliation. (Thompson Dep. pgs. 70-72; Exh. 4) There is a progressive discipline policy at Minute Maid/Coca-Cola. It is corrective action, including initial counseling, moving to a verbal, written through what is called a performance improvement plan where there are time periods laid out that improvement is supposed to be demonstrated. (Lasonde Dep. pg. 105; Exh. 8) Ms. Lasonde did not know whether the Plaintiff was on a performance plan at the time of his termination. (Lasonde Dep. pg. 105; Exh. 8) The reason for the Plaintiff's termination of employment was job abandonment. (Lasonde Dep. pg. 47; Exh. 8) Other than the email of Mr. Lane, Coca-Cola did not have any written policy relating to vacation time. (Lasonde Dep. pg. 73; Exh. 8) There is a verbal, and an understood policy, that it is the company's discretion to be apprised of when vacation plans are being made. (Lasonde Dep. pg. 73; Exh. 8) An appropriate timely manner is enough time to plan floor coverage for production. (Lasonde

Dep. pg. 74; Exh. 8) There is no certain number of days advance notice for planning vacations under any written or verbal policy of the Defendant concerning vacation time for production supervisors. (Lasonde Dep. pgs. 78-79; Exh. 8) There is no policy that says that a vacation must be posted by a certain date or time. (Lasonde Dep. pg. 79; Exh. 8) If the Plaintiff had coverage, that could be enough time, as long as he had spoken and gotten the authorization and noted it on the G-drive. (Lasonde Dep. pg. 74; Exh. 8) Hypothetically, if the Plaintiff had gone to Mr. Goodsell the day before he left for vacation and said he had to take a vacation, said he had coverage, and Mr. Goodsell said it was okay and it was entered in the computer, this would not violated the verbal policy. (Lasonde Dep. pgs. 74-78; Exh. 8)

92. The Plaintiff was replaced by a Caucasian employee. (Thompson Dep. pgs. 5-6; Exh. 4) Mr. Klenzing said that after the Plaintiff's employment was terminated, Bill Dermody took over the Plaintiff's job responsibilities. (Klenzing Dep. pgs. 48-49; Exh. 1) Mr. Goodsell testified that he believed that Bill Dermody took over the Plaintiff's job responsibilities after the Plaintiff's termination of employment on an interim basis. (Goodsell Dep. pg. 87; Exh. 2) When the Plaintiff was terminated his position was temporarily filled by Bill Dermody. The Plaintiff's position was phased out. The department went from a four-crew operation to a three-crew operation because production was lower. (Williams Dep. pgs. 86-87; Exh. 3) However, Ms. Lasonde stated that Diego Garcia, Sean Rutherford and Martin Duval covered for the Plaintiff's job after he was terminated. (Lasonde Dep. pg. 85; Exh. 8)

Respectfully submitted,

The Plaintiff
DUDLEY THOMPSON
By His Attorney

Date: October 6, 2006

MICHAEL O. SHEA, ESQ.
BBO No. 555474
Law Office Of Michael O. Shea, P.C.
451 Main Street
Wilbraham, MA 01095
Telephone No.: (413)596-8005
Facsimile No.: (413)596-8095

## Certificate of Service

I hereby certify that on this 6th day of October, 2006 a true copy of the foregoing was served upon Counsel for the Defendant by electronic filing and by first-class, United States mail, postage prepaid.

Michael O. Shea