UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


DUDLEY THOMPSON,               )
          Plaintiff            )
                               )
          v.                   )  CIVIL ACTION NO. 05-30168-MAP
                               )
THE COCA COLA COMPANY,         )
          Defendant            )


MEMORANDUM REGARDING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 15)

July 16, 2007

PONSOR, D.J.

## I. INTRODUCTION

Plaintiff Dudley Thompson, a former Production Supervisor at Defendant Coca Cola Company's Northampton plant, has filed this four-count action pursuant to Mass. Gen. Laws ch. 151B, charging Defendant with maintenance of a racially hostile work environment, discriminatory discharge, and retaliation.  Defendant has moved for summary judgment on all counts, arguing that the record, even when viewed in the light most favorable to Plaintiff, will not support a verdict in his favor on any claim.

For the reasons set forth below, Defendant's Motion for Summary Judgment will be allowed.

## II. BACKGROUND

A.  Facts.

The following facts are set forth in the light most favorable to Plaintiff, the non-moving party. <u>See</u> <u>Caban Hernandez v. Philip Morris USA, Inc.</u>, 486 F.3d 1, 8 (1st Cir. 2007) (citation omitted).

1.    <u>The Northampton Plant</u>.

Defendant's Northampton plant produces various types of non-carbonated beverages through the use of large manufacturing equipment.  Assembly line employees ensure that the each product is produced and bottled consistent with certain specifications.

In June 2000, Jerry Goodsell, the Plant Engineer, interviewed Plaintiff and recommended that he be hired as one of the Plant's four Production Supervisors.  The three other Production Supervisors were: Martin Duval, a White male; Diego Garcia, a Latino male; and Sean Rutherford, an African-American male.

These four Production Supervisors reported either to the Production Manager or to the Plant Manager, who was James Lane.  Each Production Supervisor managed up to thirty assembly line employees and was required to arrive at least thirty minutes before the beginning of each shift to meet with the Production Supervisor from the previous shift.[1]  It

_____

[1] The purpose of such meetings was to give the Production Supervisor being relieved the opportunity to pass along potentially critical information concerning the equipment

is undisputed that Production Supervisors serve a critical
role at the Plant as the production lines cannot run without
their effective oversight.

From 2001 to the middle of 2003, Walter Klenzing held
the Production Manager position.  Darren Plawinski then took
over this position briefly but left the company in August
2003.  Upon Plawinski's departure, Goodsell filled in as the
Production Manager while also handling his Plant Engineer
responsibilities, until Dennis Williams transferred to
Northampton from another Coca Cola plant to take over as
Production Manager.  According to Plaintiff, Williams began
making the transition into the Production Manager role in
early December 2003.  Williams continues to serve as
Production Manager to this day.

The Quality Assurance ("QA") Department is responsible
for testing the product as it comes off the production line
to ensure that it meets certain specifications.  If the
product fails to satisfy these criteria, the QA Supervisor
is required to shut down the line and re-calibrate the
machinery.  When this happens, the interruption has a
negative impact on the Production Supervisor's results for
that shift.  During Plaintiff's time with Defendant, Donna
Harris, a White female, served as one of Defendant's QA

and/or personnel.

Supervisors.

Defendant has a "progressive discipline policy," whereby supervisors are encouraged to respond to misconduct by "coaching," before moving onto verbal warnings, written warnings, suspensions, and finally termination. The Company also offers Performance Improvement Plans ("PIPs") in order to help an employee improve his performance and track his progress in relation to the stated goals of the plan.

It is undisputed that Defendant has a comprehensive anti-discrimination and workplace dispute resolution system, which provides employees with several avenues for reporting incidents. These avenues include a toll-free phone number to report issues of concern, as well as the opportunity for a confidential consultation with an ombudsman.

　　　2.　Plaintiff's Evaluations.

Plaintiff concedes that he received numerous verbal and written warnings regarding his performance and was also "coached" frequently during the course of his three years with the company. From March 24, 2001, to December 12, 2001, Klenzing (Plaintiff's initial Production Manager) issued Plaintiff one "Corrective Action Memo" and two written warnings. Klenzing also placed Plaintiff on two PIPs during this time due to Plaintiff's failure to: (1) show up to work on time; (2) adequately supervise his staff;

(3) follow the company policies regarding waste products; and (4) exercise appropriate judgment.

From May 30, 2003 to August 11, 2003, Klenzing's successor Plawinski issued Plaintiff two Performance Counseling Memos citing Plaintiff's failure to provide required documents regarding safety and quality incidents, as well as Plaintiff's chronic tardiness and consistent failure to process subordinates' time-cards.

Plaintiff does not dispute that these negative evaluations occurred but contends that they were a form of discrimination, harassment, or retaliation, as the shift he supervised was, in his opinion, the top performing shift at the Plant.[2]  Plaintiff admits that he was late, on occasion, and that it was not unreasonable for Defendant to expect him to be on time.  Nevertheless, he asserts that his tardiness: (1) was no worse than other employees; (2) was not so excessive as to violate company policies; and (3) did not affect the quality of his work.[3]

Plaintiff points out that notwithstanding the negative

---

[2] One of Plaintiff's supervisors testified that, given the unique challenges facing each shift, it was impossible to compare them in terms of production.  (See Dkt. No. 27, Ex. 1, Klenzing Dep. 61.)

[3] During his deposition, Plaintiff attributed his tardiness to construction work that often disrupted traffic patterns and caused delays.  According to Plaintiff, he brought this issue to the attention of his managers.

evaluations cited above, Klenzing testified that Plaintiff's "performance was, at times, where it should be," that his overall relationship with Plaintiff was "good," and that Plaintiff's shift consistently met its quotas.  Klenzing also noted in a January 2002 e-mail that Plaintiff was "doing well" and assessed Plaintiff's work as "satisfactory" in a January 2003 evaluation.  Finally, Plaintiff maintains that he disputed each negative performance evaluation he received at the time that he received it.

### 3.  The Evaluations of Plaintiff's Peers.

It is undisputed that Plawinski issued Performance Counseling Memos to the other three Production Supervisors, Duval, Garcia, and Rutherford, and placed each of them on PIPs during the summer of 2003.  Garcia testified that Goodsell, the Plant Engineer and interim Production Manager, frequently yelled at him.  (See Dkt. No. 27, Ex. 7, Garcia Dep. 26:3-6.)  Garcia also confirmed, however, that Goodsell never made comments about Garcia's Hispanic heritage and that Goodsell treated at least one white co-worker in a similar fashion.  (Id. 26:7-9, 28:20-29:9.)

Duval, the White Production Supervisor, testified that Goodsell would use profanity when he yelled at him and that Goodsell once called him a "fucking asshole."  (Dkt. No. 27, Ex. 6, Duval Dep. 14:13-24.)

-6-

4.  <u>Donna Harris' 2002 Absences</u>.

At some point in 2002, Plaintiff found that QA
Supervisor Donna Harris was not at work and the other QA
Supervisor, Hunter Alexander, did not know why.  When
Plaintiff later learned from one of Harris' subordinates
that she had taken an unapproved vacation, he reported the
incident.

According to Defendant, Harris did not take an
unapproved vacation, but was granted a number of absences in
2002 pursuant to the Family Medical Leave Act, 29 U.S.C. §§
2601 <u>et seq.</u>, to address significant health problems
suffered by her young daughter.  Defendant asserts that
Harris submitted the required medical documentation to
support her FMLA absences.  Plaintiff concedes that he has
no basis to disagree with Defendant's characterization of
this incident.  (Dkt. No. 26, Pl.'s Statement of Material
Facts in Dispute ¶¶ 48, 49.)

5.  <u>Harris' "Jamaican Bimbo" Comment</u>.

In April 2002, Harris, while talking to Ron McKeithen
-- a co-worker who (like Plaintiff) had Jamaican roots --
said words to the effect that she (Harris) was not one of
Plaintiff's "Jamaican bimbos."  Plaintiff was in another
part of the plant at the time the remark was made, but
McKeithen immediately relayed the comment to him.  During

-7-

his deposition, Plaintiff testified that he took the remark
to mean "[t]hat being married to a Jamaican woman" is like
being married to a bimbo, i.e., "a pretty, good-for-nothing"
woman. (Dkt. No. 27, Ex. 4, Thompson Dep. 34:16-21.)

Plaintiff and McKeithen reported the incident to the QA
Manager, John Newton, who, in turn, informed Celine Lasonde,
the HR Manager at the Plant. During her deposition, Lasonde
stated that she instructed Newton "to sit down with
[Harris], discuss the inappropriateness, and have her
apologize to [McKeithen], which she did." (Dkt. No. 27, Ex.
8, Lasonde Dep. 107:14-16.) The Plant Manager, James Lane,
testified that Harris was required to attend a civil
treatment seminar and apologize. (Dkt. No. 27, Ex. 5, Lane
Dep. 19:22-20:6.) Plaintiff, on the other hand, states that
Harris did not apologize to him directly, and that he was
simply told by Newton that the matter had been addressed.

According to Plaintiff, after he reported the incident
to Newton, Harris began making "mountain[s] out of . . .
molehill[s]," using her position as a QA Supervisor to
negatively impact Plaintiff's work. (Thompson Dep. 44:8-9.)
For example, Plaintiff testified that Harris once refused to
sign off on several cases of product simply as an attempt to
retaliate against him. (Id. 44:15-24.) Plaintiff also
stated that Harris started calling his supervisors to report

minor incidents that she had not reported before.

　　6.　Goodsell's Comments.

　　At a 2002 Christmas party, Plaintiff alleges that an
inebriated Goodsell expressed his irritation at an African
American disc jockey's reggae selection by stating, "I hate
Jamaican music and Jamaicans."　(Id. 6:7-15.)　During his
deposition Plaintiff stated that, while he was appalled by
this comment, he did not use any of Defendant's available
mechanisms to report it because he felt he would be fired if
he did.　(Id. 11:14-13:8; 197:20-198:4.)

　　Approximately nine months later, during an argument in
Plaintiff's office, Plaintiff contends that Goodsell said,
"I am going to deal with you, you fucking Jamaican."　(Id.
13:23-14:23.)[4]　According to Plaintiff, this was not the
first time that Goodsell had said that he would "deal with"
him, and he felt threatened by these comments.　Plaintiff
notes that Goodsell admitted raising his voice during
confrontations with Plaintiff and getting angry with
Plaintiff during these exchanges.　(See Dkt. No. 27, Ex. 2,
Goodsell Dep. 106:10-107:6.)

　　Goodsell denies making any racial comments during the

---

　　[4]　Defendant points out that prior to Plaintiff's
deposition, Plaintiff's characterization of this incident
lacked the "you fucking Jamaican" reference. (Dkt. No. 16,
Def.'s Mem. in Support Mot. Summ. J. 12 n.11 (citing Compl. ¶
8).)

course of his career at Coca Cola or at any other point in
his life.  (Id. 79:22-80:12.)  Duval and Garcia each
testified that although Goodsell frequently yelled and used
profanity, they never heard him make any racially derogatory
remarks.  (See Duval Dep. 14:13-17, 40:11-13; Gacia Dep.
26:3-14.)  Rutherford, an African American, also stated in
an affidavit that he never heard Plaintiff complain about
being treated differently because of his race.  (Dkt. No.
21, Rutherford Decl. ¶ 5.)

Of course, at this stage of the litigation, the court
must assume that Goodsell did make the improper comments
attributed to him by Plaintiff.

7.  <u>Plant Protocol Regarding Vacation Time</u>.

On August 29, 2003, the Plant Manager Lane sent an e-
mail to the four Production Supervisors outlining the proper
protocol regarding vacation time.  This e-mail stated that
the following steps needed to be taken to obtain approved
time off:

- Obtain coverage from one of the three other
  Production Supervisors,

- Request personal vacation time from the direct
  manager in writing,

- Notify the other Production Supervisors, and

- Enter the requested vacation time into a
  comprehensive computerized spreadsheet
  maintained on the plant's computer system.

(See Thompson Dep. 191:8-192:7; see also Rutherford Decl. ¶ 7.)

Plaintiff admits receiving this e-mail both in August and again in September when Lane re-sent it. Lane conceded during his deposition that there was no particular time frame within which an employee was required to start the vacation approval process. Lane simply expected that the employee would allow enough time to make sure his shifts were covered and there were no gaps in the production. (Lane Dep. 53:10-22.)

During her deposition, the HR Manager Lasonde agreed that if Plaintiff had gone to Goodsell the day before he left for vacation and said he had to take a vacation, said he had coverage, and Goodsell said it was okay and it was entered in the computer, this would not have violated the Company's policy. (Lasonde Dep. 74:18-75:3.) During his deposition, Lane said that, hypothetically, if the Plaintiff had a conversation with Goodsell and Goodsell said it was okay if Plaintiff needed some extra vacation time for medical treatment, it would be acceptable under the vacation policy "[a]s long as it was worked through with the fellow supervisors and there was agreement across the board that there were not going to be any gaps in coverage." (Lane Dep. 52:18-53:9.)

-11-

8.  <u>Plaintiff's December 2003 Trip to Jamaica</u>.

In the fall of 2003, Plaintiff determined that he was going to need dental surgery and that he wanted to have the procedure done in Jamaica.  When it became imperative for him to get this dental work done in December 2003, he began making plans to go there.  (Thompson Dep. 157:19-22.)

During his deposition, Plaintiff stated that he first communicated his vacation plans to Hector Lepage, who was Plaintiff's "leader."  (<u>Id.</u> 157:23-158:1.)[5]  Plaintiff then claims that he told his co-employee Duval that he might have to go to Jamaica for a couple of weeks for dental work, possibly longer depending upon the gravity of his condition. (<u>Id.</u> 158:17-159:6.)

Plaintiff next spoke to Dennis Williams (the incoming Production Manager) regarding his proposed vacation. Plaintiff made this request during a conversation with Williams in Plawinski's old office after Williams explained his expectations regarding Plaintiff's work.  Although no one instructed Plaintiff to begin reporting to Williams at that point, Plaintiff "took liberty . . . to assume [that Williams] was taking over from [Goodsell] and then [he] could discuss his vacation plans with him."  (<u>Id.</u> 163:1-7.)

_____

[5] It appears from the record that, despite his title, Lepage was Plaintiff's subordinate.  In any event, neither side places much weight on this communication.

According to Plaintiff, Williams said that Plaintiff could have the time off, but that he "should pass it by . . . Goodsell." (Id. 166:14-20.) Plaintiff asserts that he told Williams his vacation would run from "the 20th of December . . . until the 2nd of January, 2004, and if need be, [he] would take additional days from [his] 2004 vacation to cover [an extension]." (Id. at 161:4-7.)[6] During his

_____

[6] In his statement of facts, Plaintiff repeatedly asserts that Williams signed off on a vacation scheduled to run "from December 20, 2003 through January 9, 2004." (See Dkt. No. 26, Pl.'s Statement of Material Facts in Dispute ¶¶ 70, 71, 81.) Counsel's citation to page 161 of Plaintiff's deposition does not support this claim. A review of that page reveals the following exchange:

> A.    . . . I asked [Williams] if I could get the time to do my dental work, and he said yes, but I should pass it by [Goodsell].
>       The time line for that was the 20th of December, running up until the 2nd of January 2004, and if need be, I would take additional days from my 2004 vacation to cover, and that was approved.
>
> Q.    I'm sorry. That's what you told Mr. Williams?
>
> A.    Yes.
>
> Q.    That you would be out from the 20th until January 2nd?
>
>       MR. SHEA:    No. That's not what he just said.
>
>       MR. HART:    He said the time line was –
>
>       MR. SHEA:    He just finished telling you from the 20th of December to January 9th of '04.

(Thompson Dep. 161:1-20.)

-13-

deposition, Williams stated that Plaintiff

> asked me about taking some vacation towards the end
> of the year.  I was actually leaving.  I had my
> briefcase and was walking out, and I basically told
> [Plaintiff] that he'd have to talk to . . .
> Goodsell and . . . Lasonde, that I hadn't taken
> over at this point and couldn't tell him whether he
> could take it or not take vacation.

(Dkt. No. 27, Ex. 3, Williams Dep. 32:11-18.)

On December 12th or 13th, Plaintiff bought a plane

ticket to Jamaica.  (Thompson Dep. 123:19-23.)  Shortly

thereafter, Plaintiff states that he had a face-to-face

conversation with Duval in which Plaintiff says Duval agreed

to cover his shifts while Plaintiff was away, but requested

a confirming e-mail.  (Id. 167:9-168:22.)

Duval vigorously contests this claim.  Duval testified

in his deposition that he started asking Plaintiff about his

vacation plans in November when he heard rumors that

Plaintiff might be headed to Jamaica.  (See Duval Dep.

25:22-26:9.)  According to Duvel, he wanted as much notice

as possible so as to be able to let his family know what

extra shifts he might have to pick up during the holiday

season.  (Id. 26:10-16.)  However, Duval says Plaintiff did

not tell him either that he was, in fact, going on vacation

or the dates of his vacation, until Plaintiff sent Duval an

e-mail at 10:27 p.m. on December 18, 2003.  (See Dkt. No.

23, Duval Decl. ¶ 5.)

-14-

In this e-mail, Plaintiff stated: "I will be off on December 23, 27, 28, and 29. However, there is a possibility that I could be off also on Jan. 2, 6, and 7 if my dental work is not completed." (Thompson Dep. 174:13-19.) According to Duval,

> I did [not] read [Plaintiff's] email until I reported to work on December 21, 2003. It was through this email that I learned that I would have to cover all of [Plaintiff's] shifts from December 23, 2003 until January 7, 2004. [Plaintiff] had not obtained my agreement to cover his shifts prior to leaving for his vacation. Therefore, I had no choice but to cover his shifts, which, given the holiday season, was a great inconvenience to me. In fact, during December 2003 and January 2004, [Plaintiff's] last minute vacation caused me to have to work more than 40 days consecutively.

(Duval Decl. ¶¶ 5-7; see also Duval Dep. 41:20-42:2 (stating that Plaintiff did not check to make sure his shifts were covered prior to leaving the country).)[7]

On the night of December 19, 2003, just hours before Plaintiff's early morning flight, Plaintiff called Goodsell and for the first time informed him directly that he would be away for the next two weeks. According to Plaintiff,

> I outlined with . . . Goodsell what I told . . . Williams about going to Jamaica and that there was a possibility that I would need extra time if the dental work was [not] completed, and he did not say no, I can't have my vacation. He asked about coverage; I told him there was coverage . . . .

_____

[7] During his deposition, Goodsell stated that he covered for Duval on two occasions "because he [Duval] was working every day." (Goodsell Dep. 69:12-20.)

-15-

(Thompson Dep. 177:15-22.)

In his deposition, Goodsell admitted that he did not inform Plaintiff during this conversation that he could be terminated, disciplined, or reprimanded if he went ahead with his vacation.  (Goodsell Dep. 38:14-19.)  It is undisputed that Plaintiff never made any vacation request to Goodsell, or anyone else, in writing.

While in Jamaica, Plaintiff called the plant and ended up speaking with his co-employee Rutherford.  During their conversation, Plaintiff stated that he would have to remain in Jamaica for at least another week in order to finish his dental work.

Rutherford indicated that Plaintiff should speak with Goodsell.  Plaintiff attempted to do so, but he ended up leaving Goodsell a voice-mail in which he requested an extension of his vacation.  (Thompson Dep. 66:8-16.)  When Goodsell did not respond to this request, Plaintiff assumed that it had been granted.  (Id. 66:17-67:7.)

Plaintiff maintains that he subsequently spoke with Duval and told him that he "should be prepared to do some more coverage" because his dental work had not been completed.  (Id. 66:4-7.)

It is undisputed that Plaintiff did not enter his vacation time in the company spreadsheet beyond December

-16-

2003.  According to Plaintiff, he did not do so because at the time he left the spreadsheet did not go into 2004.  (Id. 194:17-19.)  Though Plaintiff posted his cell phone number and his home phone in the supervisor's office, he contends that he received no calls from the company during his absence from work.  (Id. 178:18-179:10.)[8]

Based on the foregoing summary, viewed in the light most favorable to Plaintiff, he failed to satisfy two of the elements of Defendant's vacation protocol: he did not request the vacation time in writing from his direct manager, and he did not enter the requested time into the computer spreadsheet.

More importantly, based on Duval's version of the episode, Defendant might reasonably have concluded that Plaintiff also failed to satisfy the other two elements: he did not obtain coverage for his shifts from one of the three other Production Supervisors before he departed, and he did not notify the other Production Supervisors before he

---

[8] During his deposition, Goodsell stated that after he received Plaintiff's voice-mail requesting an extension he (Goodsell) spoke with Lane and Lane called Plaintiff's home on two separate occasions.  (See Goodsell Dep. 43:21-44:24 (noting that Lane "did not get a hold of [Plaintiff").)

For his part, Lane recalled that someone at the company attempted to contact Plaintiff, but he did not remember who. (See Lane Dep. 63:20-64:7.)  Lasonde also testified that she tried to call Plaintiff as soon as she became aware of the situation.  (Lasonde Dep. 66:14-23, 71:14-72:12.)

departed.

No evidence in the record suggests that Duval had any racially discriminatory animus against Plaintiff, or that Duval had any reason to lie to management about Plaintiff's failure to notify him properly, or Plaintiff's unfair treatment of him in connection with the trip to Jamaica.

9.  <u>Plaintiff's Termination</u>.

Shortly after Plaintiff's departure, Goodsell asked Duval whether Plaintiff had arranged for Duval to cover Plaintiff's shifts.  (Goodsell Dep. 69:3-5.)  When Duval responded that Plaintiff had not, Goodsell informed Lane and Lasonde that Plaintiff had failed to comply with the company's vacation protocol.

Lasonde subsequently interviewed Duval and Goodsell, as well as the other two Production Supervisors, Garcia and Rutherford.  (Lasonde Dep. 31:9-17; <u>see also</u> <u>id.</u> 49:10-16 (stating that she received an e-mail from Duval stating that Plaintiff had sent Duval a "last minute" e-mail indicating when and for how long Plaintiff would be out).)[9]  Eventually, she wrote Plaintiff a letter, dated January 7, 2004, which outlined Defendant's version of the events leading up to and

---

[9]  It appears that Lasonde also spoke with Williams, who informed her that he told Plaintiff to speak with Goodsell and her when Plaintiff approached Williams about taking time off in December.  (Williams Dep. 78:3-22.)

-18-

including Plaintiff's vacation and informed Plaintiff that

the company considered him on an unapproved leave of

absence.

> According to Lasonde, Plaintiff
>
> failed to request vacation time in accordance with
> the direction of the General Manager and management
> policy, failed to ensure that appropriate coverage
> was in place for supervising [his] employees, and .
> . . ha[d] not reported to work for three weeks.

(Dkt. No. 19, Ex. 21, Letter from Celine Lasonde,

Northampton Human Res. Manager, Coca Cola Co., to Dudley

Thompson (Jan. 7, 2004).)  Lasonde's letter concluded by

telling Defendant he was being placed on an unpaid

suspension pending a further investigation into the matter.

(Id.)  Lasonde's letter also made it clear that Plaintiff

had "placed [his] position with [Defendant] in jeopardy."

(Id.)

On or around January 13, 2004, Plaintiff attended a

meeting with Goodsell, Lane, Lasonde, and Williams.  At this

meeting, Plaintiff contested Defendant's version of the

circumstances surrounding his trip, but it is undisputed

that he never suggested that Defendant's investigation, or

the reports of his co-employees, reflected any racially

discriminatory animus.  (See Thompson Dep. 78:14-79-6

(acknowledging that Harris' "Jamaican bimbo" comment was the

only discriminatory conduct Plaintiff ever reported to

management); see also Goodsell Dep. 47:19-48:2, 58:20-60:5;
Lane Dep. 65:13-66:6, 72:12-73:24, 76:6-13; Lasonde Dep.
36:13-37:9; Williams Dep. 34:5-35:13.)

On January 22, 2004, Lasonde sent a "Separation
Proposal" recommending Plaintiff's termination to a
Separation Committee in Atlanta.  (See Lane Dep. 26:17-24.)
The findings articulated in this document are, in most
respects, identical to the preliminary findings Lasonde had
set forth in her previous correspondence to Plaintiff.
(Compare Dkt. No. 27, Ex. 10, Separation Proposal with
Letter from Celine Lasonde, Northampton Human Res. Manager,
Coca Cola Co., to Dudley Thompson (Jan. 7, 2004).)

During his deposition, Lane stated that he and Lasonde
proposed that Plaintiff be terminated based partly on
"input" from Goodsell.  (See Lane Dep. 29:17-21; see also
id. 39:18-40:13 (stating his recollection that Goodsell also
recommended Plaintiff's termination).)  Although Lane
recalled that "documented performance issues over a number
of years with a number of different managers" influenced the
termination recommendation, he was clear that the
circumstances surrounding Plaintiff's trip to Jamaica "drove
the decision."  (Id. 40:14-41:15.)

After the Separation Committee signed off on Plaintiff's
termination, Lasonde sent Plaintiff a letter, dated January

23, 2004, terminating his employment for "unauthorized absences from December 20, 2003 through January 9, 2004." As Plaintiff points out, his termination was based solely upon the circumstances surrounding his trip to Jamaica. There is no indication that the separation committee in Atlanta even looked at his employment history or took his performance evaluations into account.

According to Plaintiff, Bill Dermody, a white employee, took over Plaintiff's responsibilities on an interim basis before the position was phased out.

B.   **Travel of the Case**.

On May 13, 2005, Plaintiff filed this action in the Hampshire County Superior Court.  Citing the parties' complete diversity and an amount in controversy in excess of $75,000, Defendant removed the case to this court on July 20, 2005.[10]

### III. DISCUSSION

The complaint offers four counts, the first three charging discrimination and the fourth retaliation.  This memorandum will address the discrimination claims first.

A.   **Plaintiff's Discrimination Claims**.

--------

[10] Apparently, Plaintiff did not serve Defendant until July 8, 2005; thus there was no issue concerning the timeliness of the removal.

Parsing the different theories of discrimination offered by Plaintiff in his complaint has been somewhat difficult, as the substantive allegations set forth in Counts One, Two, and Three are identical.  In moving for summary judgment, Defendant has assumed, without disagreement from Plaintiff, that the descriptive terms "Discrimination," "Harassment," and "Termination" in the captions to Counts One through Three constituted an attempt to set forth independent claims under each of these Counts for disparate treatment, hostile work environment, and discriminatory discharge respectively.

In his opposition to Defendant's motion, Plaintiff does not distinguish between disparate treatment and discriminatory discharge.  In other words, he does not argue that any basis for his claim of disparate treatment exists beyond the discriminatory discharge.  The court will therefore address the Motion for Summary Judgment, as it applies to the discrimination claims, under two theories: racially hostile work environment and discriminatory discharge.  The retaliation claim will be addressed separately.

1.  Hostile Work Environment.

The Massachusetts Supreme Judicial Court ("SJC") has defined a hostile work environment as one that is "pervaded by harassment or abuse, with the resulting intimidation,

humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace." <u>Cuddyer v. Stop & Shop Supermarket Co.</u>, 434 Mass. 521, 532 (2001) (quoting <u>Coll.-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination</u>, 400 Mass. 156, 162 (1987)).[11]

To establish his hostile work environment claim, Plaintiff must demonstrate that he worked in a racially abusive environment that unreasonably interfered with his work performance. <u>See Muzzy v. Cahillane Motors, Inc.</u>, 434 Mass. 409, 411 (2001). Sustaining that burden requires proof that Defendant's conduct "was sufficiently severe and pervasive to interfere with a reasonable person's work performance." <u>Id.</u>; <u>see also Douglas v. J.C. Penney Co., Inc.</u>, 474 F.3d 10, 15 (1st Cir. 2007) (citation omitted) (requiring proof that "the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment" and the "[racially] objectionable conduct was both objectively and subjectively offensive, such that a

---

[11] Although the majority of Chapter 151B hostile work environment claims appear to be based on sexual harassment, the SJC recently noted that the same standard of review applies to hostile work environment claims based on racial harassment. <u>See Clifton v. Mass. Bay Transp. Auth.</u>, 445 Mass. 611, 617 n.5 (2005) (citation omitted).

reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so").

Assuming a jury entirely believed all the evidence Plaintiff could possibly offer regarding the allegedly hostile environment, and drew all inferences in his favor, his hostile work environment claim would still lack sufficient support.  The only direct evidence of "severe" or "pervasive" harassment, objectively offensive to a reasonable person, was three comments: Harris' "Jamaican bimbo" remark in April 2002; Goodsell's alleged remark he "hates Jamaican music and Jamaicans" at the 2002 Company Christmas party; and Goodsell's alleged comment "I'm going to deal with you, you fucking Jamaican" in the fall of 2003.

The Harris comment was not made directly to Plaintiff and triggered a prompt investigation by Defendant's HR Department.  Even accepting Plaintiff's denial that he ever received a personal apology from Harris, it is undisputed that Defendant required Harris to attend a training seminar as a result of her use of the inappropriate language.

While undeniably offensive, Goodsell's two purported remarks, delivered nine months apart, also constitute the kind of "offhand comments" or "isolated incidents" that other courts have found insufficient to create an abusive environment.  Recently, for example, the First Circuit noted

its approval of the Sixth Circuit's conclusion in <u>Burnett v.</u>
<u>Tyco Corp.</u>, 203 F.3d 980 (6th Cir. 2000), <u>cert. denied</u>, 531
U.S. 928 (2000), that two comparably offensive remarks, even
when coupled with a battery, did not alter the conditions of
a plaintiff's employment.  <u>Rivera-Martinez v. Commonwealth</u>
<u>of P.R.</u>, 2007 WL 16069, No. 05-2605, at *3 (1st Cir. 2007)
(slip op.) (citing <u>Burnett</u>, 203 F.3d at 685).[12]

If the three comments in this case are sufficient to
create a disputed issue of fact regarding "severe and
pervasive" harassment, then summary judgment would
effectively be impossible in any hostile environment claim,
provided plaintiff could point to any sort of biased remark.
As reprehensible as Goodsell's remarks were (assuming they
were made), this is not the law.  More is needed, both as a
matter of law and as a matter of general usage to support a
claim of a racially biased atmosphere that could be called
"severe and pervasive."[13]

_____

[12] In <u>Burnett</u>, the female plaintiff alleged that a male
personnel manager: (1) "placed a pack of cigarettes containing
a lighter inside [her] tank top and brassiere strap"; (2) "gave
her a cough drop while stating, 'Since you have lost your
cherry, here's one to replace the one you lost'"; and told her
he "almost got aroused" by a sweater she was wearing.  203 F.3d
at 981.

[13]  It is worth noting that there is no evidence that
Plaintiff ever complained of, or even mentioned, Goodsell's
allegedly discriminatory comments to any co-employee, despite
the fact that at least two of his fellow Production Supervisors

Plaintiff's insufficient evidence gains no strength by reference to Goodsell's undisputed habit of raising his voice at Plaintiff, or threatening to "deal with" him.  The clear and undisputed evidence of record is that Goodsell's intemperance reflected no bias.  He raised his voice, yelled, and even cursed at white employees the same way he did at minorities.

For all these reasons Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

2.  <u>Disparate Treatment/Wrongful Termination</u>.

The court's analysis of Plaintiff's wrongful termination claim must follow the three steps now well established.  <u>See Abramian v. President & Fellows of Harvard Coll.</u>, 432 Mass. 107, 116 (2000) (following the three-stage order of proof originally set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-805 (1973)).  First, Plaintiff must make out a <u>prima facie</u> case by showing that:

_____

were themselves minorities.

However, Plaintiff's failure to    report either of Goodsell's alleged comments via any of the several reporting mechanisms does not entitle Defendant to summary judgment under <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998).

As Judge Lasker has noted, "Massachusetts discrimination law does not recognize the affirmative defense articulated in . . . <u>Faragher</u>."  <u>Myrick v. GTE Main St. Inc.</u>, 73 F. Supp. 2d 94, 98 (D. Mass. 1999) (citing  <u>Coll.-Town v. Mass. Comm'n Against Discrimination</u>, 400 Mass. 156, 163-66 (1987)).

> (1) [he] is a member of a protected class; (2)[his]
> employer took an adverse employment action against
> [him]; (3)[he] was qualified for the employment
> [he] held; and (4)[his] position remained open or
> was filled by a person whose qualifications were
> similar to [his].

Douglas, 474 F.3d at 13-14 (citations omitted).

Second, if Plaintiff succeeds in doing this, Defendant must identify a legitimate, non-discriminatory basis for its decision to terminate Plaintiff. Id. at 14 (citation omitted). Third, assuming Defendant can do this, Plaintiff bears the burden of demonstrating that the supposed legitimate basis for termination was in fact a pretext for (in this case) discrimination based on race. Id. (citation omitted).

On the facts of record, the court need not linger long on the question whether plaintiff can make out a prima facie case. Defendant concedes, as it must, that Plaintiff was a member of a protected class, that he was terminated, and that his position was re-filled, at least temporarily, by an individual whose qualifications were similar to his.

Moreover, Defendant's arguments to the contrary notwithstanding, a reasonable jury could, on the facts of record, find that Plaintiff was performing his job adequately. Both the First Circuit and the SJC have recognized that the burden on a plaintiff at the prima facie

stage is not "onerous."  <u>Kosereis v. Rhode Island</u>, 331 F.3d 207, 213 (1st Cir. 2003) (citation omitted); <u>Sullivan v. Liberty Mut. Ins. Co.</u>, 444 Mass. 34, 45 (2005) (citations omitted).  Plaintiff here has carried it.

Similarly, a review of the record reveals that Defendant has identified a justification supporting its decision to terminate Plaintiff that is untainted, on its face, by any racially discriminatory animus.  Defendant maintains that Plaintiff was fired for taking an unauthorized two-week vacation to Jamacia on eight-hours' notice, which he then extended in violation of the applicable written protocol. Most importantly, according to Defendant, he failed to notify his direct manager in writing, failed to adequately notify the other Production Supervisors, and failed to obtain coverage from one of the other Production Supervisors before his departure.  Plaintiff concedes that, if true, this violation would constitute a legitimate, non-discriminatory reason for his termination.  (<u>See</u> Thompson Dep. 175:19-23.)

The key issue, then, is whether the facts of record would support a reasonable jury in concluding by a preponderance of the evidence that Defendant's articulated rationale was, in fact, a smokescreen or pretext for discrimination.

-28-

A jury, Plaintiff argues, might see through Defendant's purportedly non-discriminatory reason for his termination by noting: (a) the racial comments made by managers; (b) the lies asserted by Goodsell and other employees regarding Plaintiff's approval for time off; and (c) the greater generosity afforded whites in Defendant's workplace.

(a)  Racial Comments.

Plaintiff emphasizes the remarks by Goodsell evincing an antipathy for Jamaicans in general and Plaintiff in particular.  According to Plaintiff, when Goodsell said, "I'll deal with you, you fucking Jamaican," he was demonstrating a clear intent to negatively affect Plaintiff's employment.  This intent is critical, Plaintiff avers, because Goodsell subsequently offered no objection to Plaintiff's vacation plans, then supposedly lied about Plaintiff's vacation being unauthorized, thereby setting the termination in motion.  Plaintiff also takes the position that the mere slap on the wrist Harris received for her "Jamaican bimbo" comment is clear proof of a discriminatory atmosphere that Defendant condoned.

The comment by Harris, which led to prompt remedial action, clearly cannot support Plaintiff claims for discriminatory discharge.  As Plaintiff himself acknowledges, Harris was not his supervisor and had no

-29-

influence in the decision to terminate him.  See
Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 11 (1st
Cir. 2007) (finding single comment by non-decisionmaker
incapable of supporting inference of pretext).

As for Goodsell's alleged remarks, it bears noting that
Plaintiff never brought them to anyone's attention, even
after learning that his employment with Defendant was "in
jeopardy."  Indeed, it is undisputed that Plaintiff did not
accuse Goodsell or any other co-worker of harboring racial
animus during his January meeting with members of the
Northampton management team.

As the SJC has noted, "[w]hen assessing the independence
of the ultimate decision maker, courts place considerable
emphasis on the decision maker's giving the employee the
opportunity to address the allegations in question."  Mole
v. Univ. of Mass., 442 Mass. 582, 599-600 (2004) (citations
omitted); see also Cariglia v. Hertz Equip. Rental Corp.,
363 F.3d 77, 87 n.4 (1st Cir. 2004) (distinguishing Conn v.
GATX Terminals Corp., 18 F.3d 417, 420 (7th Cir. 1994),
where "the plaintiff was able to appear before the
decisionmaker and present his side of the story").  Because
Defendant gave Plaintiff such an opportunity and he failed
to use it to report Goodsell's alleged bias, Defendant
cannot be faulted for accepting any recommendation Goodsell

-30-

might have made at face value.

Moreover, while it is true that Goodsell provided some of the information upon which the termination decision was based, that information was either independently verified by Lasonde (see, e.g., Lasonde Dep. 31:9-17 (noting her interview with Duval), or uncontested by Plaintiff. As noted above, Plaintiff and Goodsell's descriptions of their conversation immediately before Plaintiff's departure for Jamaica are substantially identical. Plaintiff admits (1) that he never put his request for vacation in writing, (2) that he was told by Williams that he would have to speak with Goodsell prior to going on vacation, (3) that he first contacted Goodsell by phone only a few hours before his departure, and (4) that Goodsell's failure to object to his vacation was conditioned upon Plaintiff having obtained coverage for his shifts before he left. Goodsell agrees with all of this, admitting he raised no objection to the vacation as long as there was coverage.

Given this context, the two reprehensible comments made months earlier by Goodsell were merely "stray remarks," totally unconnected with the allegedly discriminatory discharge. They are simply too vague and insubstantial to offer any support to a claim of pretext. See Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002).

Morever, as Defendant points out, "even if the remarks are relevant for the pretext inquiry, their probativeness is circumscribed [by the fact that] they were made in . . . situation[s] temporally remote from the date of the employment decision . . . [and] were not related to the employment decision in question." <u>McMillan v. Mass. Soc. for Prevention of Cruelty to Animals</u>, 140 F.3d 288, 301 (1st Cir. 1998) (internal citation omitted), <u>cert. denied</u>, 525 U.S. 1104 (1999).  Since two of the three alleged comments preceded the termination decision by over a year, and none of the three involved the termination process, their value as support for Plaintiff's discriminatory discharge claim is nil.

(b)  <u>"Lies" Regarding the Circumstances Surrounding Plaintiff's Vacation</u>.

Plaintiff avers that he had permission to take the time off that became the subject of his termination and that Defendant's employees lied about the existence of this permission.  To this, there are two responses indisputably anchored in the record.

First, Plaintiff never made his vacation request in writing -- a formality that, had Plaintiff complied with it, would have eliminated most of the uncertainty regarding the issue of permission -- and he never passed his vacation

-32-

plans by Goodsell until he had already bought his ticket and was about to leave.

Second, no lie, or even dispute, exists about what Plaintiff and Goodsell said regarding the vacation in the phone call just before Plaintiff's departure.  Goodsell, despite Plaintiff's failure to put his request in writing, and despite the reckless eleventh-hour notification, agrees with Plaintiff that he (Goodsell) did not offer an objection to Plaintiff vacation plans, providing coverage was obtained.[14]  Only after Plaintiff left did Defendant learn that the requested coverage had not been adequately obtained, and that Plaintiff's co-employee Duval was forced during the holiday season, much against his will and without his prior agreement, to cover Plaintiff's shifts to the extent that he worked forty days in a row without a day off. (See Duval Decl. ¶¶ 5-7.)  Goodsell, the Plant Engineer and acting Production Manager, was himself required to step in for Plaintiff in the role of Production Supervisor to cover some of Plaintiff's shifts, because of Plaintiff's failure to arrange adequate coverage beforehand.  (See Goodsell Dep.

---

[14] Some fuzziness exists as to what the proposed end point of the vacation would be.  Clearly, despite counsel's proffer to the contrary, there was no explicit approval of the January 9 return date.  On the other hand, Plaintiff made it clear he might need an extension beyond January 2 depending on how his dental work went.

69:12-20.)

It is true that there is a dispute between Plaintiff and Duval over whether Plaintiff obtained agreement from Duval, before Plaintiff departed, to cover Plaintiff's shifts while Plaintiff was away.  It is also true that a dispute exists between Plaintiff and Williams as to whether Williams was in a position to authorize, and did in fact authorize, Plaintiff's vacation.

However, there is no disagreement that Duval emphatically told Defendant's decision-makers, when they were considering Plaintiff's termination, that the arrangements certainly had not been made by Plaintiff with any specificity until after Plaintiff had left and presented them to Duval as a fait accompli.  There is also no disagreement that Williams told Defendant's decision-makers that he directed Plaintiff to Goodsell and Lasonde when Plaintiff sought permission to take his vacation from Williams in early December.

The record reflects no racial or other animosity against Plaintiff on the part of either Duval or Williams, and Defendant was entitled to believe them, accept their version of the incident, and take action against Plaintiff based on it.

(c)  Comparison with White Employees.

-34-

The only white employee Plaintiff can offer as an example of a person receiving more generous treatment than he enjoyed was Harris. The undisputed facts are that Harris received FMLA leave for an ill child, time off that Defendant was legally required to provide once she submitted the proper documentation. This evidence of record provides no help to Plaintiff's case.

In sum, on the undisputed facts of record, no reasonable jury could find that Defendant's articulated justification for its termination of Plaintiff -- i.e., Plaintiff's failure to comply with its written vacation protocol -- was a pretext for discrimination and that the termination was in fact motivated (even in part) by racially discriminatory animus. Given this, summary judgment for Defendant is required.

B.    Retaliation.

To set forth a retaliation claim under Chapter 151B, §4(4), a plaintiff must show that "(1) he engaged in conduct protected under Massachusetts or federal law; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse action." Sullivan v. Raytheon Co., 262 F.3d 41, 48 (1st Cir. 2001) (internal quotation marks and citation omitted), cert. denied, 534 U.S. 1118 (2002).

-35-

As to this cause of action, the record simply contains no colorable evidence. The only "protected conduct" engaged in by Plaintiff was his report in April 2002 to the QA manager of Harris' "Jamaican bimbo" remark. Nothing connects this complaint to Plaintiff's termination in December 2004. Moreover, the evidence of Harris' subsequent nitpicking, even if believed, does not constitute an "adverse employment action" for purposes of a retaliation claim. See MacCormack v. Boston Edison Co., 423 Mass. 652, 663 (1996) (affirming judgment notwithstanding the verdict based on employee's failure to introduce "evidence that he had been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment").

IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. No. 15) is hereby ALLOWED. The clerk will enter judgment for Defendant. This case may now be closed.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge